IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No: 08-80134 CIV-HURLEY/HOPKINS

FANE LOZMAN,

     Plaintiff,

vs.

CITY OF RIVERIA BEACH, a Florida
municipal corporation, MICHAEL
BROWN, an individual, GLORIA
SHUTTLESWORTH, an individual,
NORMA DUNCOMBE, an individual,
VANESSA LEE, an individual,
ELIZABETH WADE, an individual,
ANN ILES, an individual, and GEORGE
CARTER, an individual,

     Defendants.

_____

FILED by _____ D.C.

AUG 3 0 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

**PLAINTIFF'S MOTION FOR ABATEMENT OR, IN THE ALTERNATIVE,
MOTION FOR EXTENSION OF TIME, TO FILE WRITTEN OBJECTIONS TO
MAGISTRATE JAMES M. HOPKINS' JULY 25, 2012, AND AUGUST 21, 2012,
REPORTS AND RECOMMENDATION AS TO DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS (DOCKET ENTRIES 94 AND 102)**

Plaintiff Fane Lozman (Lozman) moves for an abatement to file his written

objections to Magistrate Hopkins' July 25, 2012 and August 21, 2012 reports and

recommendations.  Lozman requests an abatement until fourteen days after the United

States Supreme Court issues its opinion in *Lozman v. City of Riviera Beach, FL,* Case

1

#11-626.  In the alternative, if the District Court denies the abatement, Lozman requests an extension of time up to and including October 31, 2012.  In support of this motion, Lozman states:

1.  The undersigned will proceed *pro se* in this case against the Defendants if and until new counsel is retained to succeed Mr. Rob Bowling, who withdrew as counsel on July 30, 2012.  Bowling withdrew in response to the statements in the Magistrate's severely flawed report that Bowling had filed frivolous claims and had disregarded "numerous warnings" from the Court.  In his response, Lozman will demonstrate to the Court, in meticulous detail, that Magistrate Hopkins made multiple, critical errors in his reports, mixing up dates and events, and basing some of his conclusions on "facts" that do not exist or are not in the record.  For example, Magistrate Hopkins failed to either read or just pulled out of thin air his findings that Lozman's Fourth Amended State Counterclaim "asserted the 42 U.S.C. § 1983 constitutional and false arrest claims" (attached as exhibit 1 is Lozman's Fourth Amended State Counterclaim, DE 43-1, and exhibit 2 is page 3 of Magistrate Hopkins report, DE 94).  **To the contrary, Lozman's Fourth Amended State Counterclaim contains NO REFERENCE to 42 U.S.C. § 1983 constitutional or false arrest claims.**  The District Court should review these two attached exhibits to simply understand how flawed and nonsensical the Magistrate's reports are.  After review, the Court could confidently dismiss the Magistrate's recommendations and moot out Lozman's motion for

abatement, as there <u>was absolutely nothing "frivolous"</u> in Lozman's 1983 complaint that would merit an award of attorneys' fees.

2.      Lozman is unable to meet the current deadline, because a) he is attempting to find new counsel after Bowling's unexpected withdrawal, b) he had a pressing deadline to file a supplemental Letter Brief for Petitioner in his United State Supreme Court Case and c) Lozman has the significant task of preparing his legal team for oral argument that will take place on the first day of the United States Supreme Court's 2012 term, Monday, October 1, 2012.

3.      Historically, the United States Supreme Court reverses a significant majority of the cases in which it grants review[1].  On a very positive note, U.S. Solicitor General Donald B. Verrilli, Jr filed an amicus brief supporting Lozman and on August 13, 2012 the United States Supreme Court granted Solicitor General Verrilli's motion "to participate in oral argument as amicus curiae and for divided argument." (Attached as exhibit 3 is the August 13, 2012 United States Supreme Court order).   If Lozman does prevail in his appeal and the United States Supreme Court finds that Lozman's floating residential structure was not a vessel, the 11th Circuit opinion will be <u>vacated in its entirety</u>. Simply, the District Court that arrested Lozman's "non-vessel" did not have subject matter jurisdiction to do so.  As Lozman stated in his United States Supreme Court Reply Brief for Petition (attached as exhibit 4), page 17:

> "the venue provision, requiring any lawsuit to be governed by "the laws of the State of Florida," suggested that federal admiralty law did not apply to his home. J.A. 20. Footnote #8 -The City incorrectly suggests that after it invoked federal law to trump petitioner's state-court victory, petitioner bid for his home at the

---

[1] 72% reversal rate October Term 2010,  Scotusblog Stat Pack, June 28, 2011

U.S. Marshall auction.  Resp. Br. 13.  In truth, he never registered to bid.  The City outbid the public, foregoing the money it could have obtained at the sale in order to take ownership of the structure and destroy it.

4.      The general common-law rule governing the effect of reversal on a judgment is that, after reversal, "[the] decree [is] no longer of any force or effect. The parties [are] in precisely the same situation as though no decree had been entered." *Kaplan v. Joseph*, 125 F.2d 602, 606 (7th Cir.1942). See also *Keller v. Hall*, 111 F.2d 129, 131 (9th Cir.1940) (quoting *Butler v. Eaton*, 141 U.S. 240, 244, 11 S.Ct. 985, 35 L.Ed. 713 (1891)) (a judgment, "after it was reversed, was 'without any validity, force, or effect.' "). As Justice Story explained, "[a]t common law, if a plaintiff obtain a judgment in an inferior tribunal, which is reversed in the appellate court, it is very clear, that the reversal operates no further, than to nullify the original judgment. In other respects, the parties are precisely in the same situation, as to their rights and remedies touching the matter in controversy, as if no such judgment had ever existed." *Harvey v. Richards*, 11 F. Cas. 740, 745 (C.C.D.Mass.1814) (No. 6,182). Accordingly, when "the decision of the United States Circuit Court of Appeals [is] reversed by the Supreme Court .... the reversal of [the] decree sets aside the adjudication of such decree and same becomes no longer of any force and effect. After the reversal the situation [is] as if no decree had been entered by the Circuit Court of Appeals." *National Nut Co. of Cal. v. Kelling Nut Co.*, 61 F.Supp. 76, 80 (N.D.Ill.1945). See also 36 C.J.S. Federal Courts § 712 (1955 & Supp.2007) ("The effect of a general and unqualified reversal of

a judgment, order, or decree by [a reviewing court] is to nullify it completely and to leave the cause standing as if it had never been rendered [.]")

5.    This District Court should abate the deadline for Lozman to respond to the Magistrate's reports and recommendations until fourteen days after the United States Supreme Court issues its opinion in the Lozman case.  The District Court in this 1983 action based a finding that there was no retaliation in the arrest of Lozman's floating residential structure on the 11th Circuit admiralty opinion.  Given the historical odds that the 11th Circuit admiralty opinion will be vacated by the United States Supreme Court, why waste the judicial effort of this District Court, along with Lozman's time, by dealing with the current fee motion that would no longer be valid if the order it is based on is vacated?

For these reasons, Lozman respectfully requests that the Court grant Lozman's motion for an abatement to file his written objections to Magistrate's Hopkins' reports and recommendations up to and including two weeks after the United States Supreme Court issues its opinion in *Lozman v. The City of Riviera Beach, Fl.*

In the alternative if the Court denies the abatement, Lozman requests an extension of time up to and including October 31, 2012.

