FILED by _____ D.C.

JUN 1 2 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No: 08-80134 CIV-HURLEY/HOPKINS

FANE LOZMAN,

     Plaintiff,

vs.

CITY OF RIVIERA BEACH,

     Defendant.

_____

## PLAINTIFF'S MOTION TO AMEND COMPLAINT (DE 478) WITH ATTACHED THIRD AMENDED COMPLAINT

     Plaintiff Fane Lozman mistakenly did not comply with Local Rule 15.1 when he filed his motion for leave to amend his second amended complaint (Dkt. 478) to add a constitutional "taking claim."  The Court entered an order (Dkt. 497) giving Lozman five days to renew his motion to amend, by attaching the original of the proposed amendment to the motion.

     Lozman renews his motion to amend complaint (DE 478 attached as exhibit A), by complying with Local Rule 15.1 and attaching his proposed third amended complaint (attached as exhibit B).

Dated: June 12, 2014

By: _____

     Fane Lozman
     *Pro Se*

1

Fane Lozman

2913 Ave. F

Riviera Beach, FL  33404

sp500trd@yahoo.com

(786) 251-5868

## **CERTIFICATE OF SERVICE**

I, Fane Lozman, certify that on this 12th day of June 2014, the following will receive

ECF notification once the Clerk files this response.


Benjamin L. Bedard, Esquire
Bradley Ellis, Esquire
Roberts, Reynolds, Bedard & Tuzzio, P.A.
470 Columbia Drive, Suite 101C
West Palm Beach, Florida  33409
Telephone:  561-688-6560
Facsimile:  561-688-2343
Email:  bbedard@rrbpa.com
Attorneys for City of Riviera Beach

# EXHIBIT A

# Motion for Leave to Amend Complaint (Dkt. 478)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No: 08-80134 CIV-HURLEY/HOPKINS

FANE LOZMAN,

     Plaintiff,

vs.

CITY OF RIVIERA BEACH,

     Defendant.

_____

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND SECOND AMENDED COMPLAINT TO INCLUDE A TAKING CLAIM UNDER THE FIRST AMENDMENT

Plaintiff Fane Lozman hereby moves this Court for leave to add a taking claim to his second amended complaint. During the summary judgment hearing held on May 19, 2014, the Court suggested that Lozman perhaps amend his complaint to add an additional state claim to recover against the $25,000 admiralty bond. Lozman analyzed this situation and held a lengthy discussion with a couple members of his Supreme Court legal team. It is not as simple as filing a motion to release the bond, because a jury still has to determine the value of Lozman's floating home, and then the bond will go to partially satisfy that judgment. What are claims that can get this before a jury? The only possible claims are:  i) conversion; and ii) a taking claim.  In considering whether to allow Lozman to amend his complaint with a taking claim, it is necessary to review the conversion claim again in a slightly different light than at the summary judgment hearing.

## COMMENCEMENT OF THE CONVERSION CLAIM

**THE COURT'S RELUCTANCE TO CONSIDER CONVERSION MAY BE OVERCOME BY A CONSIDERATION OF THE NUANCES BETWEEN A VESSEL AND A HOME.**

The Court should reflect on the fact that it was the <u>City that was the plaintiff in the admiralty action</u>, and Lozman's floating home was the defendant! Lozman was only the claimant at the time. After Lozman won his Supreme Court case, it was only then that he had standing to pursue a conversion claim as the owner of a house, instead of being a claimant for a vessel. That nuance is very important for the Court to consider.

1. Lozman put the City immediately on notice after the admiralty arrest that its actions were illegal when Lozman filed his emergency motion to dismiss the admiralty arrest. As such, <u>the City had constructive notice</u>, and § 768.28(6) Fla. Stat. should not apply. Lozman had to wait for the Supreme Court case to conclude before he could bring his conversion claim as the owner of a floating home instead of the claimant for a vessel.

2. There is no question that the City waived sovereign immunity. The City took Lozman's property and has not compensated him for it.

**A TAKING CLAIM IS THE ONLY OTHER VIABLE AVENUE OF RECOVERY AND ONE THAT WILL MAKE LOZMAN WHOLE FOR HIS APPELLATE AND SUPREME COURT LEGAL FEES.**

It is ironic that Lozman, who saved thousands of homes via eminent domain, had his own home seized in a taking that was guised in the form of an admiralty action. Understanding the players and the timeline from 2006 to 2014 reveal the compelling nature of Lozman's taking claim.

2

The Court questioned Lozman at the summary judgment hearing extensively about the May 10, 2006, executive session meeting, and how Lozman's Sunshine lawsuit for reasonable notice impacted the development agreement that was to use eminent domain to take private properties to give to a private developer in the marina redevelopment project.

The retaliation directed at Lozman that started in 2006, continues to this very day. It does so as a result of the City's elected officials and key employees policy of bending over backwards to do whatever the marina district master developer, Viking, wants. Viking is a company that manufactures high end sportfishing boats, in addition to being a property developer. Viking's boat yard is located due north of the City marina, just a football punt away from where Lozman floating home was moored. The owners of Viking have always wanted control of the City marina, and Lozman has put up a relentless fight against giving the public marina to them.

## VIKING WAS THE MASTER DEVELOPER OF THE 2006, 2008, 2010, AND 2012 PLANS, AND IS THE MASTER DEVELOPER TODAY.

It is critical for the Court to understand that Viking is the key to everything that involved Lozman and the City. Viking was the master developer for:

1. The 2006 eminent domain/marina district redevelopment;

2. The 2008 marina district redevelopment plan that did not require eminent domain but used private funding;

3. The master developer for the 2010 megayacht repair facility at the City marina, in a joint venture with Rybovich[1]; and

---

[1] Attached as exhibit 1 are two of Lozman's stories from the Palm Beach Sun newspaper. Lozman's July 2010 story, "The Riviera Beach Corruption Council" that contains a copy of County Commissioner Priscilla Taylor's letter to the Governor recommending that the City marina dedication not be changed. Also Lozman's June 2010 story, "Riviera Beach's latest scam, giving away the City marina and losing 32 million dollars in the process."

4.  The master developer for the 2012 publicly funded marina district redevelopment plan[2].

Viking was the master developer for each of the four different plans.  Lozman has fought Viking on all four plans, because each plan either gave the City marina to Viking, or gave effective control of the facility to Viking for 50 years.  Lozman was quite determined, as the Palm Beach Post has reported over the years, to keep the Riviera Beach marina a public recreational facility and not have it turned over to Viking.  To fight this takeover of the public marine by Viking, Lozman had to fight the City's elected official and key employees, who Viking had put under its wide sphere of influence.  Viking even hired Attorney Esther Williams, the wife of City of Riviera Beach Police Chief Clarence Williams, to be one of its many attorneys on the redevelopment deal.  This may have played a role in why the police have hassled Lozman over the years to punish him in opposition to Viking's role in the marina redevelopment.

## IT WAS VIKING THAT INFLUENCED ELECTED OFFICIALS AND CITY EMPLOYEES TO TARGET AND RETALIATE AGAINST LOZMAN

Mr. George Carter was the City marina director that evicted Lozman from the marina in August 2006.  Shortly after the eviction actions proceedings started, <u>Mr. Carter went to work at Viking as a vice president</u>!   Carter made Lozman's life a living nightmare at the marina, by having the police harass Lozman when he would walk his dachshund.  The police came to the marina over 15 times to harass Lozman or threaten to arrest him.  Lozman cross-examined Carter during the eviction trial, and caught him being untruthful.  To show how personal this war was between Carter and Lozman, during Lozman's testimony before Judge Dimitrouleas, Lozman

---

[2] Attached as exhibit 2 is Lozman's December 2013 Palm Beach Sun newspaper story, "Don't let them take your Riviera beach marina again"

stated that he was happier destroying Carter on the stand during the state eviction case, than actually winning that trial.

The following transcript excerpt from the admiralty trial gives some background on what went on between Carter and Lozman. The entire admiralty transcript is an exhibit to the City's summary judgment motion. The Court can read Lozman's testimony to get a further understanding of Carter and his behavior towards Lozman. It is critical for the Court to understand how marina director Carter was motivated as an employee of Viking, to always get Lozman out of what he considered to be Viking's marina.


Mr. Lozman: There was a war of words in the press. And that's when things changed for me at the marina, because all of a sudden now I am their enemy. I am the bad guy.

We got to do something with this guy, Lozman. We don't want his around. He is destroying our dreams he is also destroying opportunities that were unique to elected officials, meaning like the Mayor, Brown, had a brother. And the brother had a deal where only his company was tearing down the buildings that they were going to use for the redevelopment area. And by me doing this it created their (sic) all these people that dreamed of becoming, you know, rich on all the redevelopment with all their cronies, that stopped to a halt. Everything stopped while they figured out what is going to happen with this lawsuit.

And in the meantime there was frustration. Carter, the March (sic) Director, he had already said that he had been picked to run the new marina for Viking, that he was going to be the marina manager for this, you know, fifty

million dollar marina that's going to have 150-foot boats and it's going to have a shopping center, it's going to have a hotel, it's going to be this great metropolis. And they had picked him and I has screwed up his vision for the future.

Admiralty Trial Tr. Vol. 2, 168


Mr. Lozman:  And George Carter was the Marina Director out there.  He said:  I don't give a damn what you want because I am going to charge what want (sic) I to do.  If you don't like it, screw it.  We are—

Mr. Birthisel:  Objection, Your Honor, Hearsay.

The Court: Overruled.

Mr. Lozman:  He said:  I don't care what you want.  If you don't like it, screw it.  You are going to be out of here in March.  We have evicted you.  You know, go screw yourself.

And he also said something else to me—I think it's important.  I have talked about it publicly.

During the eviction trial I—I was, you know, probably rude and aggressive, but I had Carter pretty much crying—

Mr. Birthisel:  Relevance, Your Honor.

The Court: Overruled.

Mr. Lozman:  I had Carter pretty much crying on the stand where he begged Judge Evans to let him go pick up his child and Evans said no, he had to answer my questions.

> **I tell people I was happier destroying Carter, than I was winning the case. And you say why would I do that? The reason I was happier destroying him is that Carter had made had (sic) my life a living hell. Carter had security personnel follow me around. And when I would walk my dog he would call the cops. They would come over and scream and yell at me.** Admiralty Trial Tr. Vol. 2. 162-163 (emphases added).

Mr. Lozman: No one cold (sic) believe that a month-to-month tenant on a commercial lease could come up with some kind of defense to preclude an eviction.

Mr. Birthisel: Relevance

The Court: Overruled

Mr. Lozman: And they just couldn't believe it. They were just furious.

And Carter was beside himself. Carter—I caught Carter lying—I said: Carter, who do you work for?

He says he works for Viking.

I go: Who is the head of Viking?

Who was Bob Healey?

He was a guy he had lunch with and traveled around.

I could him admitting that –I caught him lying when he said he knew Healy—he said he didn't know Healey and it turned out he knew Healey and wrote his paycheck.

So Carter came up to me afterwards, like a week later at the marina and said he hoped my brother got blown up in Iraq and my father was disgusted I was his son, trying to get me into a fistfight with him.

My father had been dead for 12 years.

My brother is a Major in the Air Force.  He is a flight surgeon.  He also just served in an Army hospital.

And I said:  Carter, I am not going to sit here and beat you up.  I am smarter than that.  But just stay away from me.

Admiralty Trial Tr. Vol. 1, 180-181 (emphases added).

## RIVIERA BEACH MAYOR MICHAEL BROWN

Mayor Michael Brown was at the June 2006 executive session meeting where a consensus was made to intimidate Lozman.  Mr. Brown was very vocal about doing whatever had to be done to stop Lozman from interfering in the 2006 redevelopment plan that used eminent domain.  **Mayor Brown had previously been the executive director of the Riviera Beach Community Development Agency while he was Mayor**, and had accepted tens of thousands of dollars in bundled campaign contributions from Viking!  Brown also had his own issues of alleged misconduct that were addressed in the State of Florida Auditor General's report.

Mayor Brown was and still is friendly with City Attorney Pamala Ryan.  City Attorney Ryan was at the June 2006 executive session meeting and is still the City Attorney today.  Ms. Ryan even attended the May 19, 2014, summary judgment hearing.  Ms. Ryan is the common link in City personnel that has survived from 2006 to 2014.

## COUNCILPERSONS CEDRICK THOMAS AND SHELBY LOWE

In March 2007, Councilpersons Cedrick Thomas and Shelby Lowe were elected. Lozman gave campaign contributions to each of them and helped get them elected. The problem was as soon as they were elected, Viking reached out to them directly, and that was the end of any positive dealings that Councilpersons Thomas or Lowe had with Lozman. Mr. Thomas is still a Councilperson today, and Mr. Lowe was a Councilperson through March 2013. Viking's close relationship extended to incredibly becoming one of a financial nature.

Mr. Thomas has a company that provides buses for students to attend Viking's maritime school. This direct financial relationship with Viking is worth a reported $200,000 a year to Mr. Thomas' bus company. The Palm Beach County OIG mentioned one of the Thomas's buses in a scam he pulled when he sold a rusted, junked bus to the City of South Bay. Attached as exhibit 3 is page 13 of the Palm Beach County OIG investigation, Audit #2013-A-0006, into South Bay that discusses the bus scam. Thomas also had a no show job at South Bay. Attached as exhibit 4 is page 14 and 15 of a different Palm Beach County OIG investigation, Audit #2014-A-0004. Attached as exhibit 5, the Palm Beach Post wrote an editorial on February 23, 2014 titled, "Editorial: State attorney should investigate corruption allegations against former South Bay official."

Mr. Lowe was also sucked into the Viking fold. Accordingly, when Viking wanted to do its 2008, 2010 and 2012 plans, these two men, along with Ms. Ryan, other elected officials and employees, did whatever they could to stop Lozman from interfering in their redevelopment plans.

## COUNCILPERSONS DAWN PARDON AND JUDY DAVIS

Ms. Dawn Pardo and Ms. Judy Davis were elected in 2008, and they too, were sucked into the Viking political machine with bundled campaign contributions. Ms. Pardo and Ms. Davis replaced two City Councilpersons, Mr. Jackson and Ms. Duncombe, who were at the June 2006 executive session meeting. So the City's contention that there was no direct link over the years between elected officials and the retaliation against Lozman is not true. The obvious common link was Viking. It was Viking that realized that Lozman was its biggest enemy, and it used its political muscle with the 2006 to 2008 and then the 2008 to 2013 elected official "groups" to target Lozman and get Lozman out of what Viking considers to be their marina.

## THE CITY'S ATTORNEY MENTIONED VIKING AT THE EMERGENCY MOTION TO DISMISS HEARING, HELD THREE DAYS AFTER THE VESSEL ARREST

It is significant that Viking has its hands in everything. The City's outside counsel specifically mentioned Viking during the emergency motion to dismiss hearing held before Judge Dimitrouleas, three days after Lozman's floating home was arrested. The vessel that Mr. Birthisel is referring to is Lozman's floating home.

> Mr. Birthisel: And this doesn't even cover the issues involved with this vessel being moored outside immediately adjacent to Viking Yacht Works yard over there in which a hurricane came through and the vessel busted loose, and the City allowed it to stay there, they would be sued.
>
> Emergency Hearing, Transcript p. 23, Case 9:09-cv-80594-WPD, Dkt. 203

### MS. CHRISTINE "PEPPER" NEWMAN, LOZMAN'S UNOFFICIAL LAW CLERK AT THE EVICTION TRIAL

This targeting knew no bounds.  The City's counsel, at the close of the summary judgment hearing, mentioned Ms. Christine "Pepper" Newman.  Ms. Newman was dragged out after Lozman for making comments as to why didn't then Mayor Brown sue Lozman.  The City attorney represented that she was opposed to Lozman, yet still got dragged out.  That is completely incorrect, but understandable since the City has not yet taken Ms. Newman's deposition.  The reason Ms Newman asked those questions was because she was tired of hearing Mayor Brown whine about Lozman all the time.  **Ms. Newman was Lozman's unofficial law clerk!  Ms. Newman also was Lozman's media coordinator!**  She was not his enemy. Attached as exhibit 6 are a couple press releases Ms. Newman distributed to the media after Lozman won the State eviction case and filed a Sunshine lawsuit to force the City to keep written minutes.

Not surprisingly, Ms. Newman also was intimidated by the City for her involvement with Lozman.  Ms. Newman's water was turned off by the City after she was dragged out of the City council meeting while making public comments, even though her bill was current.  Ms. Newman was also hassled by code enforcement, in what she understood was a direct threat not to be part of what has become known as the "Fane Fan Club."  Ms. Newman told Lozman that she felt very uncomfortable with being targeted by the City, she did not have the resources to fight back against the City, and that she would be unable to continue fighting with Lozman to clean up the political corruption in Riviera Beach.  Lozman has not personally seen Ms. Newman since shortly after she clerked for him at the eviction trial in 2007!

## MS. VIRGINIA MERCHANT

It is true that Ms. Virginia Merchant was a plaintiff on Lozman's sunshine case, but that was because Lozman's attorneys were concerned that the City might raise the issue of standing because Lozman lived on "the water." Ms. Merchant owns a tourist souvenir store, Sea Shell City, at 2100 Broadway. Lozman visited Sea Shell City and found Ms. Merchant crying. When Lozman asked what was wrong, Ms. Merchant showed Lozman a letter about how the City was going to seize her property via eminent domain. Lozman told her that he had an idea and that she should join him in his sunshine lawsuit. Ms. Merchant and Lozman became friends, until one day, the Riviera Beach CRA threatened Ms. Merchant. Lozman, whose mail was being stolen from the marina office, was using Sea Shell City's address on his court filings. When the CRA and City realized this, they scared Ms Merchant by implying that if she had any future involvement with Lozman, they would not give her a CRA grant to fix up her store. Ms. Merchant told Lozman that he could not send his mail to her store anymore, and not to visit her anymore. She told Lozman that she desperately needed the grant more than she needed Lozman as a friend. Ms. Merchant did get her grant, and that was the end of their friendship.

## LOZMAN WAS A KEY PLAYER IN THE FAILED RECALL OF THE ENTIRE FIVE MEMBER CITY COUNCIL FOR REFUSING TO PUT THE 2010 REPAIR FACILITY MARINA REDEVELOPMENT PLAN OUT FOR BID.

Lozman continued his fight to not only keep the marina a public facility, but he was also an instrumental force behind the "recall them all" plan to recall all the City council members in 2010. The City Council had refused to put the 2010 redevelopment plan out for a competitive bid. Attached as exhibit 7 is the Statement of Grounds for the recall. The recall failed because the total amount of signatures fell short of the amount needed to put the recall on the ballot.

## UNDERSTANDING THE "REST OF THE STORY" MAKES A
## TAKING CLAIM, A VALID CLAIM

The explanation of the factual connection between Viking, the former City marina director that coordinated the eviction, the two groups of elected officials, and the City attorney, shows that there was indeed both a retaliatory eviction[3], and a retaliatory sham vessel arrest to include the destruction of Lozman's floating home that resulted in a taking. The facts clearly show that the City and Viking wanted Lozman and his floating home out of what is now Viking's marina on a 50 year lease from the City. The City finally accomplished this for Viking, by taking Lozman's house out of the marina, in a similar manner as an eminent domain taking because it was in the way of the marina redevelopment.

This taking argument makes a lot of sense given the circumstances and should satisfy the Court's concerns expressed at the summary judgment hearing, because Lozman's floating home is a house for all purposes pursuant to Florida law. Lozman thus requests permission to amend his complaint to include a claim for taking, and then use this claim to also recover his legal fees at the Eleventh Circuit and the Supreme Court. Legal fees are recoverable in a taking claim.

There is no way around a trial to determine the value of Lozman's floating home. Lozman tried repeatedly to save this Court the hassle of a trial by collecting his damages for the destruction of his floating home in the admiralty case. Unfortunately Judge Dimitrouleas refused to deviate from the mandate of the Eleventh Circuit. The only question for this Court is what claim or claims will be tried to a jury to get to a fair valuation of Lozman's floating home.

Since the Court will need to hold a jury trial regardless to determine the valuation of Lozman's floating home, the § 1983 claims should be tried at the same time as the conversion

---

[3] The state eviction jury verdict found the eviction action was retaliatory based on Lozman's exercise of his First Amendment rights

and taking claims.  The § 1983 claim would also allow Lozman to be compensated for the City's vindictive destruction of Lozman's floating home if a jury finds the admiralty arrest was retaliatory.  The facts and law are just way too strong in Lozman's favor for the Court to grant summary judgment to the City.  Lozman understands that the Court does not like him, his former attorney or this case.  But this is a truly unique and very important case for the precedential value that it will set on multiple fronts.  For example, the abuses that citizens face every day at public meetings around the country during non-agenda public comment can be clarified by Lozman's case being tried.  Since Lozman has dropped the individual defendants, and limited his damage claims, it will not take the full three weeks the Court has set aside in October to try this case.

Wherefore, given the concerns of the Court at the summary judgment hearing, Lozman has provided sufficient evidence and justification to allow a takings claim to be added to the existing claims in Lozman's second amended complaint.

Dated: May 20, 2014

By: _____

Fane Lozman
*Pro Se*

Fane Lozman
2913 Ave. F
Riviera Beach, FL  33404
sp500trd@yahoo.com
(786) 251-5868

## CERTIFICATE OF SERVICE

I, Fane Lozman, certify that on this 20th day of May 2014, the following will receive

ECF notification once the Clerk files this response.

Benjamin L. Bedard, Esquire
Bradley Ellis, Esquire
Roberts, Reynolds, Bedard & Tuzzio, P.A.
470 Columbia Drive, Suite 101C
West Palm Beach, Florida  33409
Telephone:  561-688-6560
Facsimile:  561-688-2343
Email:  bbedard@rrbpa.com
Attorneys for City of Riviera Beach

# EXHIBIT 1

Page 1 • Palm Beach Sun • July 2, 2010
www.palmbeachsun.net

# The Riviera Beach *Corruption* Council

### By Fane Lozman

A protest in front of City hall last week to "Save our Marina" has morphed into a grassroots effort to recall the slime that make up the City Council. Recall D-Day will be announced at the next City Council meeting, scheduled for July 7, 2010.

### This month's corruption ditty

Now everyone sing after me, my version of Willie Nelson's classic "The Party's Over":
Turn out the lights, the corruption party is over, all greed must end, so State Attorney McAuliffe look no further,
Commissioner Cedrick Thomas and Council Chair Dawn Pardo are your main suspects again!
Tell those Grand Jurors, to kindly wake up, their time is now, to finally kick Riviera's corrupt butts.

Cedrick Thomas, a man with no ethical compass, is at it again. This time he is the front man trying to slide through another slick deal, giving away 40% of the City marina to a Viking/Rybovich partnership to build an industrial boat yard. Mr. Charles Newcomb, who donated the marina property to the City back in 1913, is rolling in his grave as Thomas and one of his cohorts in this scam, Council Chair Dawn Pardo, piss all over it. These two made their mark when they voted to lease the Marina Tiki Bar for $6500/month, when it appraised at $19,000/month and an offer had been made for $22,500/month.

County Commissioner Priscilla Taylor, a guardian angel who flies high over the political RB Slime landscape, sent the following letter to Governor Crist asking to keep the City marina as it has always been, a 100% recreational facility. Now, if we could only clone Ms. Taylor and vote in her offspring as Riviera Beach City Councilpersons, our City might have a chance to rise out of the cesspool of corruption in which it has been mired. Please write a letter to State Attorney Michael McAuliffe (a.k.a. the fearless wonderboy) at 401 North Dixie Highway, West Palm Beach, FL 33401 and thank him in advance for cleaning up the political slime of our City.

---

**Priscilla A. Taylor**

County Commissioner, District 7
Board of County Commissioners



June 14th, 2010
Office of the Governor Charlie Crist
State of Florida - The Capitol
400 South Monroe Street
Tallahassee, FL 32399

Dear Governor Crist:

It has come to my attention that the Riviera Beach Council is requesting to amend the City's dedication of submerged land to include industrial. The residents are adamantly opposed to this move. The residents are in full support of developing the marina but want the present recreational designation to remain. As the County Representative of this District I am requesting that there be no variation from the original intent that this marina be for recreational purposes. As you are aware there are few marinas with public access. It is for this reason that I am fully supportive of the residents.

It appears that the Council members are not listening to their residents. Under separate cover, I'll mail a copy of a petition signed by over 600 residents in this area, all of whom feel strongly about your not approving the City's request to lease the submerged lands to a for profit company at the Riviera Beach Marina. The Developer and the City Council's desire to have an industrial boatyard are not acceptable to the community residents, who are directly affected by this. In view of the pollution problems caused by British Petroleum (bp) and other environmental pollution issues, it is not a prudent move to add another potential pollution problem to this area. It is incumbent upon us to protect our waterfront and shorelines.