Dated: August 30, 2012

By: _____

Fane Lozman
*Pro Se*

Fane Lozman

2913 Ave. F

Riviera Beach, FL  33404

sp500trd@yahoo.com

(786) 251-5868

### CERTIFICATE OF SERVICE

The undersigned certifies that he has on this 30 day of August 2012 caused one copy of

the foregoing motion to be served on the below-named counsel by U.S. mail, postage prepaid.

Benjamin L. Bedard, Esquire
Roberts, Reynolds, Bedard & Tuzzio, P.A.
470 Columbia Drive, Suite 101C
West Palm Beach, Florida  33409
Telephone:  561-688-6560
Facsimile:  561-688-2343
Email:  bbedard@rrbpa.com
Attorneys for City of Riviera Beach


Jeffrey M. Bell, Esquire
Bell & Melamed, LLC
4901 NW 17th Way, Suite 302
Fort Lauderdale, Florida  33309
Telephone:    954-489-2331
Facsimile:     954-489-2332
Email:   jbell@bellmelamedlaw.com
Attorneys for Defendants Ann Iles,
Elizabeth Wade, George Carter,
Gloria Shuttlesworth, Michael Brown,
Norma Duncombe and Vanessa Lee

_____

Fane Lozman

6

EXHIBIT 1

RECEIVED 07/01/2008 16:28   5615882343          ROBERTS REYNOLDS
Jul 01 2008 4:24PM   COBB COLE                   3862585060            p. 1

IN THE CIRCUIT COURT, FIFTEENTH
JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO    50 2006 CA 014054
XXXX MB

CITY OF RIVIERA BEACH,

    Plaintiff,

v

FANE LOZMAN,

    Defendant.

---

### DEFENDANT'S, FANE LOZMAN, FOURTH AMENDED COUNTER-CLAIM

    Defendant/Counter-Plaintiff, FANE LOZMAN (LOZMAN), by and through his undersigned counsel, sues the Plaintiff/Counter-Defendant, CITY OF RIVIERA BEACH ("CITY"), and states as follows:

    1    This is an action for damages in excess of $15,000, exclusive of attorneys fees, costs and interest

    2.    LOZMAN is the owner of a floating home located at 200 East 13th Street, Marina Slip # 452 Riviera Beach, Florida, and occupies it as his primary residence. A Declaration of Homestead affirming his floating home as his primary residence is recorded with the Clerk of the Circuit Court, Office of the County Recorder, Palm Beach County, Florida

    3.    The Plaintiff/Counter-Defendant, CITY, operates a marina located at 200 East 13th Street, Riviera Beach, Florida (the "Marina")  CITY leases slips for use by floating homes and vessels for residential and non-residential purposes


DEFENDANT'S
EXHIBIT
A

RECEIVED  07/01/2008 16:28   5616802343          ROBERTS REYNOLDS
Jul 01 2008 4:24PM   COBB COLE                3862585068          P.2

4.    LOZMAN moored his floating home at the Marina on or about March 19, 2006. LOZMAN paid, and continues to pay, a rental charge for the slip that his floating home occupies. A copy of the Riviera Beach Municipal Marina Agreement is attached hereto as Exhibit A.

5    Shortly after relocating his floating home to the Marina, LOZMAN became aware that a multi-billion dollar re-development was planned for Riviera Beach. This re-development plan prompted public outrage and opposition because it proposed the taking of thousands of homes and businesses through the power of eminent domain. These properties would then be re-developed by the master developer into new residential and commercial properties.

6.    LOZMAN made public comments alleging acts of corruption by Riviera Beach mayor, Michael Brown (Brown) that were made at various Riviera Beach City Council and CRA public meetings during the time period after LOZMAN began residing at the Marina up until August 2006, as more fully set forth herein

7    On May 10, 2006, police escorted LOZMAN from a regularly scheduled meeting of the CITY while he was addressing the City Council from the podium during the public comments portion of the meeting.

8.    After this meeting, there was a special meeting of the Riviera Beach City Council. LOZMAN was denied access into this meeting

9    On June 7, 2006 LOZMAN filed a lawsuit against the CITY, Mayor Brown, Council Members Jim Jackson (Jackson), Norma Duncombe (Duncombe), Vanessa Lee (Lee), Elizabeth Wade (Wade), and Ann Iles (Iles), alleging a violation of the State of Florida Sunshine Law. *Lozman v. City of Riviera Beach, et al*, Case No. 50 2006 005632XXXXMB.

10    On June 28, 2006, CITY held a scheduled closed executive session. This meeting was recorded and the transcript of this proceeding has now been made a public record   At this

2

RECEIVED 07/01/2008 16:20   5516882343           ROBERTS REYNOLDS
Jul 01 2008 4:24PM   COBB COLE                 3862585068                    p. 3

meeting, CITY officials discussed defense of the Sunshine lawsuit brought by LOZMAN and the need to do "whatever we deem necessary" in the defense of that suit, including "background investigation on Lozman" and the hiring of a private investigator to determine who was "funding" the Sunshine suit. In addition, CITY wanted to investigate LOZMAN to determine whether he was connected with an entity called the Pacific Foundation, the governor, the Attorney General's office, the legislature and local citizens who CITY perceived as being opposed to the proposed re-development by CITY

11.   LOZMAN owns a small dachshund dog that he keeps with him on his floating home. Other residents at the Marina also own animals.

12.   LOZMAN received a letter dated August 9th, 2006 from Marina Director George Carter stating that LOZMAN was in violation of the Riviera Beach Municipal Marina Agreement and its rules and regulations for walking his dog without a muzzle. The letter stated that although LOZMAN's dog had not bitten anyone, that LOZMAN had until August 31, 2006 to vacate the Marina.

13.   LOZMAN requested a copy of any city regulation or ordinance requiring dogs to be muzzled while being walked in public. LOZMAN was informed that that the only applicable regulation or ordinance was that a dog must be walked with a leash. There is no city rule or regulation regarding the muzzling of a dog.

14.   The CITY did not have an animal control officer. When an issue would arise with a dangerous animal, CITY would contact Palm Beach Animal Control. Marina Dockmaster David Napier had contacted Palm Beach Animal Control on other occasions when he had a problem with dogs.

{041231-001 : RBOWL/RBOWL : 00586561.DOC; 1}

3

RECEIVED  07/01/2008 16:28   5616082343          ROBERTS REYNOLDS
Jul 01 2008 4:24PM   COBB COLE                    3862585068              p.4

15      Despite the CITY's representations and accusations regarding LOZMAN's dog,
no one from the CITY or the Marina ever contacted Palm Beach Animal Control with a
complaint.

16.     Neither CITY nor the Marina ever alleged or notified LOZMAN that he was in
violation of the ordinance regarding leashing animals

17      The Marina Rules and Regulations as set forth in exhibit B of Plaintiff's eviction
complaint did not exist prior to August 2006  A public records request in July 2006 for the
Marina Rules and Regulations yielded only those contained in the Riviera Beach Municipal
Marina Agreement.  The agreement makes no provision for muzzling of animals.

18.     During this same time period, LOZMAN was visited by the Riviera Beach Police
more than fifteen (15) times at the behest of the Marina Director and employees that directly
reported to him   Upon information and belief, these employees were following the Marina
Director's direction that anytime LOZMAN walked his dog without a muzzle, that the police
should be contacted.

19      During this time LOZMAN was also making repairs to his floating home or
houseboat.  Other owners who reside at the Marina wither had been, or were presently making
repairs to their vessels or houseboats

20.     The Marina Director singled out LOZMAN and told him that he could not make
repairs to his floating home or houseboat.