I respectfully request that as you review the City's request that you are mindful of the residents concern and not deviate from the original recreational dedication.

Sincerely,

Priscilla Taylor
County Commissioner, District 7

"An Equal Opportunity Affirmative Action Employer"

301 N. Olive Avenue   West Palm Beach, Florida 33401   (561) 355-2207   Fax: (561) 355-6332
345 S. Congress Avenue   Delray Beach, Florida 33445   (561) 276-1350   Fax: (561) 276-1380
ptaylor@pbcgov.org

# RIVIERA BEACH'S LATEST SCAM
# GIVING AWAY THE CITY MARINA AND LOSING
# 32 MILLION DOLLARS IN THE PROCESS
## By Fane Lozman

A roadmap to understanding the classic bait-and-switch game being played by the Riviera Beach City Council, a.k.a. the Cesspol of Corruption.  In a deal that benefits a selected few, and ignores the masses, the City marina is being turned into an industrial boat yard for mega yachts.  I have been fighting to keep this public facility out of the greedy hands of Viking Yachts for the last 5 years.  After beating them in 2006, Viking is back again in a deal that clearly does not benefit the public.

## UNDERSTANDING THE BASICS

**1.** The City Marina has been a recreational marina since 1913 when Charles Newcomb donated the property to the City with the condition requiring that the land always be used as a recreational facility for public use.

**2.** In 1966, the State of Florida dedicated the submerged lands at the marina to the City with the condition that these lands could only be used for recreational purposes.

**3.** In the Spring of 2008, the City solicited proposals to redevelop the marina for recreational purposes.  The redevelopment was restricted to the repair or replacement of the existing 577 slips (wet and dry), and the exclusive recreational use for the upland property (where Newcomb Hall and the Tiki Bar are located).  No new uses were contemplated.

**4.** The City Council selected Viking Yachts' proposal in the summer of 2008, a proposal that was based solely on a recreational redevelopment of the marina.  There was no mention anywhere in the Viking proposal of an industrial mega yacht boat yard.

**5.** Viking was required to sign a development agreement with the City in October 2008.  The City extended this deadline a number of times based upon Viking's failure to come up with the financing to perform on its redevelopment plan.  In July 2009, the City Community Redevelopment Agency Director, Mr. Floyd Johnson, recommended that Viking be disqualified, consistent with State law, for Viking's failure to sign the development agreement.  The City not only ignored Johnson's recommendation but fired him within one hour thereafter.

**6.** The competitive procurement laws of the State of Florida are established for the public's benefit.  These laws preclude any substantial change to a proposal that has already been accepted by a City.  Putting an industrial mega yacht boat yard in our City marina constitutes a material deviation, a substantial change from the original Request for Proposal (RFP).

**7.** State law dictates that the City throw out Viking's proposal and the RFP process started over if the City Council desires an industrial mega yacht boat yard

in the City marina.  The reason for this is simply that other mega yacht boat companies from around the world would have submitted proposals to have an industrial boat yard at the marina, if the City's initial RFP had included an industrial boat yard.  This competition would have resulted in a much better proposal for the public including a higher lease rate than the one submitted that values the marina property at an absurdly low value.

**8.** The voters of the City of Riviera Beach would have to be afforded the opportunity to vote via a referendum on whether they want to change the historical use of the City's public marina from recreational to an industrial mega yacht boat yard.

**9.** In addition, an environmental impact analysis by an independent firm would be necessary to determine if the hazardous materials associated with a mega yacht boat yard could coexist with a recreational facility where young children would be present and outdoor food would be served.  In fact, the City's request for proposal stated on page 13, paragraph 36, Obnoxious Use, "the City and CRA will not consider any proposal, which could cause.........obnoxious uses as regards to light, sound, smell, safety (emphasis added).  An industrial boat yard would have automatically been disqualified if it had been in Viking's original proposal.  This brings up the question, why are City Attorney Pam Ryan and City Manager Ruth Jones not informing the City Council that its own RFP criteria are being violated?  Instead the City attorney and City Manager approved significant changes to the proposal, which the City Council accepted!

**10.** In addition to a new RFP process, the City's comprehensive plan would require amendment to allow an industrial mega yacht boat yard in the City marina.

**11.** An industrial mega yacht boat yard requires so much space that the current 557 wet and dry recreational slips would be reduced to 100, only 18% of what presently exists.  More importantly, the rent from the industrial boat yard would only be $217,000 versus over $1.27 million in additional rent by keeping the marina the way it is!  That is over one million dollars less in revenue per year!  Over a 25 year lease, that adds up to **32 million dollars!**

## WHERE DO WE GO FROM HERE?

It is time for State Attorney Michael McAuliffe, a.k.a. the fearless wonderboy, to step up to the plate and indict those responsible for this scam.  As for the taxpayers, a recall of the City Council is necessary to uphold Charles Newcomb's written bequest of the marina property forever keeping the marina in public recreational use!

EXHIBIT 2

Page 4 • Palm Beach Sun • December 30, 2013                                                      www.palmbeachsun.net

# DON'T LET THEM TAKE YOUR RIVIERA BEACH MARINA–AGAIN!



by Fane Lozman
fane@palmbeachsun.net

## *Another New Year, another new scam...*

That is the way it goes with the elected scum in Corruption County (i.e. Palm Beach County). Riviera Beach elected officials have taken it to another level. Councilpersons Dawn Pardo, Cedrick Thomas, Judy Davis, along with the bankrupt sleazeball Bruce Guyton, keep running for elected office for one simple reason: to take away the City marina and give it to their pal and financial supporter, Viking Yachts. Second to that, their object is gaming the system to do the least work as possible, collect their City salary, travel benefits, car allowance, cell phone stipend, and any other "perks" of office, along with hitting the Riviera Beach marina Tiki Bar up for free meals and drinks.

To get elected, they needed to cut a deal with the devil. And the devil was a firm named Viking Yachts that builds luxury boats. Viking's customers needed a place to park their luxury boats, and the Riviera Beach City marina was the ideal place. So forgive me if you know the history. In 2006 the City signed over the City marina as part of a 2.4 billion dollar redevelopment project that was going to use eminent domain to take thousands of homes and businesses and give them to Viking. That plan failed, but a new evil plan to give away the marina and create a hazardous waste zone was born. So, "let's build an industrial boatyard at our recreational City marina," became their mantra.

A group of determined citizens rose up and fought this industrial boatyard. The boatyard plan was spearheaded by Riviera Beach Councilpersons Dawn "the Dictator" Pardo. This time, Viking and the mega yacht repair company Rybovich (owned by Huizenga), were to take over the City marina. Pardo, whose ties to Viking extended to accepting bundled campaign contributions and flying around on Viking's private jet, was in a frenzy trying to get the votes to defeat our referendum to stop the city marina from being coverted into an industrial boatyard. Pardo's efforts failed because our group of civic activists, spearheaded by Emma Bates, Andrew Byrd, and myself, defeated Pardon's boatyard polluting redevelopment giveaway. After whining to the Courts in multiple failed appeals to get our referendum overturned, Pardo's giveaway plan has risen from the ashes like a phoneix. Pardo, along with her scammy colleagues, have placed another referendum on the March 2014 ballot to try and overturn our 2010 referendum and thereby give away the City marina to Viking for the next 50 years. This most recent giveaway includes a sweetheart lease that will again privatize the marina, and leave the taxpayers holding the bag.

We need everyone to vote to stop this latest marina giveaway scam to Viking Yachts.

---

*I honor the late, great Donna Summer, with my latest ditty,*
*sung to the tune commonly known as "Enough is Enough (No More Tears)."*

If you've had enough, tell Pardo to shove her stuff,
Don't let her do it,
If you've had your fill,
Don't let the taxpayers pay the bill,
You can do it.

Tell Pardo and Guyton to just get out,
Nothing left to vote about,
Pack their bags and recall them out,
Just look them in the eyes and simply shout.

ENOUGH is ENOUGH is ENOUGH,
We can't go on, we can't go on, no more no,
ENOUGH is ENOUGH is ENOUGH,
We want them out, we want them out of office now.

There's nothing left for Pardo here,
And let's not waste another year.
ENOUGH is ENOUGH is ENOUGH,

VOTE DOWN The MARINA GIVEAWAY!!!

# EXHIBIT 3

OFFICE OF INSPECTOR GENERAL                                                    AUDIT # 2013-A-0006

- $17,306 in actual and asserted costs related to a bus purchased by the former City Manager from a company owned by a Riviera Beach Commissioner and former employee of the City; the bus cost $7,500 to purchase, incurred $7,981 in disputed repair costs, $1,125 in towing costs, and $700 in cash submitted for reimbursement by the former City Manager for new tires. The bus is currently in storage at a Riviera Beach repair business; the bus has been described as "scrap" and "junk" by City staff. It appears unlikely this bus will ever be put into service.


Purchased Bus in Storage

- $12,686 in checks paid to the personal account of a City employee lacking Commission approval and inconsistent with the existing pension plan for City employees. The amounts were paid in a lump sum of $6,785 followed by monthly payments totaling $5,901.
- $6,100 paid to an employee with no supporting documentation or substantiation of public purpose.
- $6,071 in City funds expended on employee lunches and parties including an employee retirement party that cost in excess of $2,300.
- $4,640 for food at official public meetings.
- $1,589 spent from petty cash (42% of the total amount we sampled) on items with a questionable public purpose or public benefit. Expenditures were for items such as employee birthday parties, employee lunches, miscellaneous food, and fuel purchases with no supporting documentation.
- $887 in flowers to employees for birthdays, funerals, and other occasions.
- $600 paid to a company that provides automated phone call services; the content of the calls was campaign messages for local candidates running for public office in upcoming elections, including City of South Bay Commission, City of Belle Glade Commission and Palm Beach County School District Board. Political message calls should not have been paid with City funds.

## Recommendations

**(4) The City Manager should establish a policy with Commission approval that identifies allowable and unallowable expenditures including prohibiting those types of expenditures that do not have a clear public purpose or public benefit.**

# EXHIBIT 4

OFFICE OF INSPECTOR GENERAL                                    AUDIT # 2014-A-0004

Recommendations

**(13) The City Manager should ensure that employee terminations follow the City's policies.**

Management Response

**(13) The City Manager and Human Resources Director will ensure terminations are consistent with City policy and State Statute. Corrected 4th quarter 2012.**

**Finding (7): EMPLOYMENT AND COMPENSATION OF A FORMER DIRECTOR OF CODE ENFORCEMENT WAS NOT CONSISTENT WITH CITY POLICIES AND WE COULD NOT SUBSTANTIATE A MEASURABLE BENEFIT TO THE CITY**

On May 18, 2009, the former City Manager hired an individual as South Bay's Director of Code Enforcement and Compliance at the rate of $15/hour. The cost to the City of that individual was as follows:

| Fiscal Year | Pay | Benefits | Total |
|---|---|---|---|
| 2009 | $12,750 | $3,521 | $16,271 |
| 2010 | 3,494 | 2,169 | 5,663 |
| Total | $16,244 | $5,690 | $21,934 |

*[handwritten annotation:] River Beach Councilperson Cedrick Thomas*

Based on our interviews of City personnel and review of documentation, we noted that code enforcement related activity was almost non-existent during the period of employment, and the individual was very rarely seen in South Bay. The former City Manager did not require the former Director of Code Enforcement to personally complete and sign a record of time worked as required by City policy. We found that the former Director of Code Enforcement only signed 13% of his timesheets. The only documentation the City could provide relative to outcomes of code enforcement work was ten Code Compliance notices sent to one owner of a business all on the same date.

Likewise, we noted that the former Director of Code Enforcement was hired as "full-time" status and therefore received full City benefits as provided for in City policy. However, the former Director's weekly timesheets averaged 20.3 hours. The part-time status should have resulted in termination of full-time benefits. Related to this, we noted that in July 2010, the former City Manager authorized a payment of 80 hours of unused accrued vacation time to the former Director of Code Enforcement. The payment was part of a final payout to the former Director of Code Enforcement who resigned his employment with the City on June 26, 2010. As a part time employee, the Former Director would not be entitled to paid vacation time.

OFFICE OF INSPECTOR GENERAL                                    AUDIT # 2014-A-0004

We have identified the total cost to the City of $21,934 as a questioned cost.   The OIG referred this matter to the State Attorney's Office.

### Recommendations

**(14) The City Manager should seek to determine the basis for the costs incurred by the City with respect to the former Director of Code Enforcement, and consult with the City Attorney on recovering any inappropriate costs.**

### Management Response

**(14) The City Manager and Human Resources Director will ensure employee compensation and benefit payouts are consistent with City policy and State Statute.  A debt collection policy is under review by the City Commission and staff is seeking approval in February 2014.**

### Finding (8): THE CITY DID NOT PERFORM ADEQUATE CHECKS TO DETECT THAT THE FORMER CITY MANAGER WAS DRIVING A TAKE-HOME CITY VEHICLE ON A SUSPENDED LICENSE

During our review of City procedures concerning vehicles used by employees on City business, we requested documentation of driver's license status.  In the case of the former City Manager, we were provided a copy of a State of Florida identification card.  When we brought to the City's attention that the card was for identification and was not a driver's license, it was discovered that the City had not collected and verified license information.  According to Florida Department of Highway Safety and Motor Vehicle records, the former City Manager had a suspended driver's license at the time he was hired.  His license was suspended for the first 14 months of his employment and again for approximately two months toward the end of his employment.  Throughout his employment, the former City Manager used a take-home City vehicle that was driven in excess of 60,000 miles.

The former City Manager's driver's license status was not detected by the City through pre and post hiring procedures.  The City had inadequate procedures to verify licensing prior to allowing employees to drive City-owned vehicles on City business.

In addition to the former City Manager driving without a valid driver's license, the City was exposed to the potential for liability by providing a take-home City vehicle to an employee who did not possess a valid driver's license.  We have identified the value of fuel charges to the City Manager's fuel account, $11,885, as a questioned cost.

EXHIBIT 5

# Editorial: State attorney should investigate corruption allegations against former South Bay official

Palm Beach Post. Posted: 12:00 a.m. Sunday, Feb. 23, 2014

The Palm Beach County State Attorney's Office should investigate whether Riviera Beach City Councilman Cedrick Thomas had a no-show, do-nothing job as a code enforcement officer in South Bay as alleged in an audit by the Palm Beach County Inspector General.

Mike Edmonson, a spokesman for State Attorney Dave Aronberg, said the office is aware of the allegations but can't comment beyond that.

As The Post's Pat Beall reported, the audit found that Thomas received full-time pay and benefits for part-time work. Thomas said he spoke with prosecutors about his South Bay job months ago. "My lawyer and I went down there, they asked some questions and that was that," he said. "I don't know why this is coming back now."

It's coming back now because the inspector general just released the audit to the public on Feb. 13. Thomas called the allegations "a political witch hunt."

Hardly. The details about Thomas were a small part of the audit that focused on serious deficiencies in how South Bay manages property and equipment, human resources, payroll and cash disbursements. There was nothing political about the audit. The response from Thomas, a failed candidate for state representative, is typical of a politician.

Thomas could not be reached for comment for this editorial on the Inspector General's audit, but he told The Post earlier that he was "offended" by the allegations. Why? The audit isn't a personal attack. It's a recitation of the facts gathered by investigators.

"We noted that code enforcement-related activity was almost nonexistent during the period of employment, and the individual was very rarely seen in South Bay," said the report. "The only documentation the city could provide relative to outcomes of code enforcement work was 10 code compliance notices sent to one owner of a business all on the same date."

Thomas signed only 13 percent of his time sheets, according to the audit. That's probably because he was in South Bay only 13 percent of the time he was supposed to be.

His time sheets indicated Thomas logged an average of 20 hours a week, which is part-time by any standard. Yet, he received benefits reserved for full-time employees. When he resigned from the city's employ, Thomas received 80 hours of vacation pay. The audit noted he was not entitled to paid vacation.

Thomas' boss was then-South Bay City Manager Corey Alston, who was indicted last year on several charges of grand theft related to alleged abuses of his office. Alston resigned a year ago after the State Attorney's Office accused him of orchestrating a back-room deal with city councilors that gave him $25,139 for 498 hours of unused sick time.

It appears Alston and Thomas used the poor city as their personal bank. South Bay has been on the state's financial emergency list of cities and towns in serious financial straits for years.

That makes the allegations against them especially egregious, particularly for Thomas, an elected official who represents one of the county's poorest cities. His constituents in Riviera Beach have much in common with the residents of South Bay. If he would take advantage of those in South Bay, can the residents of Riviera Beach trust him?

"I came there for $15 an hour," said Thomas," and all I did was try to make that community a little better."

If that's true, Thomas should be able to answer for the nearly $22,000 he received from the city. He claims to have written more than 150 code citations before leaving South Bay in May 2010. Why, then, can't the city find proof? Does Thomas have any documentation?

Thomas owes it to the public to account for public dollars. And it's the state attorney's job to make him.

- PB Post Editorial Board

# EXHIBIT 6

**FOR IMMEDIATE RELEASE**

## JURY FINDS CITY OF RIVIERA BEACH VIOLATED
## FANE LOZMAN'S RIGHT TO FREE SPEECH

*Palm Beach Circuit Court Jury finds Fane Lozman's First Amendment Rights were violated by the City of Riviera Beach*

**RIVIERA BEACH, FL**--March 5, 2007--- Mr. Fane Lozman prevailed against the City of Riviera Beach, Florida in the city's attempt to evict him from the Riviera Beach Municipal Marina. Mr. Lozman, acting as his own attorney, successfully argued the First Amendment Defense in a three day jury trial presided over by Palm Beach Circuit Judge Peter M. Evans. After a short deliberation the jury rendered the unanimous verdict on March 2, 2007. Opposing counsel for Riviera Beach, Mr. George Roberts and Ms. Sherri Renner of the West Palm Beach law firm, Roberts, Reynolds, Bedard & Tuzzio offered no comment after the verdict was read.

The jury returned two findings. 1) Mr. Lozman's protected speech was a substantial motivating factor in the City's decision to terminate his lease. 2) That the eviction charges brought by the City relating to Mr. Lozman's small dachshund were not sufficient grounds for eviction.

A second trial will be held in the near future on Mr. Lozman's counterclaim for damages.

Mr. Lozman, who had been previously arrested for exercising his constitutional rights to free speech at a City Council meeting (charges dropped by the State Attorney,) argued to the jury that the eviction was yet another step in the ongoing illegal harassment he suffered at the hands of the City's elected leaders. He further went on to show that the city's true motivation for his eviction was retaliatory as a result of his continued exercise of his First Amendment rights at city council meetings and the sunshine lawsuit he filed against the city. This lawsuit forced the city to drop their threat of eminent domain that potentially would have affected thousands of homes and businesses, along with transferring control of the city marina to a private developer.

The City's former Marina Director testified that the police were contacted on ten occasions while Mr. Lozman walked his leashed dachshund, "Lady," providing further evidence of the lengths the city went to illegally harass Mr. Lozman.

Commenting on the verdict, Lozman said "This is a great day for the First Amendment Rights of the citizens of Riviera Beach and all Americans…. the City of Riviera Beach needs to become part of the United States, instead of a dictatorship where its citizens who dare to speak up are harassed by the police, arrested at council meetings or evicted from city owned property…"

Fane Lozman is the Chairman of Scanshift.com, a financial trading research firm.

**FOR FURTHER INFORMATION CONTACT**
Ms. Christine C. Newman/tel. 561-310-2263      Mr. Fane Lozman/tel. 786-251-5868

**FOR IMMEDIATE RELEASE**

## RIVIERA BEACH CITIZEN FILES COMPLAINT IN
## STATE COURT TO ENFORCE SUNSHINE LAW

*Having just been directed in February 2007 by Circuit Court Judge Glenn Kelley to follow State law regarding the Ocean Mall referendum, Riviera Beach City Clerk Carrie Ward's professional behavior is again the subject of litigation.*

**RIVIERA BEACH, FL**—May 22, 2007--- On behalf of Riviera Beach citizen, Mr. Fane Lozman, a complaint under Florida's Sunshine Law was filed in the Fifteenth Judicial Circuit Court in Palm Beach County against the City of Riviera Beach, City of Riviera Beach City Attorney Pam Ryan, and Acting City of Riviera Beach City Attorney Glen Torcivia. The complaint alleges that the defendants have failed to keep written minutes of the City of Riviera Beach, City Council Agenda Review public meetings, along with failing to take accurate, coherent, and complete written minutes of the twice monthly, regular City Council public meetings.

It is unfortunate that citizens are compelled to pursue legal actions for the purpose of having the Court direct City employees to follow State law. City Clerk Carrie Ward's most recent embarrassing behavior, her failure to voluntarily accept the collected signatures for the Ocean Mall referendum, was spotlighted when Palm Beach Circuit Court Judge Glenn Kelley ordered Clerk Ward to place the two Ocean Mall Charter Amendments on the March 2007 Ballot. For Ms. Ward to again shirk her responsibilities by failing to either keep written minutes of public meetings at all, or to improperly take the minutes of those meetings that she does keep, should serve as a wake-up call to the Riviera Beach taxpayers as to how many hundreds of thousands of taxpayer dollars will continue to be squandered in legal fees and costs. The professional incompetence of City Clerk Carrie Ward in the performance of her official duties, along with the failure of City Attorney Pam Ryan and City Attorney Glen Torcivia to perform their official duties in seeing that the Sunshine Law is followed by this key City employee, is just one more reminder that the replacement of key City personnel is the most pressing mater before the newly elected City Council and Mayor.

The objective of this most recent legal action is to ensure that the citizens of Riviera Beach who cannot attend a public Council meeting have the opportunity to review the written minutes and clearly understand what took place at the meeting. The Sunshine Law provides no exception for laziness, indifference, or a lackadaisical attitude by a City Clerk.

# # #

**FOR FURTHER INFORMATION CONTACT**
Ms. Christine C. Newman/tel. 561-310-2263     Mr. Fane Lozman/tel. 786-251-5868

EXHIBIT 7

# STATEMENT OF GROUNDS
## FOR THE RECALL OF CITY OF RIVIERA BEACH
## COUNCILPERSON CEDRICK A. THOMAS

### Recall Committee Chairman: Mr. John Beatty

Pursuant to Florida Statute 100.361 (2) (a), the following statement of grounds for the recall of City of Riviera Beach Councilperson Cedrick A. Thomas is submitted this 23rd day of September, 2010, to the City of Riviera Beach Office of the City Clerk, Ms. Carrie E. Ward, Master Municipal Clerk.

### Statement of Grounds

City of Riviera Beach Councilperson Cedrick A. Thomas approved the assignment and lease of a portion of the City marina for a megayacht repair facility that will take approximately 40 percent of the marina property and will eliminate 80 percent of the public boat slips. Thomas approved this lease, which substantially changes the historical public use of the City marina, without following the mandated competitive process that he swore to uphold. The Request for Proposal (RFP-#2008-001) for the marina redevelopment, which

1

was based upon the 2008 Citizen's Master Plan, did not include a megayacht repair facility.  Nor did the selected winning proposal for RFP-#2008-001.  The RFP process does not allow for a substantial change of an accepted proposal without a new RFP being issued. Thomas had no discretion to thwart the competitive process.  Thomas therefore committed malfeasance when he voted to lease a portion of the City marina for a megayacht repair facility without having first conducted a competitive process in the form of a new RFP (open to other bidders) to ensure the highest lease fee could be obtained.

2

# STATEMENT OF GROUNDS
## FOR THE RECALL OF CITY OF RIVIERA BEACH COUNCILPERSON BILLIE E. BROOKS

### Recall Committee Chairman: Mr. John Beatty

Pursuant to Florida Statute 100.361 (2) (a), the following statement of grounds for the recall of City of Riviera Beach Councilperson Billie E. Brooks is submitted this 23rd day of September, 2010, to the City of Riviera Beach Office of the City Clerk, Ms. Carrie E. Ward, Master Municipal Clerk.

RECEIV
SEP 2 3 201
FICE OF THE CL

### Statement of Grounds

City of Riviera Beach Councilperson Billie E. Brooks approved the assignment and lease of a portion of the City marina for a megayacht repair facility that will take approximately 40 percent of the marina property and will eliminate 80 percent of the public boat slips. Brooks approved this lease, which substantially changes the historical public use of the City marina, without following the mandated competitive process that she swore to uphold. The Request for Proposal (RFP-#2008-001) for the marina redevelopment, which

1

was based upon the 2008 Citizen's Master Plan, did not include a megayacht repair facility. Nor did the selected winning proposal for RFP-#2008-001.  The RFP process does not allow for a substantial change of an accepted proposal without a new RFP being issued. Brooks had no discretion to thwart the competitive process. Brooks therefore committed malfeasance when she voted to lease a portion of the City marina for a megayacht repair facility without having first conducted a competitive process in the form of a new RFP (open to other bidders) to ensure the highest lease fee could be obtained.