21.     Assistant Riviera Beach Police Chief David Harris was called by the Marina
Director for the purpose of arresting LOZMAN based upon the Marina Director's directive
However, LOZMAN received permission to repair his boat prior to Tropical Storm Ernesto
arriving.

{041231-001 : RHOWL/RHOWL  00586561 DOC: 1}

4

RECEIVED  07/01/2008 16:29   5616982343          ROBERTS REYNOLDS
Jul 01 2008 4:24PM   COBB COLE                3062585068              p.5

22.     Thereafter, LOZMAN had a contract with a licensed building contractor who had the proper insurance to make repairs to LOZMAN's houseboat.  During the month of August 2006, LOZMAN had a crewmember on his boat, Jonathan Gryder (Gryder).

23.     The Marina Director George Carter contacted the Riviera Beach Police and asked that the Police issue a trespass warning against Gryder.  For eight (8) days Gryder was denied access to the Marina by the Riviera Beach Police.  After eight (8) days the Police Chief Clarence Williams and Assistant Police Chief Harris decided that they did not have the authority to bar a crewmember from coming on LOZMAN's houseboat.

24.     LOZMAN's houseboat suffered damage to its interior, including but not limited to damage to the drywall, as a result of LOZMAN being unable to make repairs to the houseboat roof when his crewmember, Gryder, was refused permission into the Marina and into LOZMAN's houseboat.

25.     On or about September 11, 2006, CITY filed an eviction action against LOZMAN.  On or about March 2, 2007, after a jury trial on CITY's possession/eviction count, a jury returned a verdict in favor of LOZMAN finding that the greater weight of the evidence showed that LOZMAN's exercise of protected speech was a substantial or motivating factor in CITY's decision to terminate LOZMAN's lease, and that CITY would not have reached the same decision in the absence of the protected speech.

## COUNT I
## BREACH OF CONTRACT

26.     LOZMAN re-alleges and re-incorporates the allegations contained in paragraphs 1-25, as through as though fully set forth herein.

{041231-001 : RBOWL/RBOWL : 00586561 DOC; 1}

5

RECEIVED 07/01/2008 16:28   5616882343          ROBERTS REYNOLDS
Jul 01 2008 4:24PM    COBB COLE            3062585068              p.8

27.     LOZMAN and CITY are parties to the Riviera Beach Municipal Marina Agreement (the "Agreement").

28.     CITY, as landlord, breached the Agreement as well as the implied covenant of peaceful possession and quiet enjoyment in the Agreement by, inter alia, refusing to allow Gryder access to LOZMAN's houseboat to make repairs. This refusal was either unreasonable and/or arbitrary.

29.     As a result of said breach, LOZMAN has suffered damages to his property, as more specifically set forth in paragraph 24, to wit, damage to LOZMAN'S houseboat.

30.     All conditions precedent to this action have occurred or have been waived.

WHEREFORE, LOZMAN demands judgment for damages, interest, and costs, and any other such relief that this Court deems just and proper.

## COUNT II

### VIOLATION OF § 768.295, Florida Statutes (2007)

31.     LOZMAN re-alleges and re-incorporates the allegations contained in paragraphs 1-25, as through as though fully set forth herein.

32.     Section 768.295, Florida Statutes (2007) is known as the Citizen Participation in Government Act (the "Act")  § 768.295(1)  This section states that it is the public policy of the State of Florida that "government entities not engage in [Strategic Lawsuits Against Public Participation] SLAPP suits because such actions are inconsistent with the right of individuals to participate in the state's institutions of government."  Id. at 768.295(2).  The term governmental entity includes "municipalities."  § 768.295(3).

33.     Under the Act, governmental entities are prohibited from filing any lawsuit, cause of action or claim, against a person or entity that is "without merit and solely because such

RECEIVED 07/01/2008 16:28   5616882343   ROBERTS REYNOLDS
Jul 01 2008 4:24PM   COBB COLE   3062585060   P.7

person or entity has exercised the right to peacefully assemble, the right to instruct representatives, and the right to petition for redress of grievances before the various governmental entities of this state, as protected by the First Amendment of the United States Constitution and s. 5, Art. I of the State Constitution." § 768 295(4).

34.   A person or entity sued by a governmental entity in violation of § 768.295 may award "actual damages arising from the governmental entity's violation" of the Act.   § 768.295(5)   The court shall award reasonable attorney's fees to a person prevailing on such a claim

35   The CITY's eviction action was without merit and was solely based upon LOZMAN's exercise of his rights secured under the First Amendment of the United States Constitution and s. 5, Art. I of the State Constitution, including the right to instruct representatives and the right to petition for redress of grievances.

36.   LOZMAN's actions and comments at CITY meetings, as well as his Sunshine suit, fall within the ambit of the proscribed acts in §768.295(4)

37.   As a result of CITY's violation of the Act, to wit, the filing of an eviction solely because LOZMAN exercised protected rights under §768.295(4), Fla Stat, LOZMAN has suffered "actual damages," which includes mental pain and suffering and damage to reputation. Although not defined in the Act, Florida courts have interpreted "actual damages" to mean "compensatory" damages, which includes the type of damages suffered by LOZMAN.

38.   All conditions precedent to this action have occurred or have been waived

39.   LOZMAN has retained the undersigned to represent him in this action and has agreed to pay the undersigned a reasonable fee for his services

{041231-00} : RHOW1/RHOW1 : 00386561 DOC; 1}

7

RECEIVED 07/01/2008 16:28   5616882343          ROBERTS REYNOLDS
Jul 01 2008 4:24PM   COBB COLE                   3862585068              P.8

WHEREFORE, LOZMAN demands judgment for his actual damages, interest, costs and attorney's fees as provided for in the Act, and any other such relief as this Court may deem just and proper.

Cobb Cole

By: _____

ROBERT T. BOWLING
FLA. BAR NO. 175935
JONATHAN D. KANEY JR.
FLA. BAR NO. 0115251
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone: (386) 255-8171
Facsimile: (386) 248-0323
ATTORNEYS FOR
DEFENDANT/COUNTER-PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished via U.S. Mail to: BENJAMIN L. BEDARD, ESQUIRE, 470 Columbia Drive, Bldg. G101, West Palm Beach, FL 33409, this 1st day of July, 2008.

_____
Attorney

{011231-001 : RBOWL/RBOWL : 00586561.DOC; 1}          8

EXHIBIT 2

responses to the Order (DE 33, 34), the District Court issued an Order of Stay and Administrative

Close Out under the *Younger* abstention doctrine, stating that the Court must abstain from

continuing the instant action until the Parallel State Court Case had reached final adjudication,

since the issues raised in the instant case went "to the heart of [Plaintiff's] counterclaim" in the

City's state court eviction action. (DE 39).

The Parallel State Court Case concluded on August 9, 2010, with Plaintiff's Fourth

Amended Counter-Claim, which asserted the 42 U.S.C. § 1983 constitutional and false arrest

claims, dismissed with prejudice.

On October 27, 2010, Plaintiff filed a Motion to Re-Open the Case and lift the stay in the

instant case since the Parallel State Court Case had concluded. (DE 40). The District Court

denied Plaintiff's motion without prejudice, requiring the Plaintiff to file an amended complaint

with only the claims that "survive[d] the final disposition of the parallel state court proceedings."

(DE 41). On November 8, 2010, Plaintiff filed a Renewed Motion to Re-Open Case, limiting the

claims to only those that remain following the Parallel State Court Case. (DE 42).