# STATEMENT OF GROUNDS
## FOR THE RECALL OF CITY OF RIVIERA BEACH COUNCILPERSON JUDY L. DAVIS

**Recall Committee Chairman: Mr. John Beatty**

Pursuant to Florida Statute 100.361 (2) (a), the following statement of grounds for the recall of City of Riviera Beach Councilperson Judy L. Davis is submitted this 23rd day of September, 2010, to the City of Riviera Beach Office of the City Clerk, Ms. Carrie E. Ward, Master Municipal Clerk.

## Statement of Grounds

City of Riviera Beach Councilperson Judy L. Davis approved the assignment and lease of a portion of the City marina for a megayacht repair facility that will take approximately 40 percent of the marina property and will eliminate 80 percent of the public boat slips. Davis approved this lease, which substantially changes the historical public use of the City marina, without following the mandated competitive process that she swore to uphold. The Request for Proposal (RFP-#2008-001) for the marina redevelopment, which was based upon the

2008 Citizen's Master Plan, did not include a megayacht repair facility.  Nor did the selected winning proposal.  The RFP process does not allow for a substantial change of an accepted proposal without a new RFP being issued.  Davis had no discretion to thwart the competitive process. Davis therefore committed malfeasance when she voted to lease a portion of the City marina for a megayacht repair facility without having first conducted a competitive process in the form of a new RFP (open to other bidders) to ensure the highest lease fee could be obtained.

## STATEMENT OF GROUNDS
## FOR THE RECALL OF CITY OF RIVIERA BEACH
## COUNCILPERSON DAWN S. PARDO

### Recall Committee Chairman: Mr. John Beatty

Pursuant to Florida Statute 100.361 (2) (a), the following statement of grounds for the recall of City of Riviera Beach Councilperson Dawn S. Pardo is submitted this 23rd day of September, 2010, to the City of Riviera Beach Office of the City Clerk, Ms. Carrie E. Ward, Master Municipal Clerk.

### Statement of Grounds

City of Riviera Beach Councilperson Dawn S. Pardo approved the assignment and lease of a portion of the City marina for a megayacht repair facility that will take approximately 40 percent of the marina property and will eliminate 80 percent of the public boat slips. Pardo approved this lease, which materially changes the historical public use of the City marina, without following the mandated competitive process that she swore to uphold. The Request for Proposal (RFP-#2008-001) for the marina redevelopment, which was based upon the

2008 Citizen's Master Plan, did not include a megayacht repair facility. Nor did the selected winning proposal for RFP-#2008-001. The RFP process does not allow for a substantial change of an accepted proposal without a new RFP being issued. Pardo had no discretion to thwart the competitive process. Pardo therefore committed malfeasance when she voted to lease a portion of the City marina for a megayacht repair facility without having first conducted a competitive process in the form of a new RFP (open to other bidders) to ensure the highest lease fee could be obtained.

## STATEMENT OF GROUNDS
## FOR THE RECALL OF CITY OF RIVIERA BEACH
## COUNCILPERSON SHELBY L. LOWE

### Recall Committee Chairman: Mr. John Beatty

Pursuant to Florida Statute 100.361 (2) (a), the following statement of grounds for the recall of City of Riviera Beach Councilperson Shelby L. Lowe is submitted this 23rd day of September, 2010, to the City of Riviera Beach Office of the City Clerk, Ms. Carrie E. Ward, Master Municipal Clerk.

### Statement of Grounds

City of Riviera Beach Councilperson Shelby L. Lowe approved the assignment of a portion of the City marina for a megayacht repair facility that will take approximately 40 percent of the marina property and will eliminate 80 percent of the public boat slips. Lowe approved this assignment, which substantially changes the historical public use of the City marina, without following the mandated competitive process that he swore to uphold. The Request for Proposal (RFP-#2008-001) for the marina redevelopment, which was

1

based upon the 2008 Citizen's Master Plan, did not include a megayacht repair facility. Nor did the selected winning proposal for RFP-#2008-001. The RFP process does not allow for a substantial change of an accepted proposal without a new RFP being issued. Lowe had no discretion to thwart the competitive process. Lowe therefore committed malfeasance when he voted to assign a portion of the City marina for a megayacht repair facility without having first conducted a competitive process in the form of a new RFP (open to other bidders).

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No: 08-80134 CIV-HURLEY/HOPKINS

FANE LOZMAN,

     Plaintiff,

vs.

CITY OF RIVIERA BEACH,

     Defendant.

_____

**PLAINTIFF'S MOTION TO AMEND COMPLAINT (DE 478) WITH ATTACHED
THIRD AMENDED COMPLAINT**

     Plaintiff Fane Lozman mistakenly did not comply with Local Rule 15.1 when he filed his motion for leave to amend his second amended complaint (Dkt. 478) to add a constitutional "taking claim." The Court entered an order (Dkt. 497) giving Lozman five days to renew his motion to amend, by attaching the original of the proposed amendment to the motion.

     Lozman renews his motion to amend complaint (DE 478 attached as exhibit A), by complying with Local Rule 15.1 and attaching his proposed third amended complaint (attached as exhibit B).

     Dated: June 12, 2014

             By: _____

                Fane Lozman
                *Pro Se*

1

Fane Lozman

2913 Ave. F

Riviera Beach, FL  33404

sp500trd@yahoo.com

(786) 251-5868

## **CERTIFICATE OF SERVICE**

I, Fane Lozman, certify that on this 12th day of June 2014, the following will receive

ECF notification once the Clerk files this response.

Benjamin L. Bedard, Esquire
Bradley Ellis, Esquire
Roberts, Reynolds, Bedard & Tuzzio, P.A.
470 Columbia Drive, Suite 101C
West Palm Beach, Florida  33409
Telephone:  561-688-6560
Facsimile:  561-688-2343
Email:  bbedard@rrbpa.com
Attorneys for City of Riviera Beach

.

# EXHIBIT B

# Proposed Third Amended Complaint

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: 08-80134-CIV-HURLEY/HOPKINS

FANE LOZMAN,

     Plaintiff,

vs.

CITY OF RIVIERA BEACH,

     Defendant.

_____

## THIRD AMENDED COMPLAINT

Plaintiff, Fane Lozman sues defendant, City of Riviera Beach ("City"), and alleges as follows:

### Nature of the Case

This action for money damages is brought against the City of Riviera Beach pursuant to 42 U.S.C. § 1983, the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and under the laws of the State of Florida against the City of Riviera Beach.

1.     This action is brought by Lozman, a civic activist, against the City who used the power of its office to retaliate against Lozman for his advocacy criticizing the City and the Riviera Beach Community Redevelopment Agency (CRA) and their respective public officials and policies. In an effort to silence and discredit Lozman, the City through its City administration and police department, waged a campaign against Lozman that included false arrests and battery, threats,

retaliation and intimidation. These actions were taken to silence Lozman and to punish him for exercising his First Amendment rights.

## Jurisdiction and Venue

2.     This action arises under the constitution and laws of the United States, particularly the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

3.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331(a) and 1343, and 42 U.S.C. § 1983, as well as principles of supplemental jurisdiction under 28 U.S.C. § 1367.

4.     This action is brought before the Court in the Southern District of Florida pursuant to 28 U.S.C. §1391(b).

5.     All conditions precedent to the maintenance of this action have been performed or have occurred prior to its institution including those set forth in Florida Statute Chapter 768.

## Parties

6.     Plaintiff Fane Lozman was a resident who lived on his floating home at the City of Riviera Beach marina, in Palm Beach County, Florida.

7.     Defendant, City of North Bay Village, is a municipal corporation in Palm Beach County, Florida.

8.     The governing body of the City is its City Council, and all powers of the City and the determination of all matters of policy are vested in the City Council.

## General Allegations

9.     In 2006, Lozman moved to the City.  He was the owner of a floating residential structure, also referred to as a floating home, which was his registered homestead, at 200 East 13th Street, Marina Slip # 452, Riviera Beach, Florida.

2

10.     Lozman leased the boat slip for his floating home from the City Municipal Marina.

11.     Shortly after Lozman moved into the City marine in March of 2006, Lozman became aware of the City's planned redevelopment project.

12.     The redevelopment plan proposed the taking of thousands of homes (and many businesses) through the power of eminent domain and giving them, along with the City marina, to a private developer for a proposed 2.4 billion dollar redevelopment project.

13.     Lozman made public comments against both the initial 2006 redevelopment plan and three subsequent plans in 2008, 2010 and 2012, along with the corruption that he perceived in the City government at various City Council and CRA public meetings between April 2006 to November 2013. The joint legislative audit committee of the State of Florida conducted two audits after Lozman moved to Riviera Beach. A letter was sent by the audit committee to the Palm Beach State attorney asking for a criminal investigation into Riviera Beach and the CRA. The State attorney subsequently forwarded this request to federal prosecutors. (attached as exhibit 1, Palm Beach Post stories, "The Feds find Riviera" and "Riviera probe request coming.")

14.     Lozman was removed by the police from a regularly scheduled meeting of the CRA while speaking from the podium during the public comments portion of the meeting on May 10, 2006.

15.     Lozman was then denied access to a special meeting of the City Council following the regularly scheduled CRA meeting preceding it on May 10, 2006.

16.     The morning after the May 10 special meeting, on May 11, 2006, Florida Governor Jeb Bush signed into law H.B. 1567, which signified a comprehensive overhaul of Florida's eminent domain laws. Section 73.013 et sq. of the Florida Statutes prohibits the use of eminent domain in the manner the City and CRA proposed for its redevelopment plan.

17.     On June 7, 2006, Lozman filed a lawsuit (attached as exhibit 2) against the City, Mayor Michael Brown, and City Councilpersons Norma Duncombe, Vanessa Lee, Elizabeth Wade, James Jackson and Ann Iles, alleging a violation of the Government-in-the-Sunshine Law.

18.     On June 28, 2006, the City held a scheduled closed executive session (attached as exhibit 3).  This meeting was recorded and the transcript of this proceeding has now been made a public record.  At this meeting, City officials discussed the Sunshine lawsuit brought by Lozman and the need to do "whatever we deem necessary" in the defense of that suit, including "background investigation on Lozman," the intimidation of Lozman, and the hiring of a private investigator to determine who was "funding" Lozman's Sunshine lawsuit.  The consensus of the elected officials to target Lozman, was designed to suppress Lozman's exercise of his rights protected under the First Amendment to the United States Constitution, in violation of 18 U.S.C. § 241, the federal statute which criminalizes "two or more persons who conspire to injury, oppress, threaten or intimidate and person in an State…in the free exercise of any right secured to him by the Constitution or the laws of the United States.

19.     In addition, the City wanted to investigate Lozman to determine whether he was connected with an entity called the Pacific Legal Foundation, the Governor, the Attorney General's office, the legislature and local citizens that the City perceived as being opposed to the proposed re-development by the City.  Lozman's Sunshine lawsuit had been publicly supported by comments from Governor Bush and Speaker of the House Bense to the media.  Their offices, along with the Attorney General's office, cooperated with Lozman's attorneys who prepared the Sunshine lawsuit.

20.     Thereafter, Lozman continued attending public meetings in Riviera Beach and continued to express his views during the public portion of such meetings.  However, the City, through its City Council, its various subdivisions and its individual employees, embarked on a

campaign of harassment and retaliation against Lozman for the purpose of punishing Lozman for exercising his right of free speech and right to petition the government for redress of grievances and intimidating Lozman in an effort to deter him from exercising such rights in the future.

21.     The City Council members in 2006 (Michael Brown, Norma Duncombe, Vanessa Lee, and Elizabeth Wade) had directed City employees, specifically marina employees and City police officers, to find means of harassing and retaliating against Lozman.  The City marina director, George Carter, took the lead in carrying out that directive in 2006.

22.     The harassment and retaliation resulted in Lozman's arrest in November 2006.  On November 15, 2006, during the public comments portion of the City council meeting, Lozman calmly approached the podium and began making his comments.  Unhappy with his comments in the U.S. Attorneys' efforts to crack down on public corruption in Palm Beach County, the City, with the tacit approval of all its elected officials, and at the specific direction of Elizabeth Wade, instructed law enforcement officers to arrest Lozman, without probable cause, and remove him from the meeting.  Lozman was handcuffed while still making his public comments, thus depriving him of his rights guaranteed by the First Amendment and his rights to attend a public meeting as set forth in Florida's Sunshine Law.  The entire incident was caught on videotape.

23.     Lozman was dragged to the City police department, with his hands handcuffed behind his back, where he was locked up in a holding cell.

24.     The City claimed that Lozman was arrested for disorderly conduct, trespassing, and resisting arrest without violence.  These charges were nolle prossed by the Palm Beach County State Attorney on January 17, 2007.

25.     The campaign of harassment and retaliation against Lozman did not cease after his 2006 arrest.  Lozman continued to attend public City meetings and was i) removed from numerous

meetings by the City police; ii) physically grabbed by the City police while Lozman was making his public comments at the speakers podium and told to sit down; iii) physically thrown by the City police to the City Council chambers floor at the specific direction of City Councilperson Dawn Pardo while Lozman was making his public comments at the speakers podium; and iv) regularly interrupted and threatened with police force and removed from public meetings (Chairpersons Ann Isles, Elizabeth Wade, Dawn Pardo, Cedrick Thomas) in an attempt to censor Lozman's public comment. The various City Council Chairpersons actions gave license to and had the effect of a legal imprimatur to the police to treat Lozman as if he had engaged in unlawful conduct. As a result, the police department became emboldened and members of the police would routinely stop and confront Lozman while he walked his dog at the marina.

26.     The acts constituting harassment and retaliation by the Defendant included:

a.      Agreeing to intimidate Lozman into dismissing his Government-in-the-Sunshine lawsuit during the June 28, 2006, executive session. This meeting was attended by City Council Chairperson Ann Isles, District 5; City Councilpersons James "Jim" Jackson, District 4; City Councilperson Elizabeth "Liz Wade, District 3; City Councilperson Norma Duncombe, District 2; Chair Pro Tem Vanessa Lee; Mayor Michael Brown; City attorney Pamala Ryan; and City Manager William Wilkins.

b.      The City's elected officials agreeing to hire a private investigator to investigate and/or follow Lozman during the June 28, 2006 executive session.

c.      Constantly censoring Lozman's public comments at City Council and CRA meetings on issues ranging from three different re-development plans for the City marina, allegations of corruption involving elected officials of the City, the misconduct and incompetence of key City employees and other issues of public concern.

6

d.      A few of the latest examples of Lozman being censored while making public comments at City Council meetings include: i) on November 6, 2013, City Chairperson Dawn Pardo had a City police officer remove Lozman from the speaker podium prior to his 3 minute allocated time for public comment had expired; ii) on October 16, 2013, City Chairperson Cedrick Thomas stated from the dais that Lozman did not have a First Amendment right to make public comments that dealt with official records, as recorded by the Palm Beach County Clerk, of an elected official because they portrayed this elected official in a negative light; and iii) during the November 13, 2013 CRA meeting, Lozman was called a "Rapist, Cross Dressing, Fag, Piece of Shit" by City Councilperson Bruce Guyton in a vile, disgusting, and slanderous attempt to intimidate Lozman into not making his public comments, and/or provoking Lozman into a physical confrontation.  Bruce Guyton has a history of violence, mental instability, DUI, and illegal drug use.  Bruce Guyton had been involuntarily committed by State Court Judge Diana Lewis, Mental Health Court, in Case No. 501996MH000389XXMAIB.

e.      Arresting Lozman for disorderly conduct, trespassing, and resisting arrest without violence on November 15, 2006, while Lozman was speaking during the public comment, non-agenda, at a City Council meeting;

f.      Publicly stating that Lozman does not have a First Amendment right to speak while he was speaking during the public comment portion of a City Council meeting on or about January 3, 2007, along with many additional meetings up to and including the November 6, 2013 City Council meeting.

g.      Causing Lozman to be physically removed by the City Police, during City Council or CRA public meetings, from the City Council Chambers, the City Hall building, or the Public Speakers Podium.  These removals occurred on numerous occasions between 2006 to 2013.  The

7

police were directed to remove Lozman by the City Council Chairpersons (or acting Chairperson), to include Liz Wade, Ann Isles, Cedrick Thomas and Dawn Pardo.  There was also an occasion where Assistant City Manager Gloria Shuttlesworth directed that a police officer remove Lozman from a City Council meeting.

      h.      On October 21, 2009, Lozman suffered a painful physical injury to his previously repaired hip socket and pelvis (there are a number of screws and plate in it from an injury sustained prior to Lozman moving to the City), after he was thrown on the City Council Chambers floor by two Riviera Beach police officers at the Direction of the City Council Chairperson Dawn Pardo.  The City Council and City attorney Pamala Ryan laughed as Lozman lay on the floor in pain.  Lozman required a visit to the Emergency Room where his injury was diagnosed, he was provided pain medication, and he used crutches until his injury healed.

      i.      Constantly censoring Lozman's comments at public meetings of the City Council and CRA from 2006 through the present.

      j.      Filing a sham federal admiralty action that culminated in the seizure and subsequent destruction by the City of Lozman's floating residence at the City Marina.   The U.S. Supreme Court reversed the lower courts and ruled that Lozman's floating home was illegally seized by the City because it was not a vessel subject to Federal Admiralty jurisdiction.

      k.      Illegally conducting a self-help eviction, by turning off Lozman's electricity to his floating home between April 1, 2009 to April 20, 2009.

      l.      Ignoring State Court Judge Peter Evan's order of April 17, 2009, to restore the electricity to Lozman's floating home.

      m.      Repeatedly harassing Lozman by having City marina employee Pierre Smith go to Lozman's floating home and take pictures through the window of Lozman, and sometimes Lozman

and his female companion, in various stages of undress.

n.     Repeatedly having the City police harass and threaten Lozman when he would walk his small dachshund on a lease around the City marina; and

o.     Illegally turning off the electricity to friends of Lozman's who resided on their personal vessels at the City marina.  The City did this in a selective manner, because the electricity was not turned off to other tenants' vessels.

## COUNT I – 42 U.S.C. § 1983 AGAINST DEFENDANT CITY OF RIVIERA BEACH.

27.     This is an action for injunctive relief and for damages under Title 42, U.S.C. § 1983.

28.     The allegations of paragraphs 1 through 26 are incorporated by reference into this Count and are re-alleged as if fully set forth herein.

29.     Lozman has a right to petition the government under the First Amendment of the Constitution of the United States of America, a right to exercise free speech at public meetings, and a right to be free from unreasonable seizures under the Fourth Amendment, as applied to the states through the Fourteenth Amendment.

30.     Lozman's rights to petition the government and exercise free speech includes the right to engage in these constitutionally protected acts without fear of retaliation by the government against him.

31.     The City, through its Council Members, determined that the City should retaliate against Lozman for his exercise of his right to petition the government and right to free speech.

32.     The City, through its Council Members acting for itself and by direction to its subordinate boards, inspectors, officers and employees, has commenced an intentional campaign to harass and intimidate Lozman.

33.     At all times alleged in this Count, the City and its individual Council Members, board members, inspectors, officers and employees acted under color of state law and in the effectuation of the policies of the Council Members.

34.     The City deprived Lozman of rights secured to him under the First and Fourth Amendments of the Constitution of the United States of America, including Lozman's right to petition the government for redress of grievances and his right to speak out freely on public issues, and to be free from unreasonable seizures.

35.     The City accomplished this deprivation by harassing and retaliating against Lozman, with Lozman being personally arrested twice.   Lozman's floating home was also arrested and destroyed by the City in a sham federal admiralty action.  The conduct comprising the deprivation of Lozman's constitutional rights include but are not limited to, the conduct alleged in paragraphs 1 to 32 above.

36.     The City intended by each of these actions to punish and retaliate against Lozman for exercising his First Amendment Rights and to deter Lozman and others from exercising such rights in the future.

37.     This policy to punish and silence Lozman for his public criticism of the City, its elected officials, and key employees was designed and carried out by the City as a governmental entity, and by the individual City policy makers at the highest level, with the purpose of stopping and punishing Lozman from engaging in constitutionally protected political speech.

38.     Each of the actions set forth in paragraph 1 to 37 of this Third Amended complaint was taken pursuant to a custom, policy, or decision made by a governmental official with final policymaking authority.

39.     As a result of the City's campaign to harass, retaliate and punish Lozman, Lozman

has been deprived of his right to petition the government and exercise free speech as secured under the First Amendment to the Constitution of the United States of America and to be free from retaliation, and unreasonable seizure of his person and property.

40.     As a result of the City's campaign to harass, retaliate and punish Lozman, Lozman has been deprived of both substantive and procedural due process guaranteed under the Fourteenth Amendment of the Constitution of the United States of America.

41.     As a result of the City's campaign to harass, retaliate and punish Lozman, Lozman has been deprived of equal protection guaranteed under the Fourteenth Amendment of the Constitution of the United States of America by virtue of the City's discriminatory and disparate treatment of Lozman in the application of its policies, procedures, regulations, ordinances and other laws.

42.     As result of the actions and conduct of defendants, Lozman has no adequate remedy at law and is suffering irreparable injury as a result of the City's ongoing campaign to harass him, which injury cannot be redressed in the absence of a permanent and mandatory injunction requiring the City to end its campaign of intentional harassment and retaliation against Lozman in response to Lozman's exercise of his rights of free speech and to petition the City for the redress of grievances.

43.     The acts of the City described above were maintained under color of the law of the State of Florida and under the color of the individual elected officials respective offices as officers and agents of the State of Florida and of the City.

44.     The acts of the City's elected officials were so obviously wrong in the light of preexisting law, that these public officials knowingly violated the law, because they had knowledge of the law and took an oath to uphold it.

45.     Lozman has suffered damage as a result of Defendant's violations of his Civil Rights,

including:

      a.      Injury to his person that was sustained after being thrown on the floor by two police officers, at the direction of City Chairperson Pardo while Lozman was making public comments.  Lozman is only seeking nominal damages not to exceed one dollar.

      b.      Damages for the destruction of Lozman's floating home, furniture and related contents as a result of City Councilpersons Pardo, Cedrick Thomas and Judy Davis' wrongful actions.

      c.      Attorneys' fees and costs incurred by Lozman as a result of and in response to the City's deprivation of Lozman's civil rights.

      d.      Attorneys' fees and costs incurred by Lozman in response to each individual wrongful act committed by the City in furtherance of the City's overall scheme to harass, retaliate against, intimidate, and punish Lozman.

      e.      Attorney's fees and costs incurred by Lozman at the district, appellate, and U.S. Supreme Court in the related admiralty action.

46.      Lozman had previously employed the law firm of Cobb and Cole to pursue this action and has contracted to pay a reasonable attorneys' fee, for which fees and the costs of this action, Lozman is liable under the provisions of Title 42 U.S.C. § 1988.

47.      Lozman has provided the City notice pursuant to Fla. Stat. §768.28(6).

### COUNT II - FALSE ARREST
(State Tort of False Arrest against City of Riviera Bea)

48.      This is an action for common-law false arrest.

49.      The allegations of paragraphs 1 through 26 are incorporated by reference into this

Count and are re-alleged as if fully set forth herein.

50.     This is a cause for damages for at least the nominal amount of $1.00, exclusive of costs and attorney's fees.  Lozman defers to the Court as to the jury instruction on how to determine the damage element of the false arrest for Lozman's loss of liberty, and for Lozman having a record for this arrest.  There was not excessive force that required medical or mental treatment, thus removing compensatory damages from the Court's analysis.

51.     On or about November 15, 2006, Lozman was arrested at a City Council meeting for speaking during the public comment portion of the meeting.

52.     Lozman was removed and arrested at the direction of the City Councilperson Wade, with the approval of Councilmembers Duncombe and Lee.

53.     The City, through its police department, intentionally arrested and detained Lozman without an arrest warrant and without probable cause in that the City knew or had reason to know at the time of his arrest and detention that Lozman had not committed any crime.

54.     Lozman was charged with disorderly conduct, trespassing, and resisting arrest without violence.

55.     State prosecutors declined to prosecute Lozman.

56.     The City's detention of Lozman was unreasonable and unwarranted by the circumstances in that Lozman was a resident of the City who was lawfully speaking at a City Council Meeting and who had not committed any crime.