On December 29, 2010, the District Court entered an Order lifting the stay and re-opening

the case. (DE 46). On January 13, 2011, Defendants filed Motions to Dismiss the Amended

Complaint, based on principles of *res judicata*. (DE 53, 54). On May 3, 2011, the District Court

entered an Order Granting in Part and Denying in Part the Defendants' Motions to Dismiss,

holding that only claims which pre-dated the filing of the last counter-claim in the Parallel State

Court Case were precluded. (DE 63). The Admiralty Case, wherein Plaintiff raised a new First

Amendment claim, was filed in April of 2009 and thus post-dated the last counter-claim in the

Parallel State Court Case. Because Plaintiff's appeal of the Admiralty Case to the Eleventh

# EXHIBIT 3

(ORDER LIST: 567 U.S.)

MONDAY, AUGUST 13, 2012

ORDERS IN PENDING CASES

11A857      REWANWAR, PRASAD D. V. WISCONSIN SUPREME COURT, ET AL.

            The application for stay addressed to The Chief Justice and

            referred to the Court is denied.

11A900      JOHNSON, GEORGE D. V. MISSISSIPPI

            The application for a certificate of appealability addressed

            to Justice Sotomayor and referred to the Court is denied.

11A952      HOLSTON, REGINALD L. V. TUCKER, SEC., FL DOC
(11-10740)
            The application for bail addressed to Justice Kagan and

            referred to the Court is denied.

11A1155     COX, JON M. V. GILSON, WARDEN

            The application for a certificate of appealability addressed

            to Justice Sotomayor and referred to the Court is denied.

12A15       COULTER, JEAN E. V. KELLY, ATT'Y GEN. OF PA, ET AL.
(12-20)
            The application for bail addressed to Justice Ginsburg and

            referred to the Court is denied.

10-930      RYAN, DIR., AZ DOC V. GONZALES, ERNEST V.

11-218      TIBBALS, WARDEN V. CARTER, SEAN

11-626      LOZMAN, FANE V. RIVIERA BEACH, FL

            The motions of the Solicitor General for leave to

            participate in oral argument as *amicus curiae* and for divided

            argument are granted.

11-1085     AMGEN INC., ET AL. V. CONNECTICUT RETIREMENT PLANS

            The motion of petitioners to dispense with printing the

1

EXHIBIT 4

No. 11-626

In The

# Supreme Court of the United States

---

Fane Lozman,

*Petitioner,*

v.

The City of Riviera Beach, Florida,

*Respondent.*

---

On a Writ of Certiorari
to the United States Court of Appeals
for the Eleventh Circuit

---

## REPLY BRIEF FOR PETITIONER

---

Edward M. Mullins
Annette C. Escobar
Astigarraga Davis Mullins
  & Grossman, LLP
701 Brickell Avenue,
  16th Floor
Miami, FL 33131

Robert Taylor Bowling
Cobb Cole
150 Magnolia Avenue
Daytona Beach, FL 32114

Philip J. Nathanson
The Nathanson Law Firm
120 North LaSalle
Suite 2600
Chicago, IL  60602

Jeffrey L. Fisher
  *Counsel of Record*
Stanford Law School
  Supreme Court
  Litigation Clinic
559 Nathan Abbott Way
Stanford, CA 94305
(650) 724-7081
jlfisher@law.stanford.edu

Kerri L. Barsh
Greenberg Traurig
333 Avenue of the
  Americas, 44th Floor
Miami, FL 33131

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ ii

REPLY BRIEF FOR PETITIONER ............................ 1

ARGUMENT ................................................................ 2

I.   This Court Should Reaffirm That The
     Purposive Test Controls Whether A Floating
     Structure Is Practically Capable Of Maritime
     Transportation ........................................................ 2

     A.   The Purposive Test Is Well-Grounded In
          Law And Has Worked For Over A
          Century ............................................................ 3

     B.   The City's Proposed Method For
          Assessing Vessel Status Lacks Legal
          Foundation And Would Be Unduly
          Manipulable .................................................. 10

II.  The Purposive Test Dictates That Petitioner's
     Floating Home Was Not A Vessel ...................... 15

CONCLUSION ........................................................... 20

ii

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Cas. & Sur. Co. v. Hillman*, 796 F.2d 770
(5th Cir. 1986)....................................................... 19

*Bennett v. Perini Corp.*, 510 F.2d 114 (1st Cir.
1975)...................................................................... 5

*Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671 (1st
Cir. 1992) ............................................................. 16

*Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625
(1887) ......................................................... 5, 12, 13

*Data Disc, Inc. v. Sys. Techn. Assocs., Inc.*,
557 F.2d 1280 (9th Cir. 1977)............................ 16

*Evansville & Bowling Green Packet Co. v.
Chero Cola Bottling Co.*,
271 U.S. 19 (1926) ........................................passim

*Great Lakes Dredge & Dock Co. v. City of
Chicago*, 3 F.3d 225 (7th Cir. 1993), *aff'd*,
513 U.S. 527 (1995) .............................................. 6

*Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934
(7th Cir. 2004)....................................................... 9

*Hayford v. Doussony*, 32 F.2d 605 (5th Cir.
1929)....................................................................... 7

*Hercules Co. v. The Brigadier General Absolom
Baird*, 214 F.2d 66 (3rd Cir. 1954)...................... 6

*Holloway v. United States*, 526 U.S. 1 (1999) ........ 15

*Jerome B. Grubart, Inc. v. Great Lakes Dredge
& Dock Co.*, 513 U.S. 527 (1995).......................... 6

iii

*Kathriner v. UNISEA, Inc.*, 975 F.2d 657 (9th Cir. 1992) ........................................................... 12

*McCreary Cnty. v. ACLU*, 545 U.S. 844 (2005)........ 9

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337 (1991) ........................................... 14

*Miami River Boat Yard, Inc. v. 60' Houseboat Serial #SC-40-2860-3-62*, 390 F.2d 596 (5th Cir. 1968) ........................................................... 17

*Michigan v. Bryant*, 131 S. Ct. 1143 (2011) ............. 9

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989) ............................................. 19

*Nickerson v. C.I.R.*, 700 F.2d 402 (7th Cir. 1983).................................................................... 10

*Pavone v. Miss. Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995) .......................... 13, 19

*Perry v. Haines*, 191 U.S. 17 (1903).................. 1, 4, 8

*Rogers v. A Scow Without a Name*, 80 F. 736 (E.D.N.Y. 1897) ................................. 6, 7

*Roper v. United States*, 368 U.S. 20 (1961) ...................................................... 5, 12, 19

*Ruddiman v. A Scow Platform*, 38 F. 158 (S.D.N.Y. 1889) .................................................. 13

*Stewart v. Dutra Constr. Co.*, 543 U.S. 481 (2005) ........................................................passim

*The Ark*, 17 F.2d 446 (S.D. Fla. 1926) ...................... 6

*The Jack-O-Lantern*, 258 U.S. 96 (1922).................. 5

*The Scorpio*, 181 F.2d 356 (5th Cir. 1950)................ 3

*The Showboat*, 47 F.2d 286 (D. Mass. 1930) ........ 6, 7

iv

*Thomson v. Gaskill*, 315 U.S. 442 (1942) .............. 16

*Tonnesen v. Yonkers Contracting Co.,*
    82 F.3d 30 (2nd Cir. 1996) ................................. 6

*Warren v. Fairfax Cnty.*, 196 F.3d 186 (4th Cir.
    1999)..................................................................... 9

*Woodruff v. One Covered Scow,*
    30 F. 269 (E.D.N.Y. 1887) ................. 7, 13, 17, 18

## CONSTITUTIONAL PROVISION

U.S. Const., amend. I.................................................. 9

## STATUTES AND REGULATIONS

1 U.S.C. § 3.....................................................passim

18 U.S.C. § 2311....................................................... 4

49 U.S.C. § 13102(25) ............................................. 4

Cal. Health & Safety Code § 18075.55(d).............. 18

## REPLY BRIEF FOR PETITIONER

It is common ground between the parties – and has long been the law – that a structure is a "vessel" if it is "practically capable of maritime transportation." *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 497 (2005); *see also Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 22 (1926) ("practically capable"); Petr. Br. 27-28, 31; Resp. Br. 16. The City thus does not distinguish itself from petitioner, or advance the ball in terms of the question presented, insofar as it propounds a "practical capability" rule for vessel status. This case turns on *how to assess* such "practical capabil[ity]."