57.     Lozman's arrest was publicized in the City and throughout Palm Beach County in print and television coverage.

58.     Lozman was arrested a second time on assault and battery after he confronted marina employee Pierre Smith who had been repeatedly taking pictures through the window of Lozman's

floating home.  This arrest was nolle prossed by the State attorney prior to arraignment.  Lozman was served paperwork that he had been arrested, yet was never taken to a police station for processing?  Lozman also seeks <u>damages for at least the nominal amount of $1.00 for this arrest</u>, exclusive of costs and attorney's fees.  Lozman defers to the Court as to the jury instruction on how to determine the damage element of the false arrest for Lozman having a record for this arrest.

59.     Lozman has provided the City notice pursuant to Fla. Stat. §768.28(6).


## COUNT III- STATE TORT OF BATTERY AGAINST THE CITY OF RIVIERA BEACH

63.     Lozman realleges paragraphs 1 through 23, and incorporates them by reference herein.

65.     The City is responsible for the conduct of the police officers in its employ.

66.     On repeated occasions between 2006 to 2013, including November 15, 2006, and October 21, 2009, the City police, while acting in the course and scope of their duties as police officers employed by City,  did, without legal justification, batter, touch and strike Lozman without the consent of Lozman and against Lozman's will.  These incidents happened during City Council and CRA meetings.

67.     As a result of such actions, Lozman suffered damages that included bodily injury and physical suffering, but are limited to $1 in nominal damages.  *See* ¶45 (a).

68.     Lozman has provided the City notice pursuant to Fla. Stat. §768.28(6).


## COUNT IV – STATE "INTENTIONAL TORT" OF CONVERSION AGAINST THE CITY OF RIVIERA BEACH

69.     The City improperly arrested Lozman's floating home to include his furniture and

other personal property with the approval of Councilpersons Pardo, Thomas and Davis, on a sham federal admiralty complaint. Lozman's floating home was towed from the City to Miami, after the City lost a State jury trial to evict Lozman's floating home from the City marina.

70.     Lozman demanded the return of his floating home to the City marina and the City refused.

71.     The City purchased Lozman's floating home at a U.S. Marshal auction. The City, after successfully preventing Lozman from stopping the confirmation of sale, maliciously destroyed Lozman's floating home at taxpayer expense.

72.     The City permanently deprived Lozman of his property in a vindictive action to try and stop Lozman from exercising his First Amendment rights, to include continuing to fight the City's attempt to turn over the City marina over to a private developer.

73.     The U.S. Supreme Court reversed the lower courts and ruled that Lozman's floating home was not subject to federal admiralty jurisdiction and should not have been seized.

74.     Lozman is entitled to damages to include: i) the fair market or replacement value of his floating home[1], furniture and other accessories; ii) living expenses from April 2009 to November 2013; and iii) his legal fees at the district, appellate and U.S. Supreme Court.

75.     Lozman has provided the City notice pursuant to §768.28(6).

### <u>COUNT V – "TAKING" AGAINST THE CITY OF RIVIERA BEACH</u>

76.     Lozman realleges paragraphs 1 through 23, and incorporates them by reference herein.

---

[1] The fraudulent representations the City made to secure the arrest warrant in the admiralty action, may justify an award of the replacement value as opposed to the fair market value of Lozman's floating home.

15

77.     Obviously Lozman has a claim against the City pursuant to the Fifth and Fourteenth Amendments of the United States Constitution, for "taking" Lozman's private property, his owner occupied residence (a.k.a. floating home), and destroying it without just compensation.

78.     More importantly, Lozman also has a claim for the unlawful "taking" against the City under the Florida Constitution, which prohibits the taking of private property "except for a public purpose and with full compensation therefore paid to each owner."  Art. X, § 6, Fla. Const.

79.     The City seized and destroyed Lozman's house in a taking action, so that the north side of the City marina where Lozman's floating home was moored could be redeveloped from fixed docks to floating docks.

80.     LOZMAN is entitled to damages to include: i) the fair market value of his residence, furniture and other accessories as compared to other floating homes in South Florida; and ii) his legal fees and costs at the district, appellate and U.S. Supreme Court that were expended to reverse the City's illegal admiralty arrest of Lozman's residence.  The reversal by the Supreme Court now makes the City liable for the taking of Lozman's floating residence without just compensation.

81.     Lozman has provided the City notice pursuant to §768.28(6)

## DEMAND FOR TRIAL BY JURY

Lozman hereby demands a jury trial as to all issues triable by a jury.

**WHEREFORE**, Lozman respectfully requests that this Court enter judgment and award:

A.     A permanent injunction that: i) Lozman has the right to petition the City for redress of grievances; the right to speak freely, without threat of arrest or being battered by the police, during the non-agenda portion of public meetings; to be free

16

from the City's policy of retaliating against Lozman for making his comments; to be free from unreasonable seizures; and the same rights guaranteed under the Constitution while Lozman lives in his floating home, as he would if he lived in a land based house.

B.      Nominal damages not to exceed $1 for a visit to the VA emergency room after being thrown on the City Council Chamber floor by two Riviera Beach police officers while Lozman made his public comments.

C.      At least nominal damages not to exceed $1.00 for two false arrests or a higher dollar amount as determined by a jury.   Lozman defers to the Court as to the jury instruction on how to determine the damage element of the false arrests for Lozman's loss of liberty, and for Lozman having a record for these two arrests.  There was not excessive force that required medical or mental treatment, thus removing compensatory damages from the Court's analysis.

D.      A monetary sum representing either the fair market value or the actual replacement[2] cost of Lozman's floating home to include its furniture and access ramp; special damages for Lozman's housing expenses and related costs between April 2009 to October 2013 for having to move into alternate housing after his floating home was illegally seized; and Lozman's costs, expenses and attorneys' fees that were incurred at the district court, appellate court, and the U.S. Supreme Court in *Lozman v. The City of Riviera Beach*, 568 U.S. ___(2013).

---

[2] The fraudulent representations the City made to secure the arrest warrant in the admiralty action, may justify an award of the replacement value as opposed to the fair market value of Lozman's floating home.

17

F.      Lozman's costs, expenses and attorneys' fees pursuant to 42 U.S.C. § 1988 in

this §1983 case to include Lozman's two successful appeals of the Court's final

dismissal and fee order at the Eleventh Circuit.

G.      Such further and other relief as the Court deems necessary and proper.


Dated: June 12, 2014

By:   _____

      **Fane Lozman**
      *Pro Se*


Fane Lozman

2913 Ave. F

Riviera Beach, FL  33404

sp500trd@yahoo.com

(786) 251-5868


18

**CERTIFICATE OF SERVICE**

      I, Fane Lozman, certify that on this 12th day of June 2014, I served the foregoing via email to

Benjamin L. Bedard, Esquire
Bradley Ellis, Esquire
Roberts, Reynolds, Bedard & Tuzzio, P.A.
470 Columbia Drive, Suite 101C
West Palm Beach, Florida  33409
Telephone:  561-688-6560
Facsimile:  561-688-2343
Email:  bbedard@rrbpa.com
Attorneys for City of Riviera Beach


Jeffrey M. Bell, Esquire
Bank Lopez Gassler PA
1200 S. Pine Island Road, #170
Plantation, Florida  33324
Telephone:    954-440-1332
Facsimile:    954-533-3051
Email:   jbell@bankerlopez.com
Attorneys for Defendants Ann Iles,
Elizabeth Wade, George Carter,
Gloria Shuttlesworth, Michael Brown,
Norma Duncombe and Vanessa Lee

EXHIBIT 1

# The feds find Riviera

**Click-2-Listen**

Palm Beach Post Editorial

Tuesday, August 28, 2007

A year ago, three state legislators, city residents and this newspaper asked for answers to this question: How accountable are Riviera Beach and its Community Redevelopment Agency for the public's money?

Some credible answers finally arrived in December. The state auditor general cited 25 counts of financial mismanagement, ranging from unpaid sales taxes to consultants being paid millions of dollars for undocumented work.

**More from Opinion**

Editorials, letters, columns and Don Wright cartoons

**Share This Story**

digg

del.icio.us

Fark

Newsvine

reddit

Technorati

Facebook

More

What are these?

Not much has happened since then, unless one counts the fact that while no one can say why - or wants to say - no one is denying that the U.S. attorney's office is reviewing the Riviera Beach audit findings. This comes after four former Palm Beach County elected officials are in prison or headed there on corruption charges. If there are similar problems in Riviera Beach, the city should be the Justice Department's new area target.

Andrew Lourie, supervisor in the U.S. attorney's office in West Palm Beach, said only: "It is a public audit. We're reviewing it." But the corruption question is why the audit initially was referred to Palm Beach County State Attorney Barry Krischer in February by the state's Joint Legislative Auditing Committee. "Now that it has been bumped up to the federal level, it seems at least a hint that the state attorney found something of consequence," said Rep. Carl Domino, R-Jupiter, the auditing committee's co-chairman. "If I was being investigated and I heard it had been referred to the feds, I wouldn't be very happy that day."

The audit getting federal scrutiny examined the city's and the CRA's books from Oct. 1, 2004 to Nov. 30, 2005. Rep. Domino and others had cited, to name one example, the $1.2"million payment to West Palm Beach construction consultant Kimley-Horn and Associates for services that were not documented. In fact, finding No. 14 was that the CRA "paid $5,612,891 for various consulting and professional services" during the audit period "without accomplishing the projects" outlined in the city's 2001 redevelopment plan.

Riviera Beach officials had tried to finesse such questions by anointing a citizens review committee. Some city representatives traveled to Tallahassee this year in a vain attempt to convince Rep. Domino's committee that continuing state scrutiny was a waste of time and taxpayers' money. City officials maintained that the expenditures cited in the audit were documented, and that no one would be stupid enough to try anything criminal.

Here's another thing that has happened since last year: Most of those officials are out of office.

# Riviera probe request coming

**By Dara Kam**
**Palm Beach Post Capital Bureau**
**Tuesday, February 06, 2007**

**TALLAHASSEE — State lawmakers are pushing for a grand jury to investigate a scathing audit of Riviera Beach and its Community Redevelopment Agency after a committee meeting on Monday exploded with accusations of wrongdoing between the mayor and city council.**

**The Joint Legislative Auditing Committee, co-chaired by Rep. Carl Domino, R-Jupiter, will send an official request to State Attorney Barry Krischer, who has received the audit but not acted on it, to look into questionable payments to consultants and possible fraud, Domino said.**

**Domino and others questioned, among other things, a $1.2 million payment ordered by Riviera Beach Mayor Michael Brown to Kimley-Horn and Associates, a West Palm Beach construction consultant, for services that were not documented.**

**Brown, whose office is largely ceremonial, and four city council members attended the committee meeting, where lawmakers demanded to know what Riviera Beach taxpayers got in return for at least $7 million in grants to redevelop blighted areas.**

**"How did this happen without any oversight by the CRA board, and what are you going to do about it?" Rep. Susan Bucher, D-West Palm Beach, repeatedly asked Riviera Beach City Manager William Wilkins.**

**"I don't know how it happened. I don't know," he finally responded.**

**Lawmakers could withhold state money from the city and the CRA but do not have authority to conduct a criminal investigation.**

**Brown told the committee that, despite the audit's findings that the CRA had accomplished little, it had helped to increase property values in the once economically depressed area.**

**But City Councilwoman Liz Wade threw a bombshell at Brown as the meeting ended, insisting on addressing the committee.**

"A few of you are saying things like 'Where's the fraud? Where's the money?'

"If you think some of us have spent the money, then I will sign off on pushing the investigation forward. If you think that money was wasted, yes. I am one of the elected officials who said we have spent $7 million, and we don't have a cotton-picking thing to show for it," a livid Wade said after the committee unanimously voted to formally ask Krischer to investigate.

"I'm tired of hiding anybody, and I'm calling a spade a spade. We have done what we had to do. The CRA director that caused those problems is gone. The cheerleader that was leading us on with regards to how much he thought was right should not be sitting up here," Wade said, referring to Brown, who shook his head.

"The $1.2 million? A nonmember of the board pulled that check and gave it to a consultant without any backup. Our auditors then sent it back to us and said there's no documentation and there's no backup for this check."

Wade said Brown also pulled five checks the CRA, made up of the five city council members, had previously approved.

Domino, R-Jupiter, pointedly asked state auditor general audit manager James Dwyer whether his report indicated fraud or criminal behavior. Dwyer said the lack of documentation justifying the expenditures raises questions about whether they served a public purpose.

Mike Edmondson, Krischer's spokesman, said that prosecutors will review the committee's request. Edmondson stressed that the inquiry must rise to a criminal level in order for it to reach a grand jury.

"If it's simply to repeat the work of the auditors, that obviously would be a futile undertaking," Edmondson said. "However, if the auditing committee has specific concerns about criminal conduct that go beyond its findings, that would be something our office would look at."

City Council Chairwoman Ann Iles said she was disturbed by the committee's vote on the investigation but "if that's going to eliminate all of the speculation and the fingerpointing and all that kind of stuff, we would go through it to get all of that cleared up. I say go ahead with it."

Monday's accusations deepen the rift between Brown and a majority of the city council, three of whom are up for reelection on March 13.

After the meeting, Brown accused Wade of lying.

"What she said was total lies. Falsehood. There's a saying, when people get desperate you have to ask why. You look at minutes, discussions, the closed executive sessions.

"The person that was really bringing up all of these issues that are identified in the audit is me. Two years ago the politics changed so that three people started making decisions which are reflected in this audit," Brown said.

EXHIBIT 2

THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. ~~CO 2006 A 005 632 XXXX MB~~

FANE LOZMAN and )
VIRGINIA MERCHANT, )
          )
      Plaintiffs, )
          )
          )
vs. )
          )
CITY OF RIVIERA BEACH, )
a municipality in the State of Florida; )
MICHAEL BROWN, in his official )
capacity as Mayor of the  City of Riviera )
Beach; and ANN ILES, ELIZABETH )
WADE, JAMES JACKSON, NORMA )
DUNCOMBE,  and VANESSA LEE in )
their official capacities as members of the )
City Council of the City of Riviera Beach, )
          )
      Defendants. )
_____/

## COMPLAINT

    Plaintiffs, FANE LOZMAN AND VIRGINIA MERCHANT, sue the Defendants, CITY OF

RIVIERA BEACH, MICHAEL BROWN, ANN ILES, ELIZABETH WADE, JAMES JACKSON,

NORMA DUNCOMBE, and VANESSA LEE, and state:

### <u>NATURE OF THE CASE</u>

    1.    This is an action for injunctive and declaratory stemming from Defendants'

wrongful actions in violation of Florida's "Sunshine Law," found in section 286.011 of the Florida

Statutes (2005).

## JURISDICTION AND VENUE

2.      Jurisdiction over the instant action is vested in this Court pursuant to article V, section 5(b), Florida Constitution, and sections 86.011 and 286.011, Florida Statutes (2005).

3.      Venue is proper in Palm Beach County pursuant to section 47.011, as Defendants reside in Palm Beach County and the complained-of conduct comprising this action occurred in Palm Beach County.

## PARTIES

4.      Plaintiff Fane Lozman is an individual residing in the City of Riviera Beach, Palm Beach County, Florida.

5.      Plaintiff Virginia Merchant has owned and worked in the Sea Shell City shop in Riviera Beach for the last 30 years. The Sea Shell City shop has been in her family's possession for over 50 years.

6.      Defendant City of Riviera Beach is a municipality within the meaning of pursuant to Article VIII, Section 2 of the Florida Constitution, and is located in Palm Beach County, Florida.

7.      Defendant Michael Brown is the Mayor of the City of Riviera Beach and resides in Palm Beach County, Florida.

8.      Defendant Ann Iles is a member and the Chairwoman of the City Council of the City of Riviera Beach and resides in Palm Beach County, Florida.

9.      Defendant Elizabeth Wade is a member of the City Council of the City of Riviera Beach and resides in Palm Beach County, Florida.

10.      Defendant James Jackson is a member of the City Council of the City of Riviera Beach and resides in Palm Beach County, Florida.

2

11.     Defendant Norma Duncombe is a member of the City Council of the City of Riviera Beach and resides in Palm Beach County, Florida.

12.     Defendant Vanessa Lee is a member of the City Council of the City of Riviera Beach and resides in Palm Beach County, Florida.

## GENERAL ALLEGATIONS

### The May 10, 2006 Special Meeting

13.     On May 10, 2006, the Riviera Beach City Council presided over a special meeting relating to the "Community Redevelopment Plan" proposed by the Riviera Beach Community Redevelopment Agency ("CRA") ("the May 10 Special Meeting").   Under the Community Redevelopment Plan, certain parts of the City of Riviera Beach that had been declared "blighted,"[1] including both businesses and residences, would be torn down to make room for new construction.

14.     In the course of the May 10 Special Meeting, Resolution 59-06 was passed.  (A true and correct copy of Resolution 59-06 is attached as Exhibit 1.)   Through Resolution 59-06, the City of Riviera Beach and the CRA entered into a contract with Viking Harbor Properties LLC ("Viking") (the "May 10, 2006 Agreement").   (A true and correct copy of the May 10, 2006 Agreement is attached as Exhibit 2.)

15.     Under the terms of the May 10, 2006, Agreement, Viking was granted the right to develop those portions of the City of Riviera Beach that had been declared "blighted," and to that end, Viking was to attempt to purchase the businesses and homes in the "blighted" area.  In the event Viking was unable to purchase any of those businesses or homes, however, the May 10, 2006 Agreement provided that the City of Riviera Beach and the CRA pledged to "provide all reasonable

---

[1] This was accomplished through a series of resolutions passed by the Riviera Beach City Council, the first of those being Resolution 130-84 in 1984.

3

cooperation … in assisting Developer [Viking] in securing ownership or control of Parcels necessary for the implementation of the project, including exercising powers of eminent domain." (Agreement, ¶ 5).

## The Sunshine Law Requirements

16.     Article 1, Section 24 of the Florida Constitution mandates that "all meetings … of any collegial public body of a county [or] municipality … at which official acts are to be taken or at which public business of such body is to be transacted or discussed, shall be open and noticed to the public."

17.     Consistent with Article 1, Section 24, the Florida Legislature enacted section 286.011 of the Florida Statutes (the "Sunshine Law"). Under the Sunshine Law, "[a]ll meetings of any board or commission . . . of any county [or] municipal corporation, or political subdivision . . ., except as otherwise provided in the Constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, or formal action shall be considered binding except as taken or made at such meeting." Id.

18.     The Sunshine Law further specifies that the "board or commission **must** provide *reasonable* notice of all such meetings." Id. (emphasis added).

19.     Part of the "reasonableness" of a notice for purposes of the Sunshine Law is an adequate and unambiguous description of the purpose of the meeting so that the public is made adequately aware of what is intended to be addressed at the meeting.

20.     Also relevant to the "reasonableness" of notice for purposes of the Sunshine Law is the form in which the notice is distributed to the public. Although a notice need not reach every citizen in order to be deemed "reasonable," the notice must nonetheless be made in such a way that

4

an average citizen who may have an interest in the matter likely would receive it.

21.     A notice also must be made sufficiently before a meeting governed by the Sunshine Law in order to be considered "reasonable" for purposes of the Sunshine Law.

### No Reasonable Notice for the Resolution 59-06<br>Meeting Was Given, in Contravention of the Sunshine Law

22.     The Sunshine Law applies to the Resolution 59-06 meeting, as it was a "meeting of [a] board or commission ... of any county [or] municipal corporation, or political subdivision" within the meaning of section 286.011 of the Florida Statutes.

23.     Despite it concerning the most important redevelopment projects in the history of Riviera Beach, the only notice of the special meeting concerning Resolution 59-06 that was given to the residents of Riviera Beach was the posting of papers on the outside and inside of the Riviera Beach City Hall on the afternoon of May 9, 2006 (the "Notice"), 24 hours before the meeting. (A true and correct copy of the May 9, 2006, Notice is attached as Exhibit 3.)

24.     The language of the Notice failed to convey the significance of the events of the Resolution 59-06 meeting. The description of the Resolution 59-06 meeting, in its entirety, simply read: "Discussion – City Property and Redevelopment."

25.     The Notice, with its reference to "Discussion," was misleading and insufficient to convey to an average member of the public that the City Council would not just be engaged in a "discussion" but would rather be *voting on*, and *enacting*, Resolution 59-06.

26.     The language of the Notice was further misleading and insufficient to convey to an average member of the public that the City Council would be voting to exercise its eminent domain against property owned by citizens of the City of Riviera Beach. The Notice simply stated that "City Property" would be "discussed," when, in reality most, if not all, of the property that was

5

subject to "discussion" and covered in Resolution 59-06 belonged not to the City, but to the *residents* of the City -- residents such as Plaintiff Virginia Merchant.

27.     The language of the Notice also was misleading in that an average member of the public reading it would have no idea what was actually being "discussed" in relation to "City Property and Redevelopment." By way of example, one of the numerous provisions in the lengthy May 10, 2006 Agreement provided that Viking would be given management control of the City of Riviera Beach Marina. (Agreement, Paragraph 3).

28.     Allowing Viking to manage the Marina, which was deeded to the City of Riviera Beach in the 1930s to be used as a public marina, is a vital decision that is likely to have a real and direct impact on hundreds of individuals, including Plaintiff Fane Lozman, who resides on a houseboat that is docked in the Marina.

29.     Upon information and belief, Viking intends to largely restrict use of the Marina for a mega-yacht business and thus Lozman will have to and other individuals will have to relocate their boats.

30.     Potentially hundreds of other concerned marina tenants similarly were deprived of an opportunity to voice their concerns over Viking being granted management control of the Marina because they were not even aware that the May 10 Special Meeting was taking place, let alone that the City Council would be voting on such an important issue as who manages the Marina.

31.     The Notice also was not reasonable for the purposes of the Sunshine Law because of the manner in which it was effected.  The sole means of distribution of the Notice was the posting of papers on the outside and inside of the Riviera Beach City Hall on the afternoon of May 9, 2006.

32.     This Notice was insufficient to apprise the public of the momentous agenda to be discussed at the May 10 Special Meeting.  The only persons likely to have learned of the Notice would have been those who by happenstance passed by the City Hall on either May 9 or May 10, 2006.  Even as to *those* persons, the Notice likely would have been ineffective due to its vague and misleading language as described above.

33.     The Notice further failed to satisfy the Sunshine Law's reasonableness requirement because it was issued on the eve of the May 10 Special Meeting.  The Notice was posted on the bulletin board outside City Hall sometime in the afternoon of May 9, 2006, that is, barely more than 24 hours ahead of the Resolution 59-06 meeting, which occurred in the evening of May 10, 2006.  There thus was insufficient time for the residents of Riviera Beach to learn of, and make arrangements to attend, the May 10 Special Meeting.

34.     Indeed, as further evidence that the Notice was insufficient in terms of timing is the fact that the Notice provides, "In accordance with the Americans with Disabilities Act of 1990, persons needing special accommodations to participate in the proceedings should contact the Legislative Aide at 561-845-4095 **no later than 96 hours prior to the proceedings**." (emphasis added).

35.     That the May 10 Special Meeting was insufficiently noticed also is supported by the fact that the meeting did not appear on the calendar of the City of Riviera Beach's website. (A true and correct copy of the calendar is attached as Exhibit 4.)  While there was an entry in the calendar for a "CRA Meeting" on May 10, 2006, this referred to a regularly scheduled meeting and *not* the May 10 City Council Special Meeting, which was distinctly separate from the CRA meeting and which, by virtue of being a meeting involving the Riviera Beach City Council, would have attracted

7

a larger audience than a CRA meeting.

36.     For instance, the Pledge of Allegiance is read at the beginning of each Riviera Beach City Council meeting, and the Pledge of Allegiance was read at the beginning of the May 10 Special Meeting even though it already had been read at the start of the regularly scheduled CRA meeting. Likewise, there were separate agendas for the CRA meeting and the May 10 Special Meeting.

37.     Indeed, it was at the regularly scheduled CRA meeting that Plaintiff Lozman first learned that the Riviera Beach City Council would be meeting to take action on Resolution 59-06 immediately following the CRA meeting.   Plaintiff Lozman was barred from attending the Resolution 59-06 meeting, however, as Defendant Ann Iles had the Riviera Beach police throw him out of the CRA meeting.

38.     After being thrown out of the CRA meeting, Mr. Lozman was prevented by the Riviera Beach police, at Defendant Iles' behest, from attending the May 10 Special Meeting.

39.     Thus, despite the magnitude of allowing Viking management control over the Marina, Plaintiff Lozman was not permitted to voice his concerns at the May 10 Special Meeting because he was barred from even attending the meeting.

40.     Plaintiff Merchant was not even aware of the May 10 Special Meeting or Resolution 59-06 until May 12, 2006, when she received via hand-delivery a letter from a law firm representing Viking that stated her property was subject to seizure under the City of Riviera Beach's eminent domain powers.