Petitioner asks this Court to adhere to the test it announced over a century ago and that it has applied in practice for nearly one hundred and fifty years: a floating structure is practically capable of maritime transportation if "*the purpose* for which the craft was constructed, and the business in which it is engaged" is moving people or things over water. *Perry v. Haines*, 191 U.S. 17, 30 (1903) (emphasis added); *see also* Petr. Br. 12-14, 25-30 (discussing other cases). The City, on the other hand, contends (like the Eleventh Circuit) that this Court's decision in *Stewart sub silentio* "rejected" the longstanding purposive test. Resp. Br. 24; *see also* Pet. App. 16a, 19a. Even though there was no need in *Stewart* to coin a new test for vessel status, the City argues that *Stewart* expanded the definition of the word "vessel" to cover the "broader" category of most anything that floats and that is not securely moored to shore with some unspecified degree of firmness. Resp. Br. 20.

This Court should turn aside the City's request to dramatically expand maritime jurisdiction. The

2

purposive test has been followed not only by this Court, but also by lower courts and espoused by maritime treatises, for over a century. It is fully consistent with *Stewart*. And it has long produced consistent and sensible results. Respondent's new formula, by contrast, contravenes well-settled principles of statutory interpretation, finds no support in precedent, and would open the door to artificial manipulations of maritime coverage.

Applying the purposive test to the facts here makes clear that the district court erred in assuming jurisdiction and granting summary judgment for the City. The purpose of petitioner's floating home was to serve as a stationary residence that functioned as an extension of land. Neither the fact that it had been towed and repositioned a few times over the years nor that it was secured by ropes instead of chains altered that purpose or otherwise rendered the indefinitely moored home a vessel.

## ARGUMENT

### I. This Court Should Reaffirm That The Purposive Test Controls Whether A Floating Structure Is Practically Capable Of Maritime Transportation.

This case provides no reason for this Court to change the basic test for determining "practical capability" of maritime transport. The purposive test this Court adopted over a century ago is firmly grounded in law and has worked well. The City's alternative test – which covers most anything that floats and then exempts items moored to shore to some unspecified degree – lacks legal pedigree and would raise serious administrability concerns.

3

## A. The Purposive Test Is Well-Grounded In Law And Has Worked For Over A Century.

The City contends that the purposive approach contradicts the text of 1 U.S.C. § 3, misreads precedent, and is unworkable. None of these criticisms has merit.

1. The purposive test comports with the text of Section 3. As petitioner has explained, the word "capable" often connotes an object's suitability or fitness for performing a certain function. Petr. Br. 20. Such is the case here. The word "capable" in Section 3 asks whether one of an object's purposes is moving people or things over water.

Contrary to the City's suggestion (Resp. Br. 19), this definition gives the "capability" prong of Section 3 independent meaning from the "use" prong. If a busy lawyer in a coastal area purchases a sailboat intending to use it for weekend excursions but never has time to set sail, the sailboat is still a vessel, even though it is continuously moored at the local marina and is never used for maritime transportation. *See, e.g., The Scorpio,* 181 F.2d 356, 358-59 (5th Cir. 1950). The "capable of" prong of Section 3, in short, ensures that watercraft designed to move people or things over water do not pass in and out of maritime jurisdiction depending on a "snapshot" of whether they are actually in use at any particular time. *See Stewart,* 543 U.S. at 494-95.[1]

_____

[1] Neither of the other statutes the City cites is helpful in construing Section 3. *See* Resp. Br. 22-23. The definitional section of the criminal code, 18 U.S.C. § 2311, uses the phrase

4

2.  Any uncertainty generated by the text of Section 3 standing alone is quickly dispelled by the precedent and tradition dictating that a structure's purpose determines whether it is practically capable of moving people or things over water.   Indeed, petitioner is at a loss to understand the City's suggestion (Resp. Br. 40-41) that this Court has never adopted the purposive test.

As noted at the outset of this brief, this Court explained in 1903 that the question of vessel status "regards only [whether] *the purpose* for which the craft was constructed, and the business in which it is engaged" is moving people or things over water. *Perry v. Haines*, 191 U.S. 17, 30 (1903) (emphasis added).   Every decision before or since has applied that test and has excluded from vessel status those structures whose purpose is not moving people or things over water.   *See Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625 (1887) (repeatedly stating that the "purpose" of a structure determines vessel status and concluding that a dry-dock was not a vessel because it was "not used for the purpose" of maritime transportation); *Evansville & Bowling Green Packet*

---

"designed for" where Section 3 uses the term "capable of," but gives no hint that Congress intended the two phrases to be anything other than interchangeable.   The definition in 49 U.S.C. § 13102(25) includes the phrase "or is intended to be used" on top of the language in Section 3.   That language encompasses objects whose purpose is not maritime transportation but whose owners nonetheless use them for that purpose – the very category of objects the City claims is already encompassed in the phrase "capable of" and thus would be superfluous if the City's construction of "capable of" were correct.

5

*Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 21-22 (1926) (holding that a wharfboat that was towed numerous times was not "practically capable" of maritime transport because its "function" was "storage and handling" of items, "not . . . to carry freight from one place to another"); *Roper v. United States*, 368 U.S. 20, 21-23 (1961) (floating warehouse that was repeatedly towed was not a vessel because it was "withdrawn from navigation"; "its function [was] storing grain until needed" and "was not moved in order to transport commodities from one location to another").[2]  Federal courts of appeals and authors of maritime treatises likewise have long taken the purposive test as settled law.[3]

---

[2] The City suggests that this Court's decision in *The Jack-O-Lantern*, 258 U.S. 96 (1922), "bestowed vessel status on [a] craft[] that had [a] non-transportation purpose[]." Resp. Br. 38. But the craft there was "a steamer" with a working "engine and boilers," and "propeller[s]." *Jack-O-Lantern*, 258 U.S. at 98-99. It is hardly surprising, therefore, that no one disputed it was a vessel.