### The Lack of Reasonable Notice Regarding the Special Meeting Was Not Accidental

41.     The failure on the part of Defendants to provide the residents of Riviera Beach with reasonable notice of the Resolution 59-06 meeting was done intentionally.  Resolution 59-06 was

8

passed during a rushed 59-06 *special* meeting.  Special meetings are normally used for emergencies

and other unusual occurrences.  Other than trying to hurriedly pass Resolution 59-06 prior to the

signing of a new law on May 11, 2006, no reason existed for deciding such a crucial event as

Resolution 59-06 in a special meeting with barely 24 hours' notice.

    42.    The very <u>next</u> day after the May 10 Special Meeting, May 11, 2006, Florida Governor

Jeb Bush signed into law H.B. 1567, which signified a comprehensive overhaul of Florida's eminent

domain laws.  Section 73.013 et seq. of the Florida Statutes prohibits the use of eminent domain for

economic development purposes (as the Community Redevelopment Plan would propose), and

specifically states that

> Notwithstanding any other provision of law . . . the state . . . or any other entity to which the power of eminent domain is delegated **may not exercise the power of eminent domain to take private property for the purpose of preventing or eliminating slum or blight conditions . . . .  [T]aking private property for the purpose of preventing or eliminating slum or blight conditions is not a valid public purpose or use** for which private property may be taken by eminent domain and does not satisfy the public-purpose requirement of Section 6(a), Article X of the State Constitution.

Fla. Stat. § 73.014(2).

    43.    H.B. 1567, which passed both houses of the Florida Legislature on May 4, 2006 (less

than a week before the adoption of Resolution 59-06), was precipitated by the June 23, 2005, United

States Supreme Court decision in <u>Kelo v. New London</u>, 125 S. Ct. 2655 (2005), in which the Court

held that that the Federal Constitution did not prohibit cities and states to use their power of eminent

domain to seize private property and transfer the property to private developers for purposes of

economic development.

    44.    The decision was greeted with popular outrage in Florida and elsewhere, and as a

result, Florida legislators immediately began working on proposals to protect the state's property

9

owners from the use of eminent domain for economic development purposes.

45.    Again, the timing of the enactment of Resolution 59-06 was likely not coincidental. The CRA had, on May 25, 2005, issued a request for redevelopment proposals for the areas of the City of Riviera Beach that had been designated as "blighted" and which thus supposedly needed redevelopment. On September 14, 2005, the CRA selected the redevelopment proposal submitted by Viking even as it knew that deliberations in the Florida Legislature over H.B. 1567 were ongoing.

46.    Then, H.B. 1567 was passed by both houses of the state legislature on May 6, 2006. Defendants knew that passage of the bill was only a matter of time and that their controversial Community Redevelopment Plan was in jeopardy.

47.    Thus, in an attempt to rush through Resolution 59-06 before H.B. 1567 was signed into law by Governor Bush, Defendants feigned compliance with the Sunshine Law's requirement that public meetings be *reasonably* noticed to the public by posting the vague and misleading Notice in front of City Hall barely 24 hours before the Resolution 59-06 meeting.

48.    In doing so, Defendants hoped that the interested residents of the City of Riviera Beach would not be aware of the May 10 Special Meeting.

49.    That is exactly what happened. The turnout at the May 10 Special Meeting was uncharacteristically small for an event of this magnitude and controversy simply because residents of Riviera Beach were deprived of their right to be aware of and thus attend this meeting.

50.    The small turnout provided Defendants the additional benefit of not having to provide for suitable accommodation for the large number of concerned residents that surely would have attended the meeting had they received proper notice of it.

10

51.   Pursuant to section 286.011, meetings such as the May 10 Special Meeting must be "open to the public." When such meetings are held at facilities that can accommodate only a small number of people even though a large turnout may be reasonably expected, the public access requirement of section 286.011 is violated.

52.   That the Resolution 59-06 meeting also was unnecessarily hasty and ill-announced is additionally borne out from the fact Viking and CRA had been negotiating on the details of the Community Redevelopment Plan for approximately *seven months*, and yet had failed to reach an agreement by the time H.B. 1567 passed both houses of the state legislature.

53.   At that point, Viking and CRA realized that something had to be done immediately before Governor Bush signed H.B. 1567 into law. So, the May 10 Special Meeting was quickly - and quietly – called up so that an agreement – even if a draft one - could be reached before H.B. 1567 was signed into law.

54.   Indeed, the May 10, 2006 Agreement itself indicates that the only concern on the part of Defendants was having *something* in writing before H.B. 1567 was signed, as the Agreement acknowledges that a "draft of a definitive development and disposition agreement and exhibits thereto embodying more complete terms has been provided by Developer to the City and CRA, the **term[s] of which must be agreed to by the parties and approved by the City and CRA."** (Agreement, Page 5) (emphasis added).

55.   Defendants thus hoped to pass Resolution 59-06 in a quick and quiet manner so as to set up a constitutional challenge against the applicability of section 73.013 et seq. of the Florida Statutes to the Community Redevelopment Plan.

56.   That the Resolution 59-06 meeting was noticed improperly in an effort to bypass

11

section 73.013 et seq. also is seen from other circumstances surrounding the timing of the meeting. Throughout the legislative session of 2005-2006, the City of Riviera Beach and Viking lobbied lawmakers for an amendment giving the city until 2010 to operate under the current eminent domain law. That amendment failed to pass, and Viking was threatening to abandon the project. After a series of closed-door meetings with Viking, however, the decision to vote on, and pass, Resolution 59-06 in a hasty and hushed manner was made.

57.     Indeed, Defendant Mayor Michael Brown went so far as to say on May 10, 2006, that "We know our enemy is now the legislature."[2]

58.     The hasty passage of Resolution 59-06 also was crucial for Viking because, under the May 10, 2006 Agreement, the CRA pledged to "provide all reasonable cooperation" to Viking in securing the land needed to carry out the Community Redevelopment Plan, "including exercising powers of eminent domain." (Agreement, Paragraph 5). Viking was particularly concerned about how much it would take to buy the properties in question after it learned that Wayne Huizenga, Jr., the son of billionaire and Miami Dolphins owner, Wayne Huizenga, had been buying the same properties that Viking needed at premium prices, sometimes more than triple its appraisal values.[3]

59.     The newfound leverage in the form of an eminent domain threat that Viking gained through Resolution 59-06 explains why Viking came down significantly on the offers made to the residents of Riviera Beach to purchase their property.

60.     For instance, on May 12, 2006, Ms. Merchant received via hand-delivery a letter from

---

[2] William Cooper, Jr., Riviera Tries to Outwit Law By Signing Pact (Palm Beach Post, May 11, 2006), available at http://www.palmbeachpost.com/news/content/local_news/epaper/2006/05/11/c1b_rbviking_0511.html?cxtype=rss&cxsvc=7&cxcat=17 (last visited June 4, 2006).

[3] William Cooper, Jr., In Riviera, Eminent Domain Bolsters Developer's Offers to Buy (Palm Beach Post, May 28, 2006), available at http://www.palmbeachpost.com/pbccentral/content/local_news/epaper/2006/05/28/c1b_rbland_0528.html (last

12

a law firm representing Viking that stated her property was subject to seizure under the City of Riviera Beach's eminent domain powers in accordance with the "Community Redevelopment Plan" implemented by the CRA. The letter further provided that "in an attempt to acquire your property without delay or the need for eminent domain," Viking was offering $800,000 for Ms. Merchant's property. (A true and correct copy of the May 12, 2006 letter is attached hereto as Exhibit 5.)

61.    Viking originally offered Plaintiff Merchant almost $2 million for her property. (A true and correct copy of the Offer is attached hereto as Exhibit 6.) After the May 10 Special Meeting, Viking offered Plaintiff Merchant only $800,000. See Exhibits 5 and 6.

62.    Viking later withdrew the 20 outstanding buy-out offers it made to Riviera city residents. Viking, however, has made it clear that the withdrawing of the offers does not mean Viking will hesitate to rely on eminent domain to obtain the properties in question.

63.    Viking's withdraw of the buy-out offers occurred the day after Governor Bush questioned whether the notice for May 10 Special Meeting complied with the Sunshine Law[4] by stating that he "d[id]n't think they have a legal basis" and "[t]o rush to expropriate people's property just seems unseemly to me."[5]

64.    Florida House Speaker Allan Bense has joined Governor Bush in questioning the legality of the city's contract with Viking. State Representative Dean Cannon has expressed similar concerns.[6]

---

visited June 4, 2006).
[4] Alan Gomez & William Cooper, Jr., Riviera Beach Master Developer Pulls Offers to Buy Private Land (Palm Beach Post, June 2, 2006), available at http://www.palmbeachpost.com/pbccentral/content/local_news/epaper/2006/06/02/m1a_DOMAIN_0602.html (last visited June 4, 2006).
[5] Alan Gomez, Bush Fires Salvo in State Battle With Riviera (Palm Beach Post, June 1, 2006), available at http://www.palmbeachpost.com/state/content/state/epaper/2006/06/01/m1a_DOMAIN_0601.htm (last visited June 7, 2006).
[6] Riviera Beach Master Developer Pulls Offers to Buy Private Land, supra note 4; William Cooper, Jr., & Alan Gomez,

13

**Preconditions Met**

65.     Plaintiffs Lozman and Merchant have met and fulfilled all applicable preconditions and requirements for the bringing of this action.

66.     Plaintiffs Lozman and Merchant have retained the law firm of Astigarraga Davis Mullins & Grossman, LLP, to enforce applicable provisions of the Florida Sunshine Law, which is seeking its reasonable attorneys' fees in this case pursuant to § 286.011, Fla. Stat. (2005).

**Count**

**Violation of the Sunshine Law by Failing to Provide Reasonable
Notice of the May 10, 2006 Meeting in Which Resolution 59-06 Was Passed**

67.     Plaintiffs reallege paragraphs 1 through 66.

68.     Defendants called and presided over an official special meeting relating to Resolution 59-06 on May 10, 2006, without furnishing the public with reasonable notice of the meeting as required under the Sunshine Law, § 286.011, Fla. Stat. (2005).

69.     Pursuant to the actions taken at the May 10, 2006, meeting, and in particular the execution of the May 10, 2006 Agreement through the passage of Resolution 59-06, Defendants have expressed a willingness to exercise the power of eminent domain to seize the private properties of Riviera Beach residents.

WHEREFORE, Plaintiffs demand:

70.     A.     A declaratory judgment that the defendants have violated the Sunshine Law by holding a special meeting on May 10, 2006, regarding Resolution 59-06, and then voting and

---

*Riviera Eyeing 30 Properties to Condemn* (Palm Beach Post, May 12, 2006), available at
http://www.palmbeachpost.com/localnews/content/local_news/epaper/2006/05/12/c1b_riviera_0512.html (last visited June 4, 2006).

14

passing Resolution 59-06, without furnishing the public reasonable  notice of the meeting as required under the Sunshine Law, § 286.011, Fla. Stat. (2005).

      B.     A declaratory judgment invalidating all actions taken at the May 10, 2006, special meeting in violation of section 286.011 of the Florida Statutes, including invalidating Resolution 59-06 and the May 10, 2006 Agreement.

      C.     A permanent injunction prohibiting Defendants from taking any action in furtherance of Resolution 59-06 and the May 10, 2006 Agreement.

      D.     An award of costs and attorneys' fees pursuant to section 286.011 of the Florida Statutes (2005), and all applicable rules and statutes.

      E.     All additional relief which the Court may deem necessary or appropriate.

Respectfully submitted,

ASTIGARRAGA DAVIS MULLINS
    & GROSSMAN, P.A.
*Attorneys for Plaintiffs*
701 Brickell Avenue
16th Floor
Miami, Florida 33131
Tel: (305) 372-8282
Fax: (305) 372-8202

By: _____
Edward M. Mullins
Florida Bar No. 863920
Karene Tygenhof No. 817031
Florida Bar No. 817031
Douglas Giuliano
Florida Bar No. 15282

Date: June 7, 2006

15

LOZMAN and MERCHANT v. CITY OF RIVIERA BEACH

EXHIBIT 1

RESOLUTION NO. 59-06

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF RIVIERA BEACH, PALM BEACH COUNTY, FLORIDA, AUTHORIZING THE MAYOR AND CITY CLERK TO EXECUTE AN AGREEMENT BY AND AMONG THE CITY, CRA AND VIKING INLET HARBOR PROPERTIES, LLC; AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, in May 2005, the Community Redevelopment Agency ("CRA") approved the issuance of the Request for Proposals for a Master Developer for Inlet Harbor Properties (the "RFP"); and

WHEREAS, Viking Inlet Harbor Properties, LLC ("Viking"), submitted a proposal in response to the RFP; and

WHEREAS, in September 2005, after presentations by developers and public input, the CRA selected Viking's proposal for the development of the redevelopment area; and

WHEREAS, the parties have been negotiating the attached agreement and a development and disposition agreement for the development of Inlet Harbor Properties; and

WHEREAS, the parties desire to enter into the attached agreement which sets forth certain specific terms for moving forward with the Inlet Harbor Properties project for the acquisition of certain parcels including the use of eminent domain, if necessary; and

WHEREAS, a development and disposition agreement embodying more complete terms will be approved by the parties within thirty days of the approval of the attached agreement.

NOW, THEREFORE BE IT RESOLVED, BY THE CITY COUNCIL OF THE CITY OF RIVIERA BEACH, PALM BEACH COUNTY, FLORIDA, as follows:

SECTION 1. That the City Council authorizes the Mayor and City Clerk to execute the attached agreement by and among the City, CRA, and Viking.

SECTION 2. This resolution shall take effect immediately upon its passage and approval by the City Council.

PASSED and APPROVED this _10_ day of May, 2006.

LOZMAN and MERCHANT v. CITY OF RIVIERA BEACH

EXHIBIT 2

# INTERNATIONAL HARBOR REDEVELOPMENT PROJECT
## RIVIERA BEACH, FLORIDA

AGREEMENT

BY AND AMONG

CITY OF RIVIERA BEACH

("City")

RIVIERA BEACH COMMUNITY REDEVELOPMENT AGENCY

("Agency")

AND

VIKING INLET HARBOR PROPERTIES, LLC

("Developer")

Dated as of May 10th , 2006

:DMA\PCDOCS\MIA2\GENERAL\390531\6

## AGREEMENT

## INTERNATIONAL HARBOR VILLAGE - CITY OF RIVIERA BEACH

THIS AGREEMENT (the "Agreement") is made this 10th day of May, 2006, by and among the City of Riviera Beach, Florida, a municipal corporation existing under the laws of the State of Florida (the "City"), the Riviera Beach Community Redevelopment Agency, a public body corporate and politic created pursuant to Chapter 163, Part III, Fla. Stats. (the "CRA" or "Agency") and Viking Inlet Harbor Properties, LLC, a Florida limited liability company (the "Developer").

## WITNESSETH:

WHEREAS, the City Council of the City of Riviera Beach, Florida ("City Council"), adopted Resolution No. 130-84 on August 7, 1984, finding a "blighted area" exists in the City, as defined in Chapter 163, Fla. Stats., and finding that the rehabilitation, conservation or redevelopment of the areas found to be blighted is necessary and in the interest of the public health, safety, morals or the welfare of the residents of the City, and finding and declaring a need for a community redevelopment agency to function within the City in order to carry out the community redevelopment purpose of Part III, Chapter 163, Fla. Stats.; and

WHEREAS, the City Council adopted Resolution 191-85 on September 4, 1985, affirming the prior finding and declaration of the area within the City as blighted; and

WHEREAS, the City Council adopted Resolution No. 187-99 on December 9, 1999, expanding the area within the City as blighted to include portions of Singer Island;

WHEREAS, the City Council adopted Ordinance No. 2883 on February 21, 2001, confirming the creation of the Agency, ratifying all prior actions taken by the Agency since its creation, and restating and expanding the powers delegated to the Agency; and

WHEREAS, the City Council adopted Resolution No. 88-01 on June 6, 2001, finding a "blighted area" exists in the City as defined in Section 163.340 (8), Fla. Stats., and finding that such area constitutes a "community redevelopment area," as defined in Section 163.340(10), Fla. Stats., and finding such area constitutes an expansion of the previously designated community redevelopment area in the City; and

WHEREAS, on October 19, 2001, the Court issued Final Summary Judgment in the case of the Riviera Beach Community Redevelopment Agency vs. The City of Riviera Beach (Case No. CA-01-8461-AN, Circuit Court, Fifteenth Judicial Circuit, Palm Beach County, Florida), finding in part that the Agency was legally and validly organized

2

on August 7, 1974, that the Agency was established at least since September 19, 1984, and that the Agency has continued in existence since its inception to the present; and

WHEREAS, the CRA Board of Commissioners adopted Resolution No. 01-2 on December 12, 2001, fording the Inlet Harbor City of Riviera Beach Redevelopment Plan Modification 2001 (the "Modified Plan") meets the requirements of Sections 163.360, 163.361 and 163.362, Fla. Stats. (2000), and approving such Modified Plan; and

WHEREAS, the City Council adopted Ordinance No. 2912 January 2, 2002, adopting the Inlet Harbor City of Riviera Beach Redevelopment Plan Modification 2001; and

WHEREAS, the City Council adopted Ordinance Nos. 2958, 2966 and 2984 (2004), approving amendments to the Modified Plan; and

WHEREAS, on May 25, 2005, the CRA Board of Commissioners approved the issuance of the Request for Proposals for Master Developer for Inlet Harbor Properties (the "RFP"); and

WHEREAS, Developer submitted a proposal ("Developer's Proposal") in response to the RFP; and

WHEREAS, after presentations by developers and public input, on September 14, 2005, the CRA Board of, Commissioners selected the Developer's Proposal and selected it as its preferred Master Developer for the Inlet Harbor Properties; and

WHEREAS, the City, Agency and Developer have determined to work cooperatively to create a Community Development District to provide for financing, construction and maintenance of Infrastructure Improvements for International Harbor Village; and

WHEREAS, the Developer has developed a comprehensive master project plan and a schedule for implementation for the plan, the specifics of which will be included in the definitive development and disposition agreement, which are the subjects of this Agreement; and

WHEREAS, the Developer has committed to the expenditure of monies and to undertake significant financial commitments in advance of receipt of all of the necessary approvals to construct the Project; and

WHEREAS, the Developer has committed to facilitate the construction of transportation infrastructure, and may commit to facilitate construction of other public infrastructure eligible for Tax Increment Financing ("TIF") Funding reflected in the City comprehensive plan (the "City Comprehensive Plan") and the CRA Master Plan in addition to the Project (i.e., US-1 Relocation); and

3

WHEREAS, the relocation of US-1 has been previously approved by City and Agency and is depicted in its relocated location in the approved City Comprehensive Plan and CRA Master Plan; and

WHEREAS, the relocation of US-1 is critical to the success of the CRA Master Plan and the Project, and the parties desire to accelerate the relocated US-1 project; and

WHEREAS, the City and CRA desire to utilize available tax increments funds to assure the relocation of US-1 and to fund certain costs in connection with the Project; and

WHEREAS, the Florida Department of Transportation has allocated and approved approximately Fifteen Million Dollars ($15,000,000) for construction of US-1 Relocation; and

WHEREAS, the CRA has not heretofore pledged its tax increment revenue; and

WHEREAS, the City and CRA intend to commit certain tax increment revenues in amounts specified in the definitive development and disposition agreement to the Developer for all qualifying purposes permitted by law in aid of the Project, including without limitation the US-1 Relocation.

WHEREAS, a draft of a definitive development and disposition agreement and exhibits thereto embodying more complete terms has been provided by Developer to the City and CRA, the termq of which must be agreed to by the parties and approved by the City and CRA.

NOW, THEREFORE, it is hereby covenanted and agreed by and among the parties hereto that this Agreement is made upon the terms, covenants and conditions hereinafter set forth.

1. Developer has been previously appointed the master developer of the CRA Project Area. Developer will proceed to develop the CRA project area in accordance with the project plan description as approved by the City and the CRA.

2. Developer will purchase City and CRA owned land required for the Project at a price per acre to be determined based on an agreed upon price or an appraisal process. Proceeds will be applied to US Highway One relocation costs.

3. Developer will seek to enter into a management agreement whereby Developer will manage the City Marina the terms of which to be agreed upon by the parties.

4. The Boardwalk-Retail area will be leased by Developer from the City/CRA for a 99 year lease term. The City/CRA will receive 9% of net rents (exclusive of tenant expense reimbursements and subject to adjustments during initial partial occupancy). During the first 5 years the 9% City/CRA participation will be available to subsidize local tenants' rents.

4

the foregoing, this Agreement expresses the intent of the parties but shall not constitute the development and disposition agreement, which agreement shall only be effected by a written document clearly labeled as such and duly executed by all the parties hereto. Except as set forth in the following sentence, in the event that a definitive development and disposition agreement is not executed by the parties within thirty (30) days, then this Agreement shall be terminated except to the extent extended by all parties. Any such termination shall not affect the obligations of Developer under paragraph 11 above, which shall expressly survive termination hereunder.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

No Page Numbering
From This Page Onward

Agreement

IN WITNESS WHEREOF, the Parties unto this Lease have set their hands and seals on the day and date first written above.

CITY OF RIVIERA BEACH

BY: _____
MICHAEL D. BROWN
MAYOR

ATTEST:

BY: _____
CARRIE E. WARD, MMC
CITY CLERK

APPROVED AS TO FORM AND
LEGAL SUFFICIENCY

BY: _____
PAMALA H. RYAN
CITY ATTORNEY

RIVIERA BEACH COMMUNITY
REDEVELOPMENT AGENCY

BY: _____
ANN ILES
CHAIRPERSON

ATTEST:

BY: _____
FLOYD T. JOHNSON
EXECUTIVE DIRECTOR

APPROVED AS TO FORM AND
LEGAL SUFFICIENCY

BY: _____
STEVEN COHEN
CRA ATTORNEY

VIKING INLET HARBOR PROPERTIES, LLC

BY: _____
ROBERT T. HEALEY
CHAIRMAN AND
AUTHORIZED REPRESENTATIVE

ATTEST:
BY: _____
WILLIAM MUELLER
GENERAL COUNSEL

RESOLUTION NO. _59-06_
PAGE -2-

APPROVED:

_____
MICHAEL D. BROWN
MAYOR

ATTEST:

_____
CARRIE E. WARD,
MASTER MUNICIPAL CLERK
CITY CLERK

_____
ANN ILES
CHAIRPERSON

_____
VANESSA LEE
CHAIR PRO TEM

_____
NORMA DUNCOMBE
COUNCILPERSON

_____
ELIZABETH "LIZ" WADE
COUNCILPERSON

_____
JAMES "JIM" JACKSON
COUNCILPERSON

MOTIONED BY:     _E. Wade_

SECONDED BY:     _N. Duncombe_

A. ILES          _aye_

V. LEE           _aye_

N. DUNCOMBE      _aye_

E. WADE          _aye_

J. JACKSON       _aye_

REVIEWED AS TO LEGAL SUFFICIENCY

_____
PAMALA HANNA RYAN, CITY ATTORNEY

DATE: _5/10/06_

LOZMAN and MERCHANT v. CITY OF RIVIERA BEACH

EXHIBIT 3

# N O T I C E

I, the undersigned, hereby called a Special Meeting of the City Council of the City of Riviera Beach, Palm Beach County, Florida to be held in City Council Chambers at the Municipal Complex, 600 W Blue Heron Boulevard, to be noticed by the City Clerk as follows:

### May 10, 2006 @ 8:00 p.m.
### Or Shortly Thereafter

**Discussion**

**City Property & Redevelopment**

**MICHAEL D. BROWN**
**MAYOR**

**CARRIE E. WARD,**
**MASTER MUNICIPAL CLERK**
**CITY CLERK**

**PLEASE TAKE NOTICE AND BE ADVISED,** that if any interested person desires to appeal any decision made by the City Council with respect to any matter considered at this hearing, such interested person, at own expense, will need a record of the proceedings, and for such purpose may need to ensure that a verbatim record of the proceedings is made, which record includes the testimony and evidence upon which the appeal is to be based.

In accordance with the Americans with Disabilities Act of 1990, persons needing special accommodations to participate in the proceedings should contact the Legislative Aide at 561-845-4095 no later than 96 hours prior to the proceedings.  If hearing impaired, telephone the Florida Relay Services 1-800-955-8771 (TDD) or 1-800-955-8770 (Voice) for assistance.