[3] *See* Pet. Br. 22, 25-26 (quoting test from Benedict's 1870 treatise and modern treatises that tracks *Perry*'s test practically verbatim); *see also, e.g., Bennett v. Perini Corp.*, 510 F.2d 114, 116 (1st Cir. 1975) ("To be a vessel, the purpose and business must to some reasonable degree be the transportation of passengers, cargo, or equipment from place to place across navigable waters.") (internal quotation marks omitted); *Tonnesen v. Yonkers Contracting Co.*, 82 F.3d 30, 36 (2nd Cir. 1996) ("[T]he important factor" in determining vessel status "is the purpose for which the structure is presently being used – e.g., transportation, construction, etc."); *Hercules Co. v. The Brigadier General Absolom Baird*, 214 F.2d 66, 69 (3rd Cir. 1954) ("[T]he purpose and business of the craft or use for which she is intended . . . are the factors which determine whether there is admiralty jurisdiction."); *Great Lakes Dredge & Dock*

6

Furthermore, even the City acknowledges that general maritime courts around the time Section 3 was enacted employed the purposive test. Resp. Br. 38; *see also* Petr. Br. 22-24. The City, of course, also asserts that a few cases followed a different path. Resp. Br. at 38-39 (citing *Rogers v. A Scow Without a Name*, 80 F. 736 (E.D.N.Y. 1897); *The Ark*, 17 F.2d 446 (S.D. Fla. 1926); and *The Showboat*, 47 F.2d 286 (D. Mass. 1930)). But none of those cases deviated from the purposive test.

The structure at issue in *Rogers* was seemingly an ordinary "house boat," which was so obviously a vessel – and so obviously different than a "floating home" – that the court spent only one sentence on the issue. 80 F. at 736; *see also* Petr. Br. 2 (distinguishing "houseboats" from "floating homes"); *infra* at 16-17 (same). Indeed, the same judge held in another case that a floating home nearly identical to petitioner's was not a vessel because it was not "employed in the transportation of freight or passengers from place to place upon water." *Woodruff v. One Covered Scow*, 30 F. 269, 270 (E.D.N.Y. 1887).[4] The "amusement vessel[]" in *The*

_____

*Co. v. City of Chicago*, 3 F.3d 225, 229 (7th Cir. 1993) ("[A] craft is a 'vessel' if its purpose is to some reasonable degree the transportation of passengers, cargo, or equipment from place to place across navigable waters.") (internal quotation marks omitted), *aff'd sub nom.*, *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).

[4] The "Judge Benedict" who the City notes (Resp. Br. 38) authored *Rogers* and *Woodruff* was a different person than Erastus Cornelius Benedict, who wrote the leading treatise of the time on admiralty law. *See* http://www.fjc.gov/servlet/nGetInfo?jid=154&cid=999&ctype=na&instate=na.

7

*Showboat* was "a five-masted schooner" with "a crew consisting of a licensed master or mate and two or three seaman." 47 F.2d at 287. Noting that this ship remained a vessel even when its owners lacked any "*present* intention" to sail, *id.* (emphasis added), the court rejected a "snapshot" test, not the purposive test. Indeed, the court accepted and distinguished another case holding that a similar structure was *not* a vessel because it "was not used, *or intended to be used,* to carry freight or passengers from one place to another." *Hayford v. Doussony*, 32 F.2d 605 (5th Cir. 1929) (emphasis added), *cited in Showboat*, 47 F.2d at 287. Finally, the court in *The Ark* held that the "boat" at issue there, which was being used at the time as a "floating supper club and dance hall," was a vessel because it had been only "*temporarily* withdrawn from commerce." 17 F.2d at 447-48 (emphasis added). Once again, this decision simply rejected a "snapshot" argument, not the purposive test.

That leaves the City's reliance on *Stewart.* According to the City, *Stewart sub silentio* "rejected" *Perry's* purposive test. Resp. Br. 24. But *Stewart* did nothing of the sort. It reaffirmed this Court's prior cases that employed the purposive test and its "withdrawn from navigation" corollary. *See* 543 U.S. at 493-94, 496. The *Stewart* Court also stressed that the statutory term "vessel" should continue to be construed "in light of the term's established meaning in general maritime law," *id.* at 492, and it used the phrase "capable of" interchangeably with "function," *id.* at 495. *Stewart* thus reinforced that while Section 3 "does not require that a watercraft be used *primarily* for th[e] purpose" of transportation on water, a structure must have a "function" of carrying

8

people or things over water in order to be a vessel.
543 U.S. at 492, 495 (emphasis in original).

3. Finally, the City attacks the administrability
of the purposive test on three grounds. None is
persuasive.

First, the City claims to be "confused" concerning
exactly what approach to "practical capability"
petitioner advocates and suggests that courts would
share its confusion. Resp. Br. 31. Let petitioner be
clear: his position is that this Court should continue
to employ the purposive test articulated in *Perry* and
applied in all of this Court's other cases. *See also*
Petr. Br. 12, 25-26. Maritime treatises and lower
courts have followed this test for almost one hundred
and fifty years, *see id.*, and it has never before
generated trouble.

Second, the City contends that the purposive test
is problematic insofar as it depends on "an owner's
subjective intent." Resp. Br. 32-33. But the
purposive test does not turn on any such intent. To
the contrary, petitioner and the Government agree
that the purposive test turns on an objective
assessment of a structure's function. Petr. Br. 22 n.8;
Gvt. Br. 24. The City's objection thus has no bearing
on this case.[5]

---

[5] The objective nature of the purposive test also disposes of
the vast majority of the concerns of amici that have filed briefs
on the City's side of the case, which are all premised on an
aversion to a subjective inquiry for vessel status. *See* Br. of
United Bhd. of Carpenters and Joiners of Am. at 3; Br. of Mar.
Law Ass'n at 11-14; Br. of Thirty-Six Admiralty and Mar. Law
Professors at 15-24; Br. of Marine Bankers Ass'n at 9-19. The
Maritime Law Association's related suggestion (at 21-24) that

9

Third, the City asserts that a rule turning on a structure's objective purpose is difficult to apply. Resp. Br. 34-36. The short answer is that the past century-plus of applying the purposive test demonstrates otherwise. At any rate, tests dependent on objective purposes abound across numerous areas of the law. *See, e.g., Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011) (Confrontation Clause's application turns on objective purpose of police interrogation); *McCreary Cnty. v. ACLU*, 545 U.S. 844, 862 (2005) ("[t]he eyes that look to purpose" to determine the legality of a law respecting religion "belong to an objective observer") (internal quotation marks omitted); *Warren v. Fairfax Cnty.*, 196 F.3d 186, 191 (4th Cir. 1999) (test for public forum under First Amendment depends on the forum's objective purpose); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 950 (7th Cir. 2004) (Clean Water Act's application depends on objective purpose of discharges); *Nickerson v. C.I.R.*, 700 F.2d 402, 404 (7th Cir. 1983) (objective purpose determines whether taxpayer's enterprise was profit or pleasure). Such tests are effective because they generate predictable outcomes based on the innate natures of things.

---

commercial lenders could be prejudiced if certain "dead ships" with ship mortgages are treated as non-vessels substantially underestimates the prudence of commercial lenders. For such loans, lenders ordinarily require borrowers to grant a ship mortgage *and* a real estate mortgage, *as well as* a UCC security interest (in case the property is deemed neither real estate nor a vessel, but merely personal property).

10

The City offers no persuasive reason why a purpose-based test is uniquely ill-suited to maritime jurisdictional inquiries. For the most part, floating structures either have a function of conveying people or things over water or they are intended to sit still (save perhaps incidental relocations). It is not hard to say which is which. Indeed, as the United States explains, numerous maritime doctrines themselves depend on assessing a vessel's purpose or function. Gvt. Br. 22-23.