Date:  May 9, 2006

LOZMAN and MERCHANT v. CITY OF RIVIERA BEACH

EXHIBIT 4

City of Riviera Beach                                                                 Page 1



| May ▾ | 2006 ▾ | | | | View Detailed Calendar | |
| --- | --- | --- | --- | --- | --- | --- |
| << Previous Month | | | | | Next Month >> | |
| **Sunday** | **Monday** | **Tuesday** | **Wednesday** | **Thursday** | **Friday** | **Saturday** |
| | **1** Agenda Review | **2** Chiefs Night In- Police Dept. | **3** City Council Meeting Chambers | **4** | **5** | **6** |
| **7** | **8** Traffic Calming Street Improvement Construction Program Meeting  Parks & Recreation Advisory Board Meeting | **9** Chiefs Night In Police Dept.  Quarter Review Workshop Chambers | **10** Library Board Meeting/Library  CRA Meeting Chambers | **11** Planning and Zoning Board Mtg./Council Chambers | **12** | **13** |
| **14** | **15** Agenda Review Chambers | **16** Chiefs Night In- Police Dept.  Waterfront Advisory Board Meeting Newcomb Hall  Zoning Board of Appeals/Council Chambers | **17** Johnson Group Workshop Council Chambers  Public Utility Meeting Chambers  City Council Meeting Chambers | **18** Code Enforcement Hearing Chambers | **19** | **20** |
| **21** | **22** General Employees Pension Board Utility Conf. Room | **23** Chiefs Night In Police Dept.  Annexation Meeting Chambers | **24** Meeting | **25** | **26** | **27** |
| **28** | **29** Memorial Day City Hall Closed | **30** Code/Building Abatement Special Magic Meeting  Chiefs Night In Police Dept.  Cable Communications and Digital Tasks | **31** | | | |

LOZMAN and MERCHANT v. CITY OF RIVIERA BEACH

EXHIBIT 5·

HARRIS, HARRIS, BAUERLE & SHARMA

ATTORNEYS AT LAW
1201 EAST ROBINSON STREET
ORLANDO, FLORIDA 32801

TELEPHONE (407) 843-0404
FACSIMILE (407) 843-0444
(800) 734-2667
WWW.HHBSLAW.COM

BRUCE M. HARRIS, ESQ.                                                    BRUCE@HHBSLAW.COM

May 12, 2006

VIA HAND DELIVERY AND CERTIFIED MAIL
Jerry and Virginia Merchant
2100 Broadway
Riviera Beach, FL  33404

Re:   Notice of Rights and First Written Offer Related to the
      City of Riviera Beach Community Redevelopment Plan
      Parcel Number(s):  56-43-42-28-11-008-0050, 56-43-42-28-11-008-0061
      and 56-43-42-28-11-008-0064
      Property Address:  2100 Broadway

Dear Mr. and Mrs. Merchant:

   As you may know, the Community Redevelopment Agency of the City of Riviera
Beach has decided to implement its Community Redevelopment Plan.  In order to
implement the Plan, the CRA needs to acquire certain property within the project
boundaries, including the fee simple interest in the property you own identified by the
Palm Beach County Property Appraiser as parcel number 56-43-42-28-11-008-0050, 56-
43-42-28-11-008-0061 and 56-43-42-28-11-008-0064.  We have obtained an opinion
from an appraiser that your property is worth $572,000.  However, in an attempt to
acquire your property without delay or the need for eminent domain, we have been
authorized to offer you $800,800 for your property.  If you wish to accept this offer, please
contact us and we will provide you with a purchase agreement documenting the terms of
the sale.

   Under Florida law, you have certain statutory rights and responsibilities when your
property is subject to condemnation.  We have enclosed a notice of these rights and
copies of Florida Statutes §§73.091, 73.092 and 73.015.

   If you have any questions about this offer, please feel free to contact me.  Thank
you.

                                   Very truly yours,

                                   Bruce M. Harris

Enclosure

LOZMAN and MERCHANT v. CITY OF RIVIERA BEACH

EXHIBIT 6

THIS FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS® AND THE FLORIDA BAR

**"As Is" Contract For Sale And Purchase**   **"As Is"**

1* PARTIES: _____ Jerry and Virginia Merchant _____ ("Seller"),
2* and _____ Roger C. Lambert, Trustee _____ ("Buyer"),
3   hereby agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property (collectively "Property")
4   pursuant to the terms and conditions of this Contract for Sale and Purchase and any riders and addenda ("Contract"):
5   I.   **DESCRIPTION:**
6*       (a) Legal description of the Real property located in _____ Palm Beach _____ County, Florida: ___ 3 Parcels ___
7*       See Attached Public Records.   56-43-42-28-11-008-0061, 56-43-42-28-11-008-0050,
8*       56-43-42-28-11-008-0064
9*       (b) Street address, city, zip, of the Property: ___ Broadway and 21st Street, Riviera Beach, FL 33404 ___
10      (c) Personal Property includes existing range(s), refrigerator(s), dishwasher(s), ceiling fan(s), light fixture(s), and window treatment(s) unless
11      specifically excluded below.
12*     Other items included are: _____
13*     _____
14*     Items of Personal Property (and leased items, if any) excluded are: _____
15*     _____
16* II.  **PURCHASE PRICE** (U.S. currency): ...................................................... $  2,000,000.00
17      **PAYMENT:**
18*     (a) Deposit held in escrow by   First American Title   (Escrow Agent) in the amount of (checks subject to clearance) $  20,000.00
19*     (b) Additional escrow deposit to be made to Escrow Agent within _____ days after Effective Date
20*     (see Paragraph III) in the amount of .......................................................... $  0.00
21*     (c) Financing (see Paragraph IV) in the amount of ............................................. $  0.00
22*     (d) Other ................................................................................... $  0.00
23      (e) Balance to close by cash, wire transfer or LOCALLY DRAWN cashier's or official bank check(s), subject
24*     to adjustments or prorations .................................................................. $  1,980,000.00
25  III. **TIME FOR ACCEPTANCE OF OFFER AND COUNTEROFFERS; EFFECTIVE DATE:**
26      (a) If this offer is not executed by and delivered to all parties OR FACT OF EXECUTION communicated in writing between the parties on or
27*     before   2-24-06 _____, the deposit(s) will, at Buyer's option, be returned and this offer withdrawn. UNLESS OTH-
28      ERWISE STATED, THE TIME FOR ACCEPTANCE OF ANY COUNTEROFFERS SHALL BE 2 DAYS FROM THE DATE THE COUN-
29      TEROFFER IS DELIVERED.
30      (b) The date of Contract ("Effective Date") will be the date when the last one of the Buyer and Seller has signed or initialed this offer or the
31      final counteroffer. If such date is not otherwise set forth in this Contract, then the "Effective Date" shall be the date determined above for
32      acceptance of this offer or, if applicable, the final counteroffer.
33  IV.  **FINANCING:**
34*     ☒(a) This is a cash transaction with no contingencies for financing;
35*     ☐ (b) This Contract is contingent on Buyer obtaining approval of a loan ("Loan Approval") within _____ days (if blank, then 30 days) after
36*     Effective Date ("Loan Approval Date") for (CHECK ONLY ONE): ☐ a fixed; ☐ an adjustable; or ☐ a fixed or adjustable rate loan, in the prin-
37*     cipal amount of $_____, at an initial interest rate not to exceed _____%, discount and origination fees not to exceed
38*     _____% of principal amount, and for a term of _____ years. Buyer will make application within _____ days (if blank, then 5 days) after
39      Effective Date. Buyer shall use reasonable diligence to: obtain Loan Approval and notify Seller in writing of Loan Approval by Loan
40      Approval Date; satisfy terms and conditions of the Loan Approval; and close the loan. Loan Approval which requires a condition related to
41      the sale of other property shall not be deemed Loan Approval for purposes of this subparagraph. Buyer shall pay all loan expenses. If Buyer
42      does not deliver written notice to Seller by Loan Approval Date stating Buyer has either obtained Loan Approval or waived this financing con-
43      tingency, then either party may cancel this Contract by delivering written notice ("Cancellation Notice") to the other, not later than seven (7)
44      days prior to Closing. Seller's Cancellation Notice must state that Buyer has three (3) days to deliver to Seller written notice waiving this
45      financing contingency. If Buyer has used due diligence and has not obtained Loan Approval before cancellation as provided above, Buyer
46      shall be refunded the deposit(s). Unless this financing contingency has been waived, this Contract shall remain subject to the satisfaction,
47      by Closing, of those conditions of Loan Approval related to the Property;
48*     ☐ (c) Assumption of existing mortgage (see rider for terms); or
49*     ☐ (d) Purchase money note and mortgage to Seller (see "AS IS" Standards B and K and riders; addenda; or special clauses for terms).
50* V.  **TITLE EVIDENCE:** At least __5__ days (if blank, then 5 days) before Closing a title insurance commitment with legible copies of instruments
51      listed as exceptions attached thereto ("Title Commitment") and, after Closing, an owner's policy of title insurance (see "AS IS" Standard A for
52      terms) shall be obtained by:
53*     (CHECK ONLY ONE): ☐ (1) Seller, at Seller's expense and delivered to Buyer or Buyer's attorney; or
54*     ☒ (2) Buyer at Buyer's expense.
55*     (CHECK HERE): ☐ If an abstract of title is to be furnished instead of title insurance, and attach rider for terms.
56* VI. **CLOSING DATE:** This transaction shall be closed and the closing documents delivered on   3/24/2006   ("Closing"), unless
57      modified by other provisions of this Contract. If Buyer is unable to obtain Hazard, Wind, Flood, or Homeowners' insurance at a reasonable rate
58      due to extreme weather conditions, Buyer may delay Closing for up to 5 days after such coverage becomes available.
59  VII. **RESTRICTIONS; EASEMENTS; LIMITATIONS:** Seller shall convey marketable title subject to: comprehensive land use plans, zoning,
60      restrictions, prohibitions and other requirements imposed by governmental authority; restrictions and matters appearing on the plat or otherwise
61      common to the subdivision; outstanding oil, gas and mineral rights of record without right of entry; unplatted public utility easements of record

FAR/BAR ASIS-1   Rev. 7/04   © 2004   Florida Association of Realtors® and The Florida Bar   All Rights Reserved   Page 1 of 4

This software is licensed to [Diane Jenkins - Jenkins Realty, Inc.] www.instanetforms.com.

62  located contiguous to real property lines and not more than 10 feet in width as to the rear or front lines and 7 1/2 feet in width as to the side
63  lines; taxes for year of Closing and subsequent years; and assumed mortgages and purchase money mortgages, if any (if additional items, see
64*  addendum); provided, that there exists at Closing no violation of the foregoing and none prevent use of the Property or
65*  _____ commercial _____ purpose(s).
66  VIII.  OCCUPANCY: Seller shall deliver occupancy of Property to Buyer at time of Closing unless otherwise stated herein. If Property is intended
67  to be rented or occupied beyond Closing, the fact and terms thereof and the tenant(s) or occupants shall be disclosed pursuant to "AS IS" Standard
68  F. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to Property from date of occupancy, shall be responsible and liable
69  for maintenance from that date, and shall be deemed to have accepted Property in its existing condition as of time of taking occupancy.
70  IX.  TYPEWRITTEN OR HANDWRITTEN PROVISIONS: Typewritten or handwritten provisions, riders and addenda shall control all printed pro-
71  visions of this Contract in conflict with them.
72*  X.  ASSIGNABILITY: (CHECK ONE): Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☒ may
73*  assign but not be released from liability under this Contract; or ☐ may not assign this Contract.
74  XI.  DISCLOSURES:
75*  (a) ☐ CHECK HERE if the Property is subject to a special assessment lien imposed by a public body payable in installments which
76*  continue beyond Closing and, if so, specify who shall pay amounts due after Closing: ☐ Seller ☐ Buyer ☐ Other (see addendum).
77  (b) Radon is a naturally occurring radioactive gas that when accumulated in a building in sufficient quantities may present health risks to per-
78  sons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.
79  Additional information regarding radon or radon testing may be obtained from your County Public Health unit.
80  (c) Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or desires additional information
81  regarding mold, Buyer should contact an appropriate professional.
82  (d) Buyer acknowledges receipt of the Florida Energy-Efficiency Rating Information Brochure required by Section 553.996, F.S.
83  (e) If the real property includes pre-1978 residential housing, then a lead-based paint rider is mandatory.
84  (f) If Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act, the parties shall comply with that Act.
85  (g) BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIA-
86  TION/COMMUNITY DISCLOSURE.
87  (h) PROPERTY TAX DISCLOSURE SUMMARY: BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT
88  OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNER-
89  SHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES.
90  IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.
91  XII.  MAXIMUM REPAIR COSTS: DELETED
92*  XIII. HOME WARRANTY: ☐ Seller ☐ Buyer ☒ N/A will pay for a home warranty plan issued by _____
93*  at a cost not to exceed $ _____
94*  XIV. INSPECTION PERIOD AND RIGHT TO CANCEL: (a) Buyer shall have ___0___ days from Effective Date ("Inspection Period") in
95  which to have such inspections of the Property performed as Buyer shall desire and utilities service shall be made available by the
96  Seller during the Inspection Period; (b) Buyer shall be responsible for prompt payment for such inspections and repair of damage
97  to and restoration of the Property resulting from such inspections; and (c) if Buyer determines, in Buyer's sole discretion, that the
98  condition of the Property is not acceptable to Buyer, Buyer may cancel this Contract by delivering written notice of such election
99  to Seller prior to the expiration of the Inspection Period. If Buyer timely cancels this Contract, the deposit(s) paid shall be imme-
100  diately returned to Buyer; thereupon, Buyer and Seller shall be released of all further obligations under this Contract, except as
101  provided in this Paragraph XIV. The above provision (b) shall survive termination of this Contract.
102  XV.  RIDERS; ADDENDA; SPECIAL CLAUSES: CHECK those riders which are applicable AND are attached to and made part of this Contract:
103*  ☐ CONDOMINIUM  ☐ VA/FHA  ☐ HOMEOWNERS' ASSN.  ☐ LEAD-BASED PAINT  ☐ COASTAL CONSTRUCTION CONTROL LINE
104*  ☐ INSULATION  ☐ Other Comprehensive Rider Provisions  ☐ Addenda
105*  Special Clause(s): _____
106*  Seller may have extended occupancy in the property for up to 18 months after closing.  During that time,
107*  Seller is to maintain the property and pay utility costs.  Buyer to pay 6% commission at closing.

108  XVI. "AS IS" STANDARDS FOR REAL ESTATE TRANSACTIONS ("AS IS" Standards): Buyer and Seller acknowledge receipt of a copy of "AS
109  IS" Standards A through Z on the reverse side or attached, which are incorporated as part of this Contract.
110  THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD,
111  SEEK THE ADVICE OF AN ATTORNEY PRIOR TO SIGNING.
112  THIS "AS IS" FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS® AND THE FLORIDA BAR.
113  Approval does not constitute an opinion that any of the terms and conditions in this Contract should be accepted by the parties in a
114  particular transaction. Terms and conditions should be negotiated based upon the respective interests, objectives and bargaining
115  positions of all interested persons.
116  AN ASTERISK(*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO BE COMPLETED.

117*  _____  2/21/06  _____  2-21-0?
118  (BUYER)                    (DATE)      (SELLER)                    (DATE)

119*  _____  _____  _____  _____
120  (BUYER)                    (DATE)      (SELLER)                    (DATE)

121*  Buyers' address for purposes of notice _____  Sellers' address for purposes of notice _____
122*  ___1818   S. Australian Ave. Suite 405_____  _____
123*  West Palm Beach, FL 33409'    615-9599___ Phone _____  _____ Phone ____
124  BROKERS: The brokers (including cooperating brokers, if any) named below are the only brokers entitled to compensation in connection with
125  this Contract:
126*  Name:     Jenkins Realty, Inc.   6% by Buyer  _____
127       Cooperating Brokers, if any                 Listing Broker

FAR/BAR ASIS-1   Rev. 7/04   © 2004  Florida Association of Realtors® and The Florida Bar   All Rights Reserved   Page 2 of 4

This software is licensed to [Diane Jenkins - Jenkins Realty, Inc.] www.instanetforms.com.

## "AS IS" STANDARDS FOR REAL ESTATE TRANSACTIONS

A. TITLE INSURANCE: The Title Commitment shall be issued by a Florida licensed title insurer agreeing to issue Buyer, upon recording of the deed to Buyer, an owner's policy of title insurance in the amount of the purchase price, insuring Buyer's marketable title to the Real Property, subject only to matters contained in Paragraph VII and those to be discharged by Seller at or before Closing. Marketable title shall be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance with law. Buyer shall have 5 days from date of receiving the Title Commitment to examine it, and if title is found defective, notify Seller in writing specifying defect(s) which render title unmarketable. Seller shall have 30 days from receipt of notice to remove the defects, failing which Buyer shall, within 5 days after expiration of the 30 day period, deliver written notice to Seller either: (1) extending the time for a reasonable period not to exceed 120 days within which Seller shall use diligent effort to remove the defects; or (2) requesting a refund of deposit(s) paid which shall be returned to Buyer. If Buyer fails to so notify Seller, Buyer shall be deemed to have accepted the title as it then is. Seller shall, if title is found unmarketable, use diligent effort to correct defect(s) within the time provided, If, after diligent effort, Seller is unable to timely correct the defects, Buyer shall either waive the defects, or receive a refund of deposit(s), thereby releasing Buyer and Seller from all further obligations under this Contract. If Seller is to provide the Title Commitment and it is delivered to Buyer less than 5 days prior to Closing, Buyer may extend Closing so that Buyer shall have up to 5 days from date of receipt to examine same in accordance with this "AS IS" Standard.

B. PURCHASE MONEY MORTGAGE; SECURITY AGREEMENT TO SELLER: A purchase money mortgage and mortgage note to Seller shall provide for a 30 day grace period in the event of default if a first mortgage and a 15 day grace period if a second or lesser mortgage; shall provide for right of prepayment in whole or in part without penalty; shall permit acceleration in event of transfer of the Real Property; shall require all prior liens and encumbrances to be kept in good standing; shall forbid modifications of, or future advances under, prior mortgage(s); shall require Buyer to maintain policies of insurance containing a standard mortgage clause covering all improvements located on the Real Property against fire and all perils included within the term "extended coverage endorsements" and such other risks and perils as Seller may reasonably require, in an amount equal to their highest insurable value, and the mortgage, note and security agreement shall be otherwise in form and content required by Seller; but Seller may only require clauses and coverage customarily found in mortgages, mortgage notes and security agreements generally utilized by savings and loan institutions or state or national banks located in the county wherein the Real Property is located. All Personal Property and leases being conveyed or assigned will, at Seller's option, be subject to the lien of a security agreement evidenced by recorded or filed financing statements or certificates of title. If a balloon mortgage, the final payment will exceed the periodic payments thereon.

C. SURVEY: Buyer, at Buyer's expense, within time allowed to deliver evidence of title and to examine same, may have the Real Property surveyed and certified by a registered Florida surveyor. If the survey discloses encroachments on the Real Property or that improvements located thereon encroach on setback lines, easements, lands of others or violate any restrictions, Contract covenants or applicable governmental regulations, the same shall constitute a title defect.

D. WOOD DESTROYING ORGANISMS: DELETED

E. INGRESS AND EGRESS: Seller warrants and represents that there is ingress and egress to the Real Property sufficient for its intended use as described in Paragraph VII hereof and title to the Real Property is insurable in accordance with "AS IS" Standard A without exception for lack of legal right of access.

F. LEASES: Seller shall at least 10 days before Closing, furnish to Buyer copies of all written leases and estoppel letters from each tenant specifying the nature and duration of the tenant's occupancy, rental rates, advanced rent and security deposits paid by tenant. If Seller is unable to obtain such letter from each tenant, the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit, and Buyer may thereafter contact tenant to confirm such information. If the terms of the leases differ materially from Seller's representations, Buyer may terminate this Contract by delivering written notice to Seller at least 5 days prior to Closing. Seller shall, at Closing, deliver and assign all original leases to Buyer.

G. LIENS: Seller shall furnish to Buyer at time of Closing an affidavit attesting to the absence, unless otherwise provided for herein, of any financing statements, claims of lien or potential lienors known to Seller and further attesting that there have been no improvements or repairs to the Real Property for 90 days immediately preceding date of Closing. If the Real Property has been improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth the names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been paid or will be paid at the Closing of this Contract.

H. PLACE OF CLOSING: Closing shall be held in the county wherein the Real Property is located at the office of the attorney or other closing agent ("Closing Agent") designated by the party paying for title insurance, or, if no title insurance, designated by Seller.

I. TIME: In computing time periods of less than six (6) days, Saturdays, Sundays and state or national legal holidays shall be excluded. Any time periods provided for herein which shall end on a Saturday, Sunday, or a legal holiday shall extend to 5:00 p.m. of the next business day. Time is of the essence in this Contract.

J. CLOSING DOCUMENTS: Seller shall furnish the deed, bill of sale, certificate of title, construction lien affidavit, owner's possession affidavit, assignments of leases, tenant and mortgagee estoppel letters and corrective instruments. Buyer shall furnish mortgage, mortgage note, security agreement and financing statements.

K. EXPENSES: Documentary stamps on the deed and recording of corrective instruments shall be paid by Seller. All costs of Buyer's loan (whether obtained from Seller or third party), including, but not limited to, documentary stamps and intangible tax on the purchase money mortgage and any mortgage assumed, mortgage title insurance commitment with related fees, and recording of purchase money mortgage, deed and financing statements shall be paid by Buyer. Unless otherwise provided by law or rider to this Contract, charges for the following related title services, namely title evidence, title examination, and closing fee (including preparation of closing statement), shall be paid by the party responsible for furnishing the title evidence in accordance with Paragraph V.

L. PRORATIONS; CREDITS: Taxes, assessments, rent, interest, insurance and other expenses of the Property shall be prorated through the day before Closing. Buyer shall have the option of taking over existing policies of insurance, if assumable, in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required by prorations to be made through day prior to Closing or occupancy, if occupancy occurs before Closing. Advance rent and security deposits will be credited to Buyer. Escrow deposits held by mortgagee will be credited to Seller. Taxes shall be prorated based on the current year's tax with due allowance made for maximum allowable discount, homestead and other exemptions. If Closing occurs at a date when the current year's millage is not fixed and current year's assessment is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an informal assessment taking into account available exemptions. A tax proration based on an estimate shall, at request of either party, be readjusted upon receipt of current year's tax bill.

M. SPECIAL ASSESSMENT LIENS: Except as set forth in Paragraph X(a), certified, confirmed and ratified special assessment liens imposed by public bodies as of Closing are to be paid by Seller. Pending liens as of Closing shall be assumed by Buyer. If the improvement has been substantially completed as of Effective Date, any pending lien shall be considered certified, confirmed or ratified and Seller shall, at Closing, be charged an amount equal to the last estimate or assessment for the improvement by the public body.

N. INSPECTION AND REPAIR: DELETED

O. RISK OF LOSS: If the Property is damaged by fire or other casualty before Closing and cost of restoration does not exceed 1.5% of the Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed pursuant to the terms of this Contract with restoration costs escrowed at Closing. If the cost of restoration exceeds 1.5% of the Purchase Price, Buyer shall either take the Property as is, together with either the 1.5% or any insurance proceeds payable by virtue of such loss or damage, or receive a refund of deposit(s), thereby releasing Buyer and Seller from all further obligations under this Contract.

P. CLOSING PROCEDURE: The deed shall be recorded upon clearance of funds. If the title agent insures adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow and closing procedure required by this "AS IS" Standard shall be waived. Unless waived as set forth above the following clos-

This software is licensed to [Diane Jenkins - Jenkins Realty, Inc.] www.instanetforms.com.



**"AS IS" STANDARDS FOR REAL ESTATE TRANSACTIONS (CONTINUED)**

ing procedures shall apply: (1) all closing proceeds shall be held in escrow by the Closing Agent for a period of not more than 5 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of Buyer, Buyer shall, within the 5 day period, notify Seller in writing of the defect and Seller shall have 30 days from date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, all deposits and closing funds shall, upon written demand by Buyer and within 5 days after demand, be returned to Buyer and, simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and reconvey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand for refund, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.

O. ESCROW: Any Closing Agent or escrow agent (collectively "Agent") receiving funds or equivalent is authorized and agrees by acceptance of them to deposit them promptly, hold same in escrow and, subject to clearance, disburse them in accordance with terms and conditions of this Contract. The parties agree that Agent shall not be liable to any party or person for misdelivery of funds in doubt as to Agent's duties or liabilities under the provisions of this Contract. Agent may, at Agent's option, continue to hold the subject matter of the escrow until the parties hereto agree to its disbursement or until a judgment of a court of competent jurisdiction shall determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as amended. Any suit between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any suit wherein Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred with these amounts to be paid from and out of the escrowed funds or equivalent and charged and awarded as court costs in favor of the prevailing party. The Agent shall not be liable to any party or person for misdelivery to Buyer or Seller of items subject to the escrow, unless such misdelivery is due to willful breach of the provisions of this Contract or gross negligence of Agent.