### B. The City's Proposed Method For Assessing Vessel Status Lacks Legal Foundation And Would Be Unduly Manipulable.

Like the Eleventh Circuit (*see* Pet. App. 16a, 19a), the City contends that purpose has nothing to do with vessel status. Advancing the broadest possible definition of the word "capable," the City emphasizes that "many objects are 'capable' of being used for purposes other than those for which they [a]re intended," and asks this Court to confer vessel status on objects based purely on what their "physical attributes" would allow to occur. Resp. Br. 20-21.

Yet faced with this Court's repeated holdings that structures that were towed across water were not vessels, the City does not defend the Eleventh Circuit's rule that anything that floats and can be towed across water is a vessel, Pet. App. 18a, 21a. Instead, the City contends that "*most* structures that are afloat" and "have the capacity to be towed across the water will qualify as vessels." Resp. Br. 29-30 (emphasis added) (internal quotation marks, alterations, and citation omitted). The City then offers the two qualifications implicit in its word

11

"most": (1) objects that "can[not] carry cargo or persons" are not vessels and (2) objects that are "immobilized by some substantial (and difficult to remove) physical restraint" are not vessels. *Id.* at 26, 29.

The City's more complicated alternative to the purpose test fares no better than the Eleventh Circuit's. The first purported restriction is really no restriction at all. And the second presents numerous legal and practical problems.

1. It is true that a structure must be able to convey people or things over water to be a vessel. But making merely that "physical" ability a prerequisite for vessel status, *id.* at 20-21, instead of requiring the structure to have a *purpose* of transporting things, does not meaningfully limit the category of covered objects. Virtually anything that floats and has either a somewhat flat surface or a cavity of some kind can carry people or things across water while under tow. For example, modular dock pieces, *see* http://www.ez-dock.com/en.html; water trampolines and play structures, *see* http://www.ravesports.com/proline.html; and floating commercial fishing nets and cages (gill nets, for instance, *see* http://en.wikipedia.org/wiki/Gill_net), all have the physical attributes necessary to carry people or things over water under tow. Yet none of these things are, as Section 3 requires, "commonly thought of as being capable of being used for water transport." *Stewart*, 533 U.S. at 494. Indeed, it is telling the City does not point to any floating object that cannot carry people or things over water.

12

2. The City's second proposed qualification to vessel status – the "substantial physical restraint" exception – is even more vexing.

As an initial matter, this test has no basis in law. Section 3 asks whether a structure is "capable of" maritime transportation.  If, as the City says, all the phrase "capable of" means is having "physical attributes that allow it to carry things over water," Resp. Br. 21, then the origin of the City's exception is unclear.  The mere fact that a floating object is firmly secured to land does not deprive *the object* of any physical attribute that would allow it to carry things over water.  Nor does it make maritime transportation, in the sense of being difficult to accomplish.  Instead, a connection to land simply requires someone to exert a certain amount of effort to unlatch the structure before using it to transport something.

Nor does the City's physical restraint exception comport with precedent.  The structures this Court deemed non-vessels in *Cope* and *Evansville* were fastened to shore by chains or cables.  But the same cannot be said of the "mobile warehouse" in *Roper*, 368 U.S. at 23, or the floating fish processing plant in *Kathriner v. UNISEA, Inc.*, 975 F.2d 657, 659 (9th Cir. 1992), which was merely "anchored and tied to a dock." Yet this Court in *Stewart* confirmed that the latter two structures were non-vessels as surely as the former two were.  543 U.S. at 494, 496.  Scows that general maritime courts deemed non-vessels likewise were sometimes simply "attached to the wharf by lines." *Woodruff*, 30 F. at 269; *see also Ruddiman v. A Scow Platform*, 38 F. 158, 158 (S.D.N.Y. 1889) (scow "designed to be moored along-

13

side a wharf" was not a vessel "because it was not designed or used for the purpose of navigation"). Equally important, *none* of these decisions turned on the precise characteristics of the attachments to shore; while judicial opinions sometimes included descriptions of the attachments as relevant evidence of a structure's function, the driving *legal test* in each case was the structure's purpose. *See supra* 4-6 Petr. Br. 22-31.

No other test makes sense. There is no way to pinpoint exactly how firmly secured a structure must be to render it a non-vessel. Must it be affixed with new ropes instead of "deteriorated" (Resp. Br. i) ones? Chains or cables instead of ropes? A particular number of chains? What if a structure is securely fastened to land with steel beams but can be easily detached from them if necessary "to tow [the structure] to sheltered waters in the event potentially damaging weather is forecast"? *See Pavone v. Miss. Riverboat Amusement Corp.*, 52 F.3d 560, 564 (5th Cir. 1995). The potential questions go on and on.

Even if this Court were willing to create out of whole cloth a precise test for what constitutes a "substantial physical restraint," the test would be utterly manipulable. If all that separated petitioner's floating home from the structures at issue in *Cope* and *Evansville* were four or five chains, then everyone in petitioner's position in the future could simply use chains instead of ropes to fasten their structures to piers. Worse yet, owners of sailboats or yachts who used them sparingly could presumably moor them with chains or cables instead of nylon lines and thereby evade maritime jurisdiction entirely. In short, if any rule has the potential to

14

undermine stability in maritime law and wreak havoc on things such as preferred ship mortgages (*see* Br. of Nat'l Marine Bankers Ass'n), it is the City's proposal.

Lastly, the City's proposed test for vessel status would extend maritime law into disputes in which there is no need for federal jurisdiction – and in which maritime law's special rules designed to "compensat[e] or offset[]" the special hazards and disadvantages" of navigation at sea, *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 354 (1991), do not sensibly apply.  To repeat just one example: the City's test would confer "seaman" status on waiters on floating restaurants, blackjack dealers in floating casinos, and nannies on floating homes.  Petr. Br. 40.  A "seaman" is anyone who has a "substantial" connection to a vessel and who "contributes to the vessel's function or mission."  *Stewart*, 543 U.S. at 494-95.  As OSHA has explained and court decisions confirm, such waiters, blackjack dealers, and nannies most certainly would satisfy these requirements, *see* Petr. Br. 40 (citing authority), and the City does not seriously contend otherwise, *see* Resp. Br. 45.[6] Instead, the City simply says "this Court need not address the substantive maritime tort doctrines that petitioner invokes." *Id.* at 44.

---

[6] Also noteworthy is the United States' warning that "adopting the Eleventh Circuit's test on a nationwide basis would significantly increase the number of large passenger 'vessels' that the Coast Guard would be required to inspect, diverting time and resources away from structures that are far more relevant to maritime safety and security."  Gvt. Br. 29 n.11.

15

This will not do. It is perfectly understandable for a litigant – as well as the Maritime Law Association and some maritime professors – to want to broaden the scope of admiralty jurisdiction and expand the reach of maritime law's generous remedies. But one cannot ignore the potential consequences of such a request or deride them as mere "policy arguments." *Id.* at 42. It is a fundamental canon of construction that when this Court construes a statutory term – especially, as here, a term in a definitional provision – it must consider "'not only the bare meaning' of the critical word or phrase 'but also its placement and purpose in the statutory scheme.'" *Holloway v. United States*, 526 U.S. 1, 6 (1999) (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)). Such is the essence of structural analysis. That the City endeavors to steer this Court away from contemplating whether its rule fits with the rest of maritime law is compelling reason, in and of itself, to reject its proposal.