P. ATTORNEY'S FEES; COSTS: In any litigation, including breach, enforcement or interpretation, arising out of this Contract, the prevailing party in such litigation, which, for purposes of this "AS IS" Standard, shall include Seller, Buyer and any brokers acting in agency or nonagency relationships authorized by Chapter 475, F.S., as amended, shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

S. FAILURE OF PERFORMANCE: If Buyer fails to perform this Contract within the time specified, including payment of all deposits, the deposit(s) paid by Buyer and deposit(s) agreed to be paid, may be recovered and retained by and for the account of Seller as agreed upon liquidated damages, consideration for the execution of the Contract and in full settlement of any claims; whereupon, Buyer and Seller shall be relieved of all obligations under this Contract; or Seller, at Seller's option, may proceed in equity to enforce Seller's rights under this Contract. If for any reason other than failure of Seller to make Seller's title marketable after diligent effort, Seller fails, neglects or refuses to perform this Contract, Buyer may seek specific performance or elect to receive the return of Buyer's deposit(s) without thereby waiving any action for damages resulting from Seller's breach.

T. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; FACSIMILE: Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall bind and inure to the benefit of the parties and their successors in interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to the attorney or broker representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic media. A legible facsimile copy of this Contract and any signatures hereon shall be considered for all purposes as an original.

U. CONVEYANCE: Seller shall convey marketable title to the Real Property by statutory warranty, trustee's, personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters contained in Paragraph VII and those otherwise accepted by Buyer. Personal Property shall, at the request of Buyer, be transferred by an absolute bill of sale with warranty of title, subject only to such matters as may be otherwise provided for herein.

V. OTHER AGREEMENTS: No prior or present agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No modification or change in this Contract shall be valid or binding upon the parties unless in writing and executed by the parties intended to be bound by it.

W. SELLER DISCLOSURE: (1) There are no facts known to Seller materially affecting the value of the Property which are not readily observable by Buyer or which have not been disclosed to Buyer; (2) Seller extends and intends no warranty and makes no representation of any type, either express or implied, *as to the physical condition or history of the Property; and (3) Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.*

X. PROPERTY MAINTENANCE; PROPERTY ACCESS; ASSIGNMENT OF CONTRACTS AND WARRANTIES: Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool in the condition existing as of Effective Date, ordinary wear and tear excepted. Seller shall, upon reasonable notice, provide utilities service and access to the Property for appraisal and inspections, including a walk-through prior to Closing, to confirm that all items of Personal Property are on the Real Property and that the Property has been maintained as required by this "AS IS" Standard. Seller will assign all assignable repair and treatment contracts and warranties to Buyer at Closing.

Y. 1031 EXCHANGE: If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with Closing or deferred) with respect to the Property under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate in all reasonable respects to effectuate the Exchange, including the execution of documents; provided (1) the cooperating party shall incur no liability or expense related to the Exchange and (2) the Closing shall not be contingent upon, nor extended or delayed by, such Exchange.

Z. BUYER WAIVER OF CLAIMS: *Buyer waives any claims against Seller and, to the extent permitted by law, against any real estate licensee involved in the negotiation of the Contract, for any defects or other damage that may exist at Closing of the Contract and be subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer.*

This software is licensed to [Diane Jenkins - Jenkins Realty, Inc.] www.instanetforms.com.



EXHIBIT 3

Page 1

IN RE:  SCHEDULED CLOSED EXECUTIVE SESSION


CASE:  FANE LOZMAN AND VIRGINIA MERCHANT VS. CITY OF
RIVIERA BEACH

CASE NO.:  502006CA005632XXXXMBAD      **CERTIFIED COPY**


SPECIAL COUNSEL:  DON STEPHENS, ESQUIRE


CASE:  JERRY CORIE AND GENIE CORIE, ET AL. VS. CITY OF
RIVIERA BEACH, ET AL.


CASE NO.:  502006CA005799XXXXMBAF


                        Wednesday, June 28, 2006
                        Riviera Beach, Florida
                        5:47 p.m. - 6:50 p.m.


APPEARANCES:

ANN ILES, CHAIRPERSON, DISTRICT 5

JAMES "JIM" JACKSON, CITY COUNCILPERSON, DISTRICT 4

ELIZABETH "LIZ" WADE, CITY COUNCILPERSON, DISTRICT 3

NORMA DUNCOMBE, CITY COUNCILPERSON, DISTRICT 2

VANESSA LEE, CHAIR PRO TEM

PAMELA H. RYAN, CITY ATTORNEY

WILLIAM E. WILKINS, CITY MANAGER

MICHAEL D. BROWN, MAYOR

MAUREEN HALL, COURT REPORTER

Page 2

1              (Thereupon, the following proceedings were

2        had):

3                        - - -

4              MS. ILES:  Okay.  Are you ready now?

5              Okay.  Ladies and gentlemen, we are getting

6        the show on the road.  Do I have to say anything?

7              MS. RYAN:  We have to open up a regular

8        meeting.

9              MS. ILES:  Oh.

10             MS. RYAN:  And then close it for the closed

11       executive session.

12             MS. ILES:  Okay.  I call this regular special

13       meeting to order at 5:47, Wednesday, June 28, and

14       we don't need roll call, do we?

15             MS. WADE:  Do we recess or close?

16             MS. RYAN:  Let me just say, present at this

17       special meeting are councilpersons Duncombe,

18       Jackson, Wade and Chairperson Iles.

19             In addition, the city manager, the city

20       attorney and special counsel Don Stephens.

21             Now you can just close the meeting.

22             MS. WADE:  Close or recess?

23             MS. RYAN:  Close.

24             MS. WADE:  I move to adjourn.

25             MR. JACKSON:  Second.

Page 3

```
1            MS. ILES:  Okay.  Moved and seconded.  We are
2       now adjourned.  We are going to open up our closed
3       executive session.
4            Okay.  Got to do roll call again.
5            MS. RYAN:  Present are the same persons who
6       were at the --
7            MS. ILES:  Special.
8            MS. RYAN:  -- special meeting.
9            Madam chair, we are here to discuss two new
10      lawsuits that have been filed against the city and
11      one against the CRA, in addition to the city.  We
12      will take them in turn.
13           The first one we will discuss is Fane Lozman
14      and Virginia Merchant versus the City of Riviera
15      Beach.  We have already retained special counsel,
16      Don Stephens, who will give us a brief summary of
17      the case, and we will discuss our strategy.
18           We are looking for some strategy
19      recommendations from the council on this case, and
20      we will be doing the same thing on the second case
21      as well.
22           We will go ahead and start with the case that
23      was just filed against us; as, you know, as it
24      relates to the May 10, 2006 special city council
25      meeting.
```

Page 4

1           MR. STEPHENS:  Good evening.

2           MS. ILES:  Good evening.

3           MR. STEPHENS:  I don't know how much

4    information you all want, but I am just going to

5    try to break it down as succinctly as I can.

6           Basically, Lozman and Merchant filed a

7    lawsuit that is somewhat confusing.  It is really

8    a lawsuit pursuant to violation of the Sunshine

9    Statute or Sunshine Law, but they also ask for

10   declaratory relief and injunctive relief.

11          So, what we have done is we filed a motion to

12   dismiss the lawsuit, because the issues regarding

13   declaratory, they didn't allege the proper

14   elements to state a cause of action for

15   declaratory relief, nor did they allege the proper

16   elements for a permanent injunction, which is what

17   they are trying to do.

18          It is clear what they are trying to do.  I

19   mean, they are basically saying, because the May

20   10 meeting didn't give them enough notice, they

21   want The Court to step in and declare, number one,

22   that the resolution and the contract are void, but

23   they also want The Court to issue a permanent

24   injunction prohibiting the council from entering

25   into such agreement.

Page 5

```
 1           And they are not dealing with the new bill
 2      that the governor signed, but they are, in a
 3      sense, saying that this meeting was sort of
 4      hastily and quickly.
 5           You know, basically what they are trying to
 6      do is say this meeting was put together without
 7      giving proper notice in order to beat the governor
 8      in signing that bill.
 9           And in researching some of the cases, there
10      are no -- there are no cases that say that the 24
11      hour notice you gave would be adequate notice, and
12      there is no cases that say the 24 hours you gave
13      would be inadequate.
14           There are cases that say an hour-and-a-half
15      notice is inadequate, and there are cases that say
16      three days notice is adequate, but you certainly
17      not only just gave notice in terms of posting
18      things, but that was also the way that things were
19      routinely done.
20           That was also -- in fact, in speaking with
21      the clerk, she also said that she actually faxed a
22      notice to the Palm Beach Post.  She also said that
23      on Channel 18 that the notice was also typed into,
24      would come up on Channel 18, so everyone within
25      the city can look on there and see that there was
```

Page 6

1    a meeting coming up.

2         Not only that, the notice was passed out at

3    the CRA meeting, and one of the guys who was

4    complaining is Fane Lozman.  He was at the CRA

5    meeting, and one of the grounds for our dismissal

6    was that he actually got actual notice.

7         There is a case that says, if someone has

8    personal notice, then they can't file a lawsuit

9    saying that they didn't get notice or that the

10   Sunshine Law was violated.

11        So, I mean, the city really has -- I mean,

12   you know, I can't promise you that The Court is

13   going to agree with me, but the city really has

14   given notice, and the city did not, you know, just

15   have a meeting with one little piece of notice

16   posted out front.

17        I mean, there was -- the notice was passed

18   around to different people's offices.  It was on

19   TV, you know, and it was sent to The Post.  The

20   Post could have, actually could have called the

21   press, if they wanted to call the television

22   stations, or they could have posted something in

23   their newspapers the next morning.

24        So, you know, this is one of those cases

25   where they really are upset, obviously, because of

Page 7

```
 1      what is at stake, and the case law is that you

 2      have to give reasonable notice no matter what the

 3      meeting is.

 4           Just because this is a very important issue

 5      doesn't mean that you got to give some special

 6      notice because of the gravity of what we are

 7      dealing with.

 8           So, these people were saying basically

 9      because of what we are dealing with, that you

10      should have given them a week's notice.  But most

11      of the arguments, quite frankly, that they were

12      making or would be making, some of those same

13      people made those arguments in front of you at the

14      CRA meeting.

15           So, I mean, I think that what this is going

16      to boil down to is the Judge is going to have to

17      make a decision as to whether or not the notice

18      that was given, whether or not that was reasonable

19      notice.

20           And I, you know; and, again, I think that,

21      you know, this is not something that was done just

22      for this situation, which I think is good.

23           I mean, I think that the city has been doing

24      the same type of notice for a period of time, and

25      the city didn't deviate with this matter at all.
```

Page 8

1          I mean, it -- you know, they are not

2     asserting --

3          I mean, they are not showing anything, or

4     they haven't alleged anything that which would

5     prove to me or anyone else that you went out of

6     your way to have a secret meeting, which is what

7     most of the Sunshine violations are for is when

8     two people go have lunch together and start

9     talking about what they are going to do at a

10    public meeting.  That didn't happen here.

11         There are no such allegations, and I think

12    one of the strong points is this, and that there

13    is a Sunshine manual that is published I believe

14    by the Attorney General's office that said, if you

15    are going to call a special meeting, you have to

16    give at least 24 hour notice.

17         So, you have met those things, I mean; but,

18    you know, obviously, this is going to boil down to

19    whether or not a Judge believes that you gave

20    reasonable notice.

21         I don't believe that they are going to be

22    able to cite to anything specific to show that the

23    notice was unreasonable, and I don't believe we

24    are going to be able to cite to anything to show

25    that we absolutely did the right thing.

Page 9

1          I think it is going to boil down to a Judge

2      looking at this and making a determination but --

3          MS. WADE:  I have a statement.  The meeting

4      preceding, I think it was the CRA meeting where it

5      was discussed, and the mayor said we would call a

6      special meeting.

7          MS. DUNCOMBE:  Public meeting.

8          MS. WADE:  A public meeting.

9          MR. STEPHENS:  Right.

10          MS. WADE:  That was stated in front of

11      Mr. Lozman and all of the petitioners except the

12      lady from the Sea Shell.  But I don't know who she

13      is.

14          MR. STEPHENS:  I think you actually said that

15      there was another meeting following, because I

16      recall, from listening to the tape, that -- I

17      think it was Councilmember Lee was saying that

18      maybe there was not going to be something that was

19      going to happen afterwards, but then I think you

20      interrupted her and said no, that's not right.

21          MS. WADE:  Yeah.

22          MR. STEPHENS:  But, anyway, Mr. Lozman states

23      in this that he got notice at the CRA meeting that

24      there was a meeting, so I think anybody who is at

25      the CRA meeting knew that there was a meeting.

Page 10

1            MS. ILES:  Excuse me.  Let me interrupt you.

2       The mayor, Michael Brown, came n.

3            MS. WADE:  The point I am making is, they are

4       alleging the Sunshine violation, and my

5       recollection of all that I have gone through here

6       at the city, like you said, it has to be two or

7       more meetings to discuss what we are going to vote

8       on.

9            The meeting, in essence, for the city, was

10      called by one person, so we can't say Sunshine

11      there, because the mayor has that authority.

12           I was not necessarily in favor of the

13      meeting, but I attended the meeting, and I worked

14      with you all, because that's what we are trying to

15      do.  It was known from the time we left

16      Tallahassee as to what the city had to do, and as

17      far as the Sunshine violation now, I have

18      personally seen Mr. Lozman with the Roberts Rule

19      and the Sunshine book in his hands, so he is

20      totally aware.

21           My only fear, and we have gone through this,

22      and I guess Michael can attest to this, but the

23      police department, a lot of times a Judge rules

24      against us incorrectly because of the climate, you

25      know, the climate, okay.  But it is very clear

Page 11

1    that if no one else was aware of the meeting, he

2    was.

3         MR. STEPHENS:  Well, definitely he admits --

4         He admits that he was aware of the meeting.

5    He alleges something that doesn't appear to be

6    consequential, but he said that he was kicked out,

7    that he wasn't allowed to come back into the

8    meeting, because he was kicked out of the CRA

9    meeting, you know.

10        MS. WADE:  Okay.  Well, does -- are you aware

11   of the fact that these microphones and the cameras

12   broadcast outside and downstairs?

13        MR. STEPHENS:  No.

14        MS. WADE:  Well, he still had an opportunity

15   to see what was going on.

16        MR. STEPHENS:  Well, he is complaining about

17   it being closed, and they are attacking the notice

18   in a variety of ways.  I mean, they are saying

19   about the time.  They are also saying about, you

20   know, they incorrectly stated in their complaint

21   that it was only posted here, and that's not --

22        MS. WADE:  And we can prove otherwise.

23        MR. STEPHENS:  And that's not true, so they

24   are talking about the manner in which it was

25   posted or communicated to the public, and they are

Page 12

1        talking about the amount of time.

2            Basically what they are doing is, you know,

3        they are trying to allege everything they can and

4        throw everything they can in here to say, this was

5        a bad meeting, but the Sunshine violation can be

6        two people meeting on their own about something

7        that is going to come before the council, but it

8        can also be the council having a meeting after

9        having given insufficient or unreasonable notice,

10       and that's what really what we are talking about

11       is, whether or not the notice was sufficient.

12           And I think the fact that there is no case

13       law that says that what you did is clearly wrong,

14       to me that, you know, quite frankly, there should

15       be a presumption that maybe he was right, because

16       there is nothing that said that it was clearly

17       wrong.

18           MS. WADE:  Would it be too much work to go

19       back and pull every, I would just say the last

20       five or six special meetings that we've had to

21       show just how much notice was given on those,

22       because we have had quite a few meetings that was

23       only 24 hour notice.

24           MS. RYAN:  Right, and I think that if it

25       comes to a hearing, it will be sufficient for The

Page 13

1      Court to come in and say, we had a meeting on this

2      date, 24 hours notice.  We had a meeting on that

3      date, 24 hours notice.  This is what the city, you

4      know, did.  We have done this for years.  We were

5      in compliance with the law, as far as we knew.

6           MS. WADE:  And then there is also a few years

7      back where the Palm Beach Post took the city to

8      court for a records violation, and the ruling of

9      that Judge was, one day is fair, and one day

10     equals 24 hours, so we have worked under the

11     assumption of the 24 hour rule for, you know,

12     quite some time.

13          MR. STEPHENS:  Well, the Sunshine manual

14     states that a special meeting has to be -- you

15     have to give at least 24 hour notice.

16          In this case more than actually 24 hour

17     notice was given.  I mean, they are saying 24 hour

18     notice; but, in essence, it was more than 24 hour

19     notice, and I think the fact that it was posted on

20     Channel 18 is important.  I mean, I think that is

21     really important, the fact that it was posted on

22     there.  Anybody who is concerned about making it

23     to a city council meeting, and they live within

24     your city, could have gotten the notice.

25          MS. ILES:  No.  They are talking about the

Page 14

1       May 10 meeting that we called a special city

2       council meeting after the CRA meeting.

3           MS. RYAN:  Try not to get confused, because I

4       continue to do it.  The special meeting that was

5       called on the Bernard McKenzie contract, that was

6       a meeting that was called Wednesday night at the

7       council meeting for Friday morning at 10:00.

8       There were two different meetings.  I am

9       constantly confusing this.

10          MS. WADE:  What day was the May 10 meeting?

11          MS. RYAN:  The May 10 meeting I believe was a

12      Wednesday night after.  This meeting was supposed

13      to start -- we put it on for 8:00 o'clock or after

14      the CRA meeting, and the CRA meeting went a long

15      time, and I remember we were, city staff, was

16      waiting around and waiting around, and I think --

17          MS. WADE:  I think she stopped the meeting

18      and had that one and then went back to the CRA

19      meeting.

20          MS. ILES:  We stopped the meeting around

21      8:30, quarter to 9:00.

22          MS. WADE:  We actually cut the meeting

23      because of that advertisement.

24          MS. RYAN:  My recollection is that the

25      meeting didn't start until --

Page 15

1          MS. WADE:  Well, we can clarify by looking at

2      the tape.

3          MR. STEPHENS:  The May 10 meeting?

4          MS. RYAN:  Yes.  Do you know what time?

5          MR. STEPHENS:  The May 10 meeting, it

6      lasted - the CRA meeting lasted - it had to be

7      about two hours and 45 minutes.

8          And the reason I say that is because the

9      whole thing, I looked at, it was about two hours

10     and 54 minutes, you know, so --

11         And this, the actual meeting didn't take very

12     long, so I would say the meeting -- so it was at

13     least two-and-a-half hours, the CRA meeting.  It

14     was at least two-and-a-half hours.

15         MS. RYAN:  I think it was closer to

16     10:00 o'clock.

17         MS. ILES:  So then why did we call for the

18     meeting to take place that Monday?

19         MS. RYAN:  The mayor called for the meeting,

20     and I don't know if --

21         MR. STEPHENS:  It was posted at 3:40 on, I

22     believe, May 9.  I believe the posting was at

23     3:40.

24         MS. RYAN:  P.m.

25         MS. ILES:  Right.

Page 16

```
 1            MR. STEPHENS:  P.m., yeah, and the meeting
 2     actually --
 3            So, I mean, you are talking about more than
 4     24 hours.
 5            MS. WADE:  Okay.  Now, madam chair, when the
 6     clerk faxed the notice to The Post, did The Post
 7     print it?
 8            MR. STEPHENS:  I haven't figured that out
 9     yet.  I am going to call someone at The Post.
10            MS. WADE:  Because if they got it at 3:40
11     p.m., then they had time to have it in the paper
12     the next day, like they usually do.
13            MR. STEPHENS:  Well, they definitely had time
14     to have it in the paper, if the wanted to do that.
15     I mean, they could have posted it on their web
16     site, if they wanted to.
17            MS. ILES:  But are we responsible if they did
18     not post?
19            MR. STEPHENS:  No.  What you have to do is --
20     what you have to do is make an effort to give
21     people notice; and, actually, the case law
22     indicates that, you know, the press having notice
23     is important, not just for noticing people that
24     there is a meeting; but, also, it shows that you
25     are not trying to have a meeting in private.
```

Page 17

1            MS. WADE:  But do we pay for that posting?

2            MR. STEPHENS:  Right.

3            MS. WADE:  Okay.  So when she cites that, we

4      need to find out if we actually paid for that.

5            MS. RYAN:  We don't pay for that, not for

6      that.

7            MS. WADE:  Not for special meeting?

8            MR. WILKINS:  They have a section in the

9      paper where they publish notices.

10           MS. RYAN:  It is free.  That part is free.

11           MS. WADE:  That's what I wanted to know, if

12     that part was free or if it was something out of

13     the ordinary.  What I am saying is, going back to

14     the history of the number of special meetings that

15     have been called, it is different from when we are

16     doing ordinances and all that kind of stuff.

17           MS. RYAN:  Those have to be noticed.

18           MS. WADE:  I just wanted to get that clear.

19           MS. ILES:  I am trying to get some sense as

20     to why we called the meeting on that Tuesday.

21           MS. RYAN:  You didn't call the meeting.  The

22     mayor called the meeting.

23           MS. ILES:  I understand.  Why the mayor

24     called the meeting.  Why did the mayor on Tuesday

25     call for the meeting?

Page 18

```
 1          MR. BROWN:  That's a question to me?

 2          MS. ILES:  Yes.

 3          MR. BROWN:  Okay.  I was listening to the

 4     discussions.  I believe, if I recall, we had

 5     adopted the contract, if I am getting the dates

 6     right.  The city, and forgive me, 1 was kind of

 7     paying attention to what you all were saying.  The

 8     city commission had accepted and agreed to retain

 9     Mr. McKenzie, I believe.

10          MS. RYAN:  No, we are not talking about

11     McKenzie.

12          MR. BROWN:  Because here is what happened.

13          MS. RYAN:  McKenzie was -- that was at a

14     council meeting, but this meeting happened before

15     McKenzie.

16          MR. BROWN:  Here is what happened.  Here is

17     what happened.  You remember, I believe it is the

18     time when we had the agreement with Viking.

19          MS. RYAN:  Yes.

20          MR. BROWN:  Right?

21          MS. RYAN:  Yes.

22          MR. BROWN:  And in order for the CRA to enter

23     into a binding agreement, the city and the CRA

24     have to meet on it.

25          MS. RYAN:  Yes.
```

Page 19

1          MR. BROWN:  And I believe what happened is,

2     when I called the special meeting, it was we who

3     approved the Viking written agreement at the city

4     council meeting.

5          MS. RYAN:  No, at the CRA meeting first

6     because you called --

7          MR. BROWN:  At the CRA meeting, and then this

8     meeting followed that meeting?

9          MS. RYAN:  Correct.

10          MR. BROWN:  Because you needed, in order for

11     a contract to be binding, because there was city

12     property affected by the CRA agreement, we needed

13     a city council meeting, so that this council could

14     also approve the same contract.

15          MS. RYAN:  Right.  She wants to know why did

16     you --

17          MS. ILES:  I was just trying to get some

18     sense of --

19          MR. BROWN:  And the reason -- I believe this

20     is the meeting you are speaking of.  The reason I

21     did it is because if the CRA signs a contract, and

22     the city hasn't signed a contract, particularly

23     with all of their property and city property that

24     was involved, then it is an incomplete process.

25          MS. RYAN:  Right, and you want it done by May

1      10.

2         MR. BROWN:  We needed it.  Right.  In order

3      for us, as a body, that's one of the things we

4      agreed upon, all of us.  In order for us to move

5      forward, we needed both meetings.

6         MS. RYAN:  Correct.

7         MR. BROWN:  All right.  If you would have had

8      just the CRA meeting without the city council

9      meeting, you would have had an incomplete process;

10     and, therefore, not a legal subsequent agreement.

11        MS. RYAN:  And so the issue, this is a

12     question, was added on to the CRA meeting, or was

13     it already listed on the CRA meeting?

14        MR. STEPHENS:  It was an add on.

15        MS. RYAN:  So it was added on to the CRA

16     meeting, and so you called for a discussion

17     meeting of the council, so it would be done on May

18     10.

19        MR. BROWN:  Right, but remember, at the CRA

20     meeting, obviously, we have had a series of

21     discussions and negotiations regarding the CRA,

22     the master developer dating forever, and when the

23     council and the CRA enter into the agreement with

24     Viking, yes, we had to have --

25        I called a special meeting so that that

Page 21

1      contract that we entered, that you all entered at

2      the CRA will be valid, because the city had to

3      have a meeting to approve the same contract.

4              MR. STEPHENS:  That makes sense.

5              MR. BROWN:  Right.

6              MR. STEPHENS:  And I think, quite frankly, I

7      think somebody was talking about sympathy earlier.