## II. The Purposive Test Dictates That Petitioner's Floating Home Was Not A Vessel.

Even though the City itself initially pursued relief against petitioner "under state landlord-tenant law" in state court, Pet. App. 30a – turning to federal law only after losing at trial and subsequently being enjoined for engaging improper self-help tactics (Dft. Tr. Exh. 4) – the City now contends that petitioner's floating home was so clearly a vessel that it was entitled to summary judgment on that jurisdictional issue. Applying the purposive test to the record here, however, shows that the Eleventh Circuit's decision should be reversed because petitioner's home was not

16

a vessel. At the very least, this case should be remanded so that the lower courts can apply the proper legal test and take any extra evidence that is necessary to do so. *See* Gvt. Br. 29-31.[7]

Without denying that "floating homes" are non-vessels, the City urges this Court to lump petitioner's home in with the "houseboats" that various lower courts have held are vessels. Resp. Br. at 54-55 (citing *Miami River Boat Yard, Inc. v. 60' Houseboat Serial #SC-40-2860-3-62*, 390 F.2d 596 (5th Cir. 1968); *Hudson Harbor 79th St. Boat Basin, Inc. v. Sea Casa*, 469 F. Supp. 987 (S.D.N.Y. 1979)). But unlike houseboats, which have a "purpose" of moving

---

[7] The City now suggests for the first time in this litigation (and on the last page of its brief) that it need only have "made a 'prima facie' showing that petitioner's [home] was a vessel." Resp. Br. 57. Because the City made no such argument in its Brief in Opposition, this Court should consider it waived. *See* Sup. Ct. R. 15.2. At any rate, the City's suggestion is frivolous. A plaintiff may need to make only a prima facie showing on a jurisdictional issue when the issue first arises in district court proceedings, or on appeal after a district court has dismissed the case. But when, as here, a district court postponed any jurisdictional determination until the submission of evidence and then assumed jurisdiction and entered judgment for the plaintiff, Pet. App. 40a-42a, an appellate court must decide whether the plaintiff properly established jurisdiction by a preponderance of the evidence. *See Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Data Disc, Inc. v. Sys. Techn. Assocs., Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977) ("Of course, at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence."); *see also Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675-78 (1st Cir. 1992) (same in context of jurisdictional facts that go to merits).

17

people and their things over water, *Miami Boat Yard*, 390 F.2d at 597, the objective facts indicate that petitioner's home lacked any such purpose. Petitioner's home was constructed with plywood to specifications governing land-based dwellings. Petr. Br. 3. It may not have been as architecturally impressive or meticulously maintained as upmarket floating homes in places like Seattle and Sausalito. But, just like such structures, petitioner's home was designed to sit still and function as an extension of land, not to carry things over water. *Id.* at 4. Indeed, at the time of its seizure, the home had been sitting still for three years and was indefinitely affixed to the City's marina. *Id.* at 16.

None of the City's quibbles with these inalterable facts indicate any contrary purpose.

• The City emphasizes that petitioner's floating home was secured in its marina pursuant to a "wet-slip agreement" and that "[p]etitioner lacked any property interest in the Marina's land." Resp. Br. 55. But floating homeowners frequently lack any real property interest. *See* Br. of Seattle Floating Homes Ass'n at 7, 25; *Woodruff*, 30 F. at 269 (floating home not a vessel even though it was tied to municipal wharf). And to the extent the terms of the standard moorage agreement petitioner signed shed any light on whether its purpose was maritime transportation, the venue provision, requiring any lawsuit to be governed by "the laws of the State of Florida,"

18

suggested that federal admiralty law did not apply to his home. J.A. 20.[8]

•  The City contends that the home's affixations to land – ropes, a power line, and a water hose – were too "insubstantial" to indicate indefinite mooring. Resp. Br. 51, 54.  But it is common for floating homes on saltwater to be attached by rope instead of cables or other metal devices; rope provides greater elasticity in fluctuating tides.  Br. of Seattle Floating Home Ass'n at 7-8; *Woodruff*, 30 F. at 269.  The critical aspect of petitioner's home's utility connections, therefore, was not how difficult they might have been to remove, but rather – as one state law distinguishing floating homes from houseboats puts it – that they showed that the home was "*dependent* for utilities upon a continuous utility linkage to a source originating on shore."  CAL. HEALTH & SAFETY CODE § 18075.55(d) (emphasis added).  The nature of petitioner's utilities connections, in other words, underscored, rather than undermined, the non-transportation purpose of his home.

•  The City next notes that petitioner's floating home was "relocated" twice over the six years of his ownership – first from the place of purchase to North Bay Village, and then from North Bay Village to the City's marina.  Resp. Br. 56, 48-49.  But petitioner

---

[8] The City incorrectly suggests that after it invoked federal law to trump petitioner's state-court victory, petitioner bid for his home at the U.S. Marshal's auction.  Resp. Br. 13.  In truth, he never registered to bid.  The City outbid the public, foregoing the money it could have obtained at the sale in order to take ownership of the structure and destroy it.

19

had the structure moved only out of necessity. When he purchased the home, it was affixed to someone else's private property, so he had to move it. And he moved it from North Bay Village only because a hurricane destroyed the facility. Those reasons for moving hardly suggest that petitioner's home had any transportation purpose.[9]

• Finally, the City disputes that petitioner's floating home incurred damage when it was towed. *Id.* at 49. Even if petitioner's home had remained unscathed, this would not suggest petitioner's home was a vessel. There is no indication that the structures at issue in *Evansville*, *Roper*, or *Pavone* incurred any damage whatsoever when towed repeatedly. Yet this Court treated each as non-vessels because they lacked any transportation function. *See Stewart*, 543 U.S. at 493-94, 496. In any event, numerous photos in the record reflect the damage petitioner's home suffered when towed. *See, e.g.*, J.A. 52 (photo 17; bright plywood patch showing where exterior wall failed), 48 (photo 10: white epoxy patch), 44 (photo 1: discolored patches showing

---

[9] The City also occasionally references the U.S. Marshal's arrest and tow of the structure after the City has filed its complaint and acted on its purported maritime lien. *E.g.*, Resp. Br. 50. But it is well-established that a plaintiff may not establish subject matter jurisdiction based on facts it manufactures after filing its lawsuit. *See, e.g.*, *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."); *Aetna Cas. & Sur. Co. v. Hillman*, 796 F.2d 770, 775 (5th Cir. 1986) (a plaintiff cannot "create jurisdiction retroactively where it did not previously exist").

20

repairs below French doors).  And if the district court
or Eleventh Circuit had ruled evidence on this
particular point relevant, petitioner could have
introduced much more.  *See* Petr. Br. 5 n.6; Gvt. Br.
30.

## CONCLUSION

For the foregoing reasons, the judgment of the
court of appeals should be reversed.

Respectfully submitted,

EDWARD M. MULLINS
ANNETTE C. ESCOBAR
ASTIGARRAGA DAVIS MULLINS
  & GROSSMAN, LLP
701 Brickell Ave., 16th Floor
Miami, FL 33131

ROBERT TAYLOR BOWLING
COBB COLE
150 Magnolia Avenue
Daytona Beach, FL 32114

PHILIP J. NATHANSON
THE NATHANSON LAW FIRM
120 North LaSalle, Ste. 2600
Chicago, IL  60602

JEFFREY L. FISHER
  *Counsel of Record*
STANFORD LAW SCHOOL
  SUPREME COURT
  LITIGATION CLINIC
559 Nathan Abbott Way
Stanford, CA 94305
(650) 724-7081
jlfisher@law.stanford.edu

KERRI L. BARSH
GREENBERG TRAURIG
333 Avenue of the
  Americas, 44th Floor
Miami, FL 33131

August 2012