8      I think if you can show to a Judge, and I think

9      you have to do it this way.  I think if you can

10     show to a Judge that way before anybody started

11     complaining with the legislature and coming up

12     with a bill and all this stuff, that the city

13     invested a lot of time and a lot of money to make

14     this happen and that other folks were the ones who

15     went and started trying to do things behind the

16     doors to shut this down.

17             And I think, really, I think if you can

18     parade those people into the courtroom to say, I

19     was working on this since this date, and so now,

20     you know, now when you are trying to get all of

21     this, you can't just rush and throw something.

22     You are spending all this time, all this money, to

23     get all this together, and then you got other

24     folks working against you.

25             I mean; and, you know, the Florida

Page 22

1    Constitution says that you cannot, you cannot

2    create a law that will affect just the City of

3    Riviera Beach.  So they spent some time trying to

4    make sure that they got it where it affected only

5    the City of Riviera Beach without hurting other

6    folks.  And so they were doing all these things to

7    create this to hurt the City of Riviera Beach.

8         And I think you can show that, and I think

9    when you show that, I really do believe that

10   public sentiment will certainly change when they

11   see that the city was doing all this stuff for

12   months, if not years, talking about bringing

13   people in and getting contracts and going about

14   your business, and then all of a sudden you got

15   some other folks who were supposedly political

16   power house people getting involved and doing

17   things to try to kill the process.

18        I think all of that is important, and I think

19   all of that deals with whether or not the notice,

20   itself, is reasonable.  Everybody knew with any

21   common sense that you had to try to get something

22   together before that bill was signed.  I mean, we

23   just have to be realistic.

24        MS. WADE:  That's what I mean by the climate,

25   Don.  That's exactly what I mean by the climate.

Page 23

1          MS. DUNCOMB:  It shouldn't be our argument.

2     I mean, it should be that we have the right to try

3     to solidify a decision that we have made.  I think

4     when you start going into all that other stuff, it

5     sort of changes what the real issue is.

6          We finally adopted one area with the CRA, and

7     we just needed to solidify it, and we needed to

8     get it over, because we had been working all this

9     time with it.

10         MR. STEPHENS:  Right.  I don't think you can

11    separate those issues.

12         MS. WADE:  Wait a minute.

13         MR. STEPHENS:  You can try, but I don't think

14    you can separate what was the climate and all that

15    stuff that was going on.

16         MS. WADE:  The reason I am saying I am

17    worried about the climate, you had a problem with

18    the P and Z board with the same argument, and it

19    made the most sense of all, but we did not get the

20    vote, okay.  So it is going to depend on -- and

21    the eminent domain issue is something that has

22    been a global thing.  People are complaining about

23    they have no property, they are not vested, they

24    are not affected, so it is going to -- and so when

25    we lay this out, one of the things --

Page 24

1        I know the reason I attended the meeting was

2    that the governor was fixing to sign a bill that

3    was brought up after we had started the process,

4    okay, so I didn't feel like I was shorting the

5    governor or the legislature, because this was

6    already in our toolbox.  It was not put in the

7    toolbox by the City of Riviera Beach, okay, and we

8    had been working towards this for the last 15

9    years, not just a few years.

10        So, since we were this far in, and we have

11    the invoices to show that there was ongoing work,

12    and there was no reason in the world for us not to

13    call a special meeting.  We had called a special

14    meeting before to get something finished.

15        MR. STEPHENS:  Well, my point is that it

16    wasn't that you all decided to try to rush this,

17    just to rush to try to get something together.  It

18    was the fact that somebody was trying to do

19    something to thwart the whole process.

20        MR. WILKINS:  Mr. Stephens, the issue is not

21    the motive for the meeting.  The issue is whether

22    the meeting was called in accordance with state

23    law and regulations, and the facts are that we

24    did, and it is irrespective of why we called the

25    meeting.

Page 25

1          MR. STEPHENS:  Right.  Well, but what the law

2      is, is that you have to look at the circumstances

3      to determine whether or not it was reasonable.

4          You know, in other words, if you didn't have

5      a deadline that was right there then --

6          MS. RYAN:  Why call it.

7          MR. STEPHENS:  -- you should have called the

8      meeting two weeks later or a month later and made

9      sure that everybody got, you know, two, three

10     weeks notice, so it is kind of hard to separate

11     those things.

12         MR. WILKINS:  Who makes the decisions whether

13     it is three weeks long or a month long or a year

14     long?

15         MR. STEPHENS:  Yeah, but what I am saying

16     is --

17         MS. DUNCOMBE:  That's not the argument we

18     need to make.  Our argument is that we should make

19     the argument that we had finally solidified one

20     side of this contract, and we need to go on and

21     solidify the other side of it.

22         MR. STEPHENS:  Right.

23         MS. WADE:  That doesn't make you rush it.

24         MS. ILES:  But I think -- go ahead.

25         MR. BROWN:  I think it is also important to

Page 26

```
 1      point out, and it is important that we don't allow
 2      them to back us into this corner.
 3          The fact is, is that when this council
 4      selected Viking as the master developer, there was
 5      a contractual obligation of some type with Viking,
 6      and the fact is, is that even though we had this
 7      meeting, and we reduced that contract, or we
 8      entered into one of a series of contracts that
 9      will eventually be executed with Viking, that was
10      not the first contract we had with Viking.
11      Because when this council selected Viking at that
12      meeting, there is no one that can legally argue
13      that the city and the CRA was contractually bound
14      and that Viking was not bound and that Viking was
15      not the master developer.  So --
16          MR. STEPHENS:  Right.
17          MR. BROWN:  -- when the governor and all
18      these other people claim that we rushed to enter
19      into a contract with Viking and that that contract
20      only came into place on May the 10, we can't let
21      them lead us down to that track, because the facts
22      are, no, we had a contract on the night when this
23      council voted them, number one.
24          MR. STEPHENS:  Right.
25          MR. BROWN:  And if you don't believe that, if
```

Page 27

1    this council had told Viking, we changed our mind,

2    let's watch Viking walk in here with ten lawyers

3    to sue us, or if a month later if Viking says, we

4    are leaving, and this council and city would have

5    said, well, no, if you leave, that's going to cost

6    us money, we could have sued Viking, that's number

7    one.

8         Number two, although I understand what you

9    are saying as well regarding the practical affect

10   of in court it helps that if you can show the

11   Judge what the big picture was, because there

12   seems to be some room in these, this area of the

13   law that talks about, okay, let's look at why the

14   meeting was held.

15        MS. RYAN:  That's correct.

16        MR. BROWN:  My second point is, and it is

17   tied in to what you are discussing and what

18   everyone else has mentioned here.

19        We need to paint the picture and look at it,

20   if we haven't already, the connection between

21   Mr. Lozman, the Pacific Foundation, the efforts

22   from the governor and the legislatures and all of

23   the local people here who are working together to

24   try to stop a process that we have been working on

25   since 1999.

Page 28

1          And I think that furthers your point when you

2    say that we can paint the bigger picture, because

3    the reality is that at this hearing, if we are

4    able to paint that picture and point out how these

5    people are working together, I don't know if you

6    have checked to see whether Lozman is tied to the

7    Pacific Foundation, I don't know, but my suspicion

8    is all of them are working together.

9          When you look at the Attorney General's

10   office, apparently there are people from FDLE

11   walking around.  The governor said he was going to

12   refer this issue to the Attorney General's office

13   to see if we violated the Sunshine.

14         You know, if the governor or the Attorney

15   General calls the FDLE office and says, I want you

16   to look into Riviera Beach, so now they got FDLE

17   people walking around, and these same people,

18   Lozman and the rest of them, Ward, are walking

19   around saying well, you know, FDLE is looking into

20   Riviera Beach.  It is all a part of the same

21   scheme.

22         So we need to take -- you need to figure out,

23   one, how far we need to go to determine what the

24   connection is, if any, between these groups.  Are

25   they working together?  Who is funding them?  Who

Page 29

```
 1        is funding Lozman?  If there is a single source.

 2        That's number one.

 3             And two, find out if they have met with

 4        people from the A.G.'s office, or the governor's

 5        office, or the rest of them, and are they all

 6        working together, and if that's the case, let's

 7        expose it soon, so that the public fully

 8        understands what they are trying to do.

 9             MR. STEPHENS:  Right.  And I agree.  I think

10        one of the things you have to do, and that's why I

11        am saying, you really can't separate certain

12        things.  I think that The Court has to see the

13        picture.

14             I mean, I just believe The Court has to see

15        the whole picture, because I think if anybody

16        looked at the whole picture, they would have to

17        conclude that this is unfair to the City of

18        Riviera Beach, what is going on.  That's just

19        what --

20             MS. WADE:  Do we know if Lozman is a

21        registered voter anywhere?

22             MR. STEPHENS:  No.

23             MS. WADE:  Because his front yard is water.

24        He lives at the marina.

25             MR. STEPHENS:  All we have done so far, and I
```

Page 30

1     think that's why we are here, to see exactly what

2     the council wants done.  But all we have done so

3     far is file a motion hoping to get rid of certain

4     claims but realizing the issue of the notice claim

5     is not going to go away on a motion, at least

6     certainly not on a motion to dismiss, but

7     hopefully some of the other issues will go away.

8          MS. WADE:  Can we find out where he is

9     registered?  I don't think it is here.

10          MR. STEPHENS:  I think we can send him some

11     discovery to find out, ask him all sorts of

12     questions and try to get other information.

13          MS. ILES:  But how much difference would that

14     make?  Does he have to be a resident before he can

15     file a lawsuit against us?

16          MR. STEPHENS:  Well, I think he should have

17     an interest.  Obviously, he rents from the city.

18          MS. DUNCOMBE:  He rents from the city?

19          MR. STEPHENS:  I think he has enough interest

20     in this lawsuit to get past on that issue, because

21     he -- I mean, he is -- he rents.  He has a

22     contract with the city, I assume.

23          MS. WADE:  I understand he has a contract

24     with the city, but my point is, like Mike was

25     talking about the ex pose.

Page 31

1      He has caused trouble before, okay, and is he

2   a pawn that's just being moved around?  Is he a

3   registered voter?  Okay.  He is definitely not a

4   property owner, because he is renting and living

5   on the water.  His front yard is water, his

6   backyard is water, and his side is water.

7      Okay.  He lists his address as 200 Blue

8   Heron, I mean, 13 Street, but that's my address.

9   That's the marina's address, you know.

10     So, and then, as Michael asked, who funded

11  it, and I think it is a big game to Mr. Lozman,

12  okay, because of the things that he rallied up

13  in -- where was it?

14     MR. BROWN:  South somewhere.

15     MS. WADE:  South Miami or somewhere, and it

16  is a big game to him, but is he -- you know, what

17  are his motives?  Is there any way we can kind of

18  point at some of the motives?

19     MR. STEPHENS:  I think before you do that you

20  got to find out what is going on.

21     MR. BROWN:  Well, then that's really the

22  question to me, for us is, do we want, and I

23  suggest to the council, direct you or to spend

24  some money to do some background investigation on

25  Lozman, his connection, and the connectivity of

Page 32

1       all of these groups together.  Not, I mean, not a

2       whole treasury of the city but from --

3              And, look, not a big brother from the

4       standpoint, oh, we want to investigate who these

5       people are.

6              MR. STEPHENS:  I think a private investigator

7       can find those things that you are talking about.

8              MR. BROWN:  Let's find out who they are.

9       Let's find out if, because I suspect they are

10      working together.  Find out if he is a pawn.

11      Somebody is funding him.

12             MS. RYAN:  But my question is, how is that,

13      and that's fine, but how is that relevant to the

14      lawsuit?

15             MR. BROWN:  It is very relevant.

16             MS. RYAN:  Hold on.  Even though the Judge

17      looks at the circumstances, they are still looking

18      at the four corners of this complaint.

19             This is not a frivolous lawsuit.  I don't

20      think it is frivolous.  I think we can win, but an

21      argument can be made, and they made the argument

22      that the meeting should have had at least, should

23      have had more than 24 hours notice because of the

24      type of meeting that it was.

25             MR. BROWN:  What about if you were the Judge

Page 33

1    and you are sitting there and they walk --

2        MS. RYAN:  I would not bring in that

3    testimony.

4        MR. BROWN:  Well, let me finish my point.  If

5    you were the Judge and you were sitting there, and

6    I guess you answered it.  If I was able to explain

7    to you well, wait a minute, Judge, let me tell you

8    what is really happening here.

9        First of all, we have had these type of

10    meetings.  This is the standard proceeding.  We

11    have had emergency meetings before.  There is

12    nothing out of the ordinary about our process

13    here, and here is what is at work, and here is the

14    context in which the meeting was held.

15        Now, even if the Judge doesn't let it in, the

16    fact that we find it out, at least it helps us in

17    preparation.

18        MS. RYAN:  Sure.

19        MR. BROWN:  For this lawsuit.

20        MS. RYAN:  And for the next one.

21        MR. BROWN:  And other lawsuits, because

22    these --

23        We need -- what my reason -- I really wanted

24    to be here today is so this council understands,

25    at least in my opinion, we need to understand that

Page 34

1    these people are attacking us.  They are trying to

2    destroy everything we have worked on.

3        And, even though this is just the first step

4    in this lawsuit, there are some very powerful

5    people from the governor down to the legislature,

6    and they all think the same thing, whatever his

7    name is, who basically are here to try to destroy

8    us, and we need to understand that.  We need to

9    use every reasonable tool that we have to find out

10   who they are, what we are up against, so that we

11   can map our strategy out or else we will be pushed

12   out to Okeechobee, Clewiston, and beyond.

13       MR. STEPHENS:  Right, and I think, basically,

14   I mean, I think both of you are right, actually.

15   I mean, I think that you have to have information

16   so that you know who you are dealing with, even if

17   you don't use it in court, but Ms. Ryan is right.

18       In Court what really is important is what you

19   all were thinking when you set the meeting on that

20   date at that time.

21       I mean, that's what The Court is going to

22   look at to make a determination of what is

23   reasonable, what is reasonable from your

24   perspective, and I think what is reasonable from

25   your perspective was the fact that you had been

Page 35

1   going through all these contracts, and you had

2   been doing all these things, and there was no way

3   that you weren't going to work your butt off to

4   the last minute to finalize this last piece of the

5   puzzle to get it done.

6       And I think you all are right, and so I think

7   both of you are right, but if you are dealing with

8   somebody in a lawsuit, I mean, you know, we have

9   normal lawsuits.  We want to find out everything

10  we can about the person who is suing our client.

11  We want to know everything about it.  I mean, we

12  know whether they are in debt and all that kind of

13  other stuff.

14      MS. WADE:  I think it would help to

15  intimidate the same way as FDLE is coming to my

16  house.  I am wondering if my lines are tapped or

17  whatever.  I think they should be questioned by

18  some of our people on a legitimate pay scale basis

19  so that they can feel the same kind of unwarranted

20  heat that we are feeling, and I am going to

21  caution that the city has been there before; and,

22  as I said, it is not right now who is right.  It

23  is the climate.

24      We watched an entire council over a two year

25  period being oust, black and white.  We watched an

Page 36

```
 1    entire administrative staff being taken out, black

 2    and white.  We watched Newman, the FBI agent that

 3    was sent here for two years after the last

 4    election was over, stand and say that they, after

 5    the election, they found no corruption in the City

 6    of Riviera Beach.

 7         So, I am saying, it is the climate.  We can

 8    go in there and be as right as right can be, but

 9    if that Judge is already preconcluded, you got the

10    governor's hand in this, or supposedly in this,

11    because all we have got is hearsay that his hand

12    is in it.  You understand what I am saying?  You

13    got FDLE knocking at my door.

14         MR. BROWN:  He called my name, buddy.  The

15    governor called my name.

16         MS. WADE:  He called your name?  What I am

17    saying, I am very, very -- I am not scared, but I

18    am very cautious.  I have seen this city right,

19    dead right.

20         Okay.  And as a result of that, the city --

21    now, if we lose this process that we have got over

22    here, we can look back and see what the city lost

23    in that process when they took out that council

24    and the city manager and staff, okay.

25         Ibis, Caloosa and Iron House, they were all
```

Page 37

1    in the annexation map with the City of Riviera

2    Beach.  Okay.  We have none of it.  Okay.  As we

3    speak today, we have none.

4        If these people are successful, then we are

5    going to have the same right or worse on our

6    eastern shores.  So, it is very important that we

7    understand the history, and that's why I say it is

8    very important that you form or we formalize some

9    kind of strategy that's going to let the Judge

10   know that it is not the first time, okay.

11       And the city ends up losing when you get

12   people like Tina White that's only interested in

13   getting her a job.  She wants to pick up trash.

14   She doesn't have a pickup truck.  She wants to do

15   hurricane roofs.  She doesn't have a hammer to

16   nail.  You understand?  She wants to do the Jazz

17   Festival.  She can't sing an tune, but she has

18   come to this city and ask for all of these things.

19   I am sounding funny, but she is one person.  Okay.

20   Now she is on the war path.

21       We have a guy that works for Waste

22   Management.  He is now sending us what was wrong

23   with Waste Management's contract.

24       If they all prevail on incorrect information

25   because of the climate, the city loses, and when

Page 38

1    we are talking about identifying the people who is

2    behind it, I am trying to give you as much

3    information I have in an open forum that we can

4    start checking on.

5         MR. BROWN:  Ms. Wade, I agree with most --

6         MS. WADE:  I know it is hard for you to say,

7    Michael.

8         MR. BROWN:  What I wouldn't -- I don't know

9    the specifics of the individuals that she is -- I

10   mean, I know who the people are, and Ms. Wade

11   expresses her way in a certain way, and I have

12   mine, but I do agree with her, and we are 100

13   percent on the same -- this is serious stuff, and

14   what -- this is the first step, and I agree, these

15   people are trying to destroy everything that we

16   have done.  And when Ms. Wade talks about Iron

17   Horse and Caloosa, most people don't understand

18   what you are talking about, Ms. Wade, in that

19   those areas out west that were in the annexation

20   area of Riviera Beach, that all of these forces

21   that have worked together over the years and

22   circumstances that happened here in City Hall came

23   together and deprived this city of those very

24   valuable assets.

25        And, if we don't understand, we must

Page 39

1    understand in this bound, that this fight goes on,

2    and this is the Alamo, as far as I am concerned,

3    and this is serious stuff.

4         MR. STEPHENS:  And that's what I am talking

5    about when I say the big picture, and that's why I

6    say, you can't try to fight a narrow, legal issue.

7    If you do, you are going to lose.

8         MS. WADE:  That's right.

9         MR. STEPHENS:  I mean, that's all I am saying

10   to you, and you can say well, I don't want to

11   bring this in here, but it is all in here.

12        I mean, you got to put it together, and you

13   got to put it together, and you got to paint it

14   broad so that they will know what you all were

15   thinking.

16        MS. ILES:  And as we are all -- we are here

17   to hear the statement in our community.  We got to

18   call a spade a spade, and we can sit here, and it

19   is going to be uncomfortable, but the facts are

20   the facts, and we need to put them out there, and

21   it wasn't the folks sitting on the stairs that

22   lost that property out there.  It wasn't the folks

23   outside.  It was the folks sitting on this dais

24   that lost us Caloosa, Iron Horse, and all of those

25   things out there.

Page 40

1        I don't have anything to say about the

2    governor.  The governor will do what he feels like

3    he needs to do.  But, the bottom line for me is

4    that this community needs to move forward, and

5    irrespective of what anybody in Tallahassee does,

6    and I will use my analogy here, and it probably

7    will make some people uncomfortable, but so be it.

8        You can't tie my hands, put a noose around my

9    neck, put me on a box and then wait for me to sit

10    there and wait for me to kick that box out from

11    under me, okay.

12        I got to try to figure out how to get that

13    noose out from around my neck, and it is about

14    self preservation.  It is about moving the city

15    forward.  We have home rules.  We have to make the

16    decision, and they are not going to be popular,

17    because people don't want to change, you know, or

18    people are afraid of change, suspicious of change,

19    and once it occurs, and it is a good product, then

20    folks, you know, yes, I was with them, but yeah,

21    but she was up beating us up.

22        But we need to have all of the things that

23    could possibly be coming at us, all of those

24    avenues, no matter how they are labeled, you know.

25        MS. DUNCOMBE:  Madam chair, may I offer a

Page 41

1    consensus; and, like you say, the council

2    previously helped cause a lot of the problems of

3    that era.  It is perceived now that we are in

4    disagreement, okay.  Let us take this opportunity

5    to send one message.  Whatever goes on in our home

6    is in our home, but when we step out the door, we

7    have to step out together.

8        Let me offer this consensus, that we put as

9    much money behind this case as we have to.  We

10    have spent money on other things that we have

11    disagreed together on and selected, but we need to

12    make one solid statement.  Whatever our

13    disagreements are, we are not going to allow you

14    to take our disagreements with each other and beat

15    us up with it.  Okay.

16        So, I would like to offer up a consensus that

17    we spend whatever.  If you need a private

18    investigator, whatever you need.  If you need

19    somebody to shadow every name that's on this

20    document, I ask for a consensus that we spend

21    those dollars and get it done, so we send one

22    message.  This is our house, and we are going to

23    stay, and there ain't none of them going to run us

24    away.

25        MR. STEPHENS:  And this is -- this is just a

Page 42

1    small part of the fight, you all are right, that

2    they are trying to attack you on both sides with

3    two different things, but really they are trying

4    to fight the same thing; and, that is, they are

5    trying to stop this development, and that's the

6    bottom line.

7         They are saying Sunshine violation, but this

8    has absolutely nothing to do with that.  What it

9    really has to do with is they are saying this is

10   one mechanism to try to void the contract to make

11   the other bill binding on you.

12        MS. ILES:  Okay.  Let's try to get this one

13   to some kind of end, because we have got a second

14   one we need to --

15        MS. RYAN:  Which should be brief, because of

16   this one, the discussion.

17        MS. ILES:  Do we have a consensus of what

18   Ms. Wade is saying?  I guess it is not on so --

19        MR. JACKSON:  I think what Ms. Wade says is

20   right.  We do have to beat this thing, and

21   whatever it takes, I think we should do it.

22        MS. RYAN:  Okay.

23        MS. DUNCOMBE:  Okay.  The only thing I have

24   to say is that the only way you can have a

25   consensus and really show that you have it,

Page 43

```
 1        council can't be in court fighting on enough.  We

 2        need to settle that situation and get it out of

 3        the way.  I don't care what you feel.  That's the

 4        only way you can show that we have a -- and,

 5        listen, one thing you don't ever have to worry

 6        about me in terms of whatever happens in terms of

 7        what decisions we make.  I am not going to ever go

 8        out there and knock anybody.

 9             I am from a family of 13, and we never

10        agreed.  We didn't deal with sister-in-laws,

11        brother's in-laws, nieces and nephews.  Whatever

12        we said, that was it, and we had lot of

13        disagreement, and that was reasonable.  So I, you

14        know, that's the only thing I have to say.  You

15        are going to have to settle with what you have

16        going on with yourself.  You have got to settle

17        that.

18             MS. WADE:  When you say what we have going

19        with ourselves, are you referring to the case with

20        the mayor?

21             MS. DUNCOMBE:  Yes.

22             MS. WADE:  I am not going to discuss that

23        matter.  May I finish my statement?  I am not mad,

24        but what I am saying though, my recommendation,

25        Ms. Duncombe, is that the City Attorney talk to
```

Page 44

1    you and give you the real info on that case, so

2    that you will have a real complete understanding

3    from the real legal point of it.

4        I am not going to discuss it here or debate

5    it with you, but -- and I agree with what you are

6    saying.  Looking at it from the outside looking

7    in, it looks bad.

8        So now that you are on the inside, I would

9    highly advise you to please talk to the city

10   attorney.  The case has ended, unless the mayor

11   thinks it is not.  There is a decision on the

12   case.  So you need to talk to the city attorney so

13   that you will have a better understanding.

14       MR. STEPHENS:  So we won't have a Sunshine

15   violation while we are here, I think you will have

16   to be careful.

17       MS. RYAN:  Don't say anything else, please.

18       MS. ILES:  Okay.

19       MR. STEPHENS:  It is part of the strategy, I

20   understand.

21       MS. ILES:  We have a consensus to move

22   forward on this particular lawsuit and to do

23   whatever we deem necessary, that means collecting

24   information about what is going on so we can be

25   better prepared.

Page 45

1          MR. STEPHENS:  Absolutely.

2          MS. ILES:  And then to try to formulate our

3     strategies.

4          MR. STEPHENS:  Right.

5          MS. ILES:  Even if we have to go to court, if

6     it is not dismissed.  Okay.  So do I have